# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **MACCO PROPERTIES, INC.,** | ) | **Case No. 10-16682-R** |
| | ) | **Chapter 7** |
| | ) | |
| **NV BROOKS APARTMENTS, LLC,** | ) | **Case No. 10-16503-R** |
| | ) | **Chapter 7** |
| Debtors. | ) | **(Jointly Administered)** |

## TABLE OF CONTENTS

I.  **JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-

II.  **FINDINGS OF FACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-
    A.  Background Leading to the Appointment of Trustee . . . . . . . . . . . . . . .  -4-
    B.  Initial Trustee Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -11-
    C.  Challenge to the Legitimacy of Trustee . . . . . . . . . . . . . . . . . . . . . . . .  -14-
        1.  Findings Supporting Denial of Motion to Dismiss . . . . . . . . . . .  -19-
        2.  Finding of No Agreement to Limit Trustee's Powers . . . . . . . . .  -20-
        3.  Finding Cause to Appoint Trustee . . . . . . . . . . . . . . . . . . . . . . .  -20-
        4.  Findings Supporting Denial of Motion to
            Terminate Trustee and Reinstate Prior Management . . . . . . . . .  -21-
    D.  The Global Agreement Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -24-
    E.  Trustee's Sales of SPEs and Real Property . . . . . . . . . . . . . . . . . . . . .  -30-
    F.  Abandonment of Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -40-
    G.  Trustee's Operation of Properties and Entities . . . . . . . . . . . . . . . . . .  -42-
    H.  Price's Proposed Plan and Disclosure Statement . . . . . . . . . . . . . . . . .  -55-
    I.  Renewed Attempt to Disband the Committee . . . . . . . . . . . . . . . . . . . .  -62-
    J.  Adversary Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -65-
        1.  Pending Adversaries Seeking Recoveries from
            Price and McGinnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -65-
        2.  Adversary Seeking Subordination of Claims . . . . . . . . . . . . . . .  -66-
        3.  First Specialty Insurance Corporation litigation . . . . . . . . . . . . .  -67-
    K.  The UST's Motion to Convert vs. Price's Motion to Dismiss . . . . . . . .  -69-
    L.  The Conversion Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -72-
    M.  Contested Chapter 11 Issues After Conversion . . . . . . . . . . . . . . . . . .  -74-
        1.  Objections to Fee Applications and Affirmative Claims . . . . . .  -75-
        2.  District Court Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -77-

3.      Fee Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -80-

N.     Trustee's First Application for Interim Compensation . . . . . . . . . . . . -80-

**III.    CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -86-

A.     Application of Chapter 11 Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . -86-

1.      Section 326 Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . -91-

2.      The Adjusted Lodestar Test . . . . . . . . . . . . . . . . . . . . . . . . -97-

a.     Time spent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -97-

b.     Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -98-

c.     Services were necessary to the administration of the case, or beneficial at the time at which the service was rendered toward the completion of the case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -99-

d.     Amount of time spent was commensurate with the complexity, importance, and nature of the problem, issue, or task addressed . . . . . . . . . . . . . . . . . . . . . . -103-

e.     Professional person is board certified or otherwise demonstrated skill and experience in the bankruptcy field . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -104-

f.     Compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than bankruptcy cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -106-

3.      <u>Johnson</u> Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -107-

a.     The time and labor required . . . . . . . . . . . . . . . . . . . . -107-

b.     The novelty and difficulty of the issues . . . . . . . . . . . . -108-

c.     The skill required to properly perform the services . . . -108-

d.     The preclusion of other employment due to accepting the case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -108-

e.     The customary fee and whether the fee is fixed or contingent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -109-

f.     Time limitations imposed by the client or the circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -110-

g.     The amount involved and the results obtained . . . . . . . -110-

h.     The experience, reputation, and ability of the professionals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -111-

i.     The "undesirability" of the case . . . . . . . . . . . . . . . . . -111-

j.     The nature and length of the professional relationship with the client . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -117-

k.     Awards in similar cases . . . . . . . . . . . . . . . . . . . . . . . -117-

B.     Application of MED PLLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -119-

1.      Time spent and whether it was reasonable in light of

the complexity, importance, and nature of the problem, issue,
or task addressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -123-

2. Rates charged and whether rates are consistent with those
charged by comparably skilled professionals in non-bankruptcy
cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -123-

3. Skill and experience in the bankruptcy field . . . . . . . . . . . . . . -124-

4. Whether services were necessary to the administration of,
or beneficial at the time at which the service was rendered
toward the completion of, the case . . . . . . . . . . . . . . . . . . . . . -124-

C. Application of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -125-

1. Objection to Form and Content of Fee Applications . . . . . . . . -127-

2. Standards for Review of Counsel's Fee Applications . . . . . . . . -129-

3. Section 330(a)(4) Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . -131-

4. Section 330(a)(3) Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . -137-

    a. Time spent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -137-

    b. Rates charged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -140-

    c. Whether the services were necessary to the administration
of, or beneficial at the time at which the service was
rendered toward the completion of, a case under this
title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -141-

    d. Whether the services were performed within a
reasonable amount of time commensurate with the
complexity, importance, and nature of the problem,
issue, or task addressed . . . . . . . . . . . . . . . . . . . . . . . . -141-

    e. Whether the person is board certified or otherwise
has demonstrated skill and experience in the bankruptcy
field . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -142-

    f. Whether the compensation is reasonable based on the
customary compensation charged by comparably
skilled practitioners in cases other than cases
under this title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -142-

5. Johnson Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -144-

    a. The novelty and difficulty of the questions . . . . . . . . . . -144-

    b. The preclusion of other employment by the attorney
due to acceptance of the case . . . . . . . . . . . . . . . . . . . . . -145-

    c. Whether the fee is fixed or contingent . . . . . . . . . . . . . . -145-

    d. Time limitations imposed by the client or the
circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -146-

    e. The amount involved and the results obtained . . . . . . . -146-

    f. The "undesirability" of the case . . . . . . . . . . . . . . . . . . -147-

    g. The nature and length of the professional relationship
with the client . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -148-

        h.    Awards in similar cases . . . . . . . . . . . . . . . . . . . . . . . . . -148-

D.    Effect of the <u>ASARCO</u> Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . -149-

E.    Price's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -154-

      1.    Claims against Trustee and MED PLLC . . . . . . . . . . . . . . . . -155-

           a.    Breach of fiduciary and statutory duties . . . . . . . . . . . . -156-

           b.    Mismanagement and/or gross negligence . . . . . . . . . . . -164-

      2.    Claims against Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . -167-

F.    Relief is Precluded by the Equitable Doctrine of "Unclean Hands" . . -169-

**IV.   SUMMARY AND CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -175-

# MEMORANDUM OPINION

The following three contested matters are before the Court for decision after a full trial on the merits conducted on November 3, 2014 through November 7, 2014; January 20, 2015 through January 22, 2015; and January 26, 2015 through January 27, 2015 (the "Fee Hearings"):[1]

> Application of Counsel for Chapter 11 Trustee for Allowance of Final Compensation and Reimbursement of Expenses (Doc. 1935) filed by Bellingham & Loyd, P.C. on January 8, 2014, as supplemented on April 10, 2014 (Doc. 2026) and October 22, 2014 (Doc. 2177) (collectively "Counsel's Final Application"); and the Objection of Jennifer Price to Application of Counsel for Chapter 11 Trustee for Allowance of Final Compensation and Reimbursement of Expenses (Doc. 1963) filed on January 29, 2014, as supplemented on October 30, 2014 (Docs. 2181 and 2184).[2]

> Application for Approval of Final Fees for Chapter 11 Trustee (Doc. 1967) filed by Michael E. Deeba on January 31, 2014, as supplemented on April 11, 2014 (Doc. 2029), on December 1, 2014 (Doc. 2270), and on January 25, 2015 (Doc. 2342, as amended in Doc. 2352)[3] (collectively "Trustee's Final Application"); and the Objection of Jennifer Price to Application for Approval of Final Fees for Chapter 11 Trustee (Doc. 1991) filed on February 20, 2014, as supplemented on January 7, 2015 (Doc. 2315).[4]

---

[1]A fourth matter, the Amended Motion for Allowance of Fees and Expenses by Attorneys for [Chapter 7] Trustee (Doc. 2175), and the objection thereto by Jennifer Price and Lew McGinnis (Doc. 2180) is also before the Court, but will be addressed in a separate order. Unless otherwise stated, "Doc. __" refers to the docket number of documents filed in Case No. 10-16682.

[2]In the supplemental objections, Jennifer Price is joined by her husband Lew McGinnis. McGinnis asserts standing to object to fee applications as an unsecured creditor of the estate. McGinnis purchased the claim on which he bases his standing *after* the fee applications were filed.

[3]Price and McGinnis filed a motion to strike the January 25, 2015 supplement. An Order Denying Motion to Strike Supplement is entered contemporaneously herewith.

[4]Again, McGinnis joined the supplemental objection.

Application for Allowance of Final Compensation and Reimbursement of Expenses of Financial Consultant and Accountant for Chapter 11 Trustee (Doc. 1956) filed by Michael E. Deeba, PLLC ("MED PLLC") on January 27, 2014, as supplemented on April 11, 2014 (Doc. 2028) (collectively, "MED PLLC Final Application"); and the Objection of Jennifer Price to Application of Compensation and Reimbursement of Expenses of Financial Consultant and Accountant for Chapter 11 Trustee (Doc. 1983) filed on February 17, 2014.

Michael E. Deeba was appointed Chapter 11 Trustee ("Trustee") in the Macco Properties, Inc. ("MACCO") case on May 31, 2011. Janice Loyd and James Bellingham, and the firm of Bellingham & Loyd, P.C., served as counsel for Trustee ("Counsel"). Trustee's firm, MED PLLC, was retained as Trustee's accountant and financial advisor.

Counsel requests approval and payment of final compensation in the amount of $200,803.63, and final approval of five interim fee and expense awards in the total amount of $723,169.18. Jennifer Price ("Price") and Lew McGinnis ("McGinnis") object to allowance of Counsel's fees on various grounds. Price also asserts setoff claims against Counsel for alleged breach of fiduciary duty, mismanagement, gross mismanagement, and gross negligence.[5]

Trustee requests allowance and payment of final compensation in the amount of $748,295.27, and final approval of three interim compensation awards in the total amount

---

[5]In her objection, Price, as sole equity owner of MACCO, asserted affirmative claims for relief against Counsel for breach of fiduciary duty, misrepresentation, negligence, legal malpractice, gross negligence, mismanagement, gross mismanagement, slander, libel, and misuse of funds and estate property. Objection (Doc. 1963) at 19-20. At the hearing held on November 5, 2014, however, Price's counsel clarified that the "affirmative claims" were being asserted "in the defensive posture only as offsets against the fees being sought, not to recover damage over and above the amount of fees being sought." Transcript ("Tr.") 11/5/14 at 384. She also limited the defensive claims she would be pursuing at trial to breach of fiduciary duty, mismanagement, gross mismanagement and gross negligence, and waived jury trial on those claims. Id. at 385-98.

of $739,522.36. Price and McGinnis object to compensating Trustee on various grounds. Price also claims damages from alleged breaches of fiduciary duty, gross negligence, and willful misconduct on the part of Trustee, and seeks to offset her damage claim against any compensation awarded to Trustee.[6]

The MED PLLC Final Application requests payment of $20,327.97 and final approval of three interim awards totaling $308,047.20. Price and McGinnis assert the same objections and defensive claims against MED PLLC as they lodge against Trustee.

Upon consideration of the entire record, the evidence presented and admitted at the Fee Hearings, the briefs and closing arguments of counsel, and the applicable law, the Court finds and concludes as follows:

## I.    JURISDICTION

This is a core proceeding as described by 28 U.S.C. § 157(b)(2)(A), (b)(2)(B), and (b)(2)(O). The Court has jurisdiction of this proceeding by virtue of 28 U.S.C. §§ 157, 1334, and Local Civil Rule 81.4(a) of the United States District Court for the Western District of Oklahoma.

## II.    FINDINGS OF FACT

The MACCO Chapter 11 case, filed in 2010, was originally assigned to Bankruptcy Judge Niles Jackson. In November 2014, Judge Jackson recused himself from hearing these fee applications, and the matters were assigned to the undersigned judge. The Court has reviewed in detail all pleadings in this case and in the Chapter 11 cases of affiliated entities,

---

[6]Although Price asserted a panoply of torts against Trustee in her objection to his application, in closing arguments she argues only breach of fiduciary duty, gross negligence and willful misconduct.

and pleadings in related adversary proceedings, as well as all transcripts, exhibits and other matters of record, in order to fully understand the course of the proceedings over the past four years. From this record, as well as the testimony and exhibits admitted at the Fee Hearings, it is apparent that the magnitude of the fee requests are directly related to the level of disruption and obstruction to the orderly administration of the estate perpetrated by the very parties who are objecting to the allowance of the fees. Allowance and payment of fair compensation to Trustee and his professionals for their service in this most difficult case will likely result in little or no final distribution to Price, as equity holder, or McGinnis, as an unsecured creditor – a result Price blames on Trustee's alleged mismanagement. But the record demonstrates that every aspect of the administration of the estate was presented to and blessed by the Court and creditors, and the fact that fees may consume any remaining equity is attributable to Price's and McGinnis's own conduct. Their loss was self-inflicted and avoidable. To provide context for evaluating the necessity and reasonableness of the services provided by Trustee and his professionals, a full recapitulation of the history of this case is required.

A.    **Background Leading to the Appointment of Trustee**[7]

On November 2, 2010, McGinnis, as president, filed a voluntary petition on behalf of MACCO seeking relief under Chapter 11 of the Bankruptcy Code, and assumed the

---

[7]The findings in this section summarize, in part, the more detailed findings made by Judge Jackson in the Order Denying Motion of Jennifer Price for Dismissal of Chapter 11 Case and Other Related Relief and Order Denying Plaintiff's Emergency Motion for Preliminary Injunction Against Defendant Michael E. Deeba, Trustee (the "52-Page Order"), which was entered after a five-day evidentiary hearing held in July 2011. Trustee Exhibit ("TRX") 38.

responsibility of performing the fiduciary duties of a debtor in possession. MACCO was a property acquisition and management company that was the sole or controlling member and/or manager of approximately thirty limited liability companies that MACCO created as "single-purpose entities" at the request of lenders (the "SPEs"), each of which owned a multi-family apartment complex or commercial real estate (*i.e.*, income-producing properties).[8] MACCO also owned a real estate portfolio in its own name, which consisted of several single-family residences and vacant land in Oklahoma, Kansas and Texas (*i.e.*, non-income producing properties). Price owns 100% of MACCO's stock and also participated in management of MACCO. MACCO owned 100% of the interests in most of the SPEs and a 99% interest in the remaining SPEs, with the other one percent held by a corporation wholly owned by McGinnis. As a result, Price and McGinnis controlled all the SPEs and real property owned by MACCO. Prepetition and during the first seven months of the Chapter 11 case, McGinnis and Price personally, or through employees of McGinnis's wholly-owned personnel leasing company, managed and operated all the properties held by MACCO and its subsidiary SPEs. No third parties served as officers, directors or managers of MACCO or the SPEs.

Historically, MACCO and its subsidiary SPEs acquired properties that were described by appraiser James Hoyt, MAI, as class D properties. McGinnis and Price would rehabilitate

---

[8]McGinnis also caused certain of MACCO's subsidiaries to voluntarily file for Chapter 11 relief in this District. Those entities were Twin Lakes Apartments, LLC, Case No. 10-13881; NV Brooks Apartments, LLC, Case No. 10-16503; MA Cedar Lake Apartments, LLC, Case No. 10-16563; JU Villa Del Mar Apartments, LLC, Case No. 10-16842; SEP Riverpark Plaza, LLC, Case No. 10-16832; and Holbrook Shopping Center, LLC, Case No. 11-11235.

-5-

them, raising their status to class C or C+ properties (and in some cases, class B properties),[9] manage them for a period, and then sell them for a profit.[10]

The SPEs executed notes and mortgages against the apartment complexes or commercial buildings. Each property was encumbered by a mortgage in favor of at least one lending institution. Most were also burdened with ad valorem tax liens. On the petition date, the notes were at least technically in default due to the non-payment of taxes and other breaches of the loan agreements, and several properties were facing foreclosure. MACCO had guaranteed repayment of the notes secured by the SPEs' real property. As of the petition date, MACCO's guarantee liability exceeded $60 million.[11]

The non-operating properties were owned directly by MACCO and were also encumbered by mortgage notes totaling at least $11 million, plus unpaid taxes and condo fees, and again, some were on the brink of foreclosure or sheriff's sale.[12] Price and/or McGinnis personally guaranteed payment of all debt owed by MACCO and the SPEs.

---

[9]Hoyt, Tr. 1/22/15 at 719. Mr. Hoyt explained that "[i]n the apartment business we can classify them as A, B, and C" with A being high quality and C being low. Id. A class D property "would be one that has . . . either plywooded windows and that type of thing, or had been in such disarray that it was not occupied or poorly occupied or something." Id. "Mr. McGinnis would [use] his talent and bring it back to a higher and better occupancy." Id.

[10]Hoyt, Tr. 7/25/11 (TRX-218) at 199-200. Mr. Hoyt observed that McGinnis had particular expertise in "buying troubled real estate, properties, and a lot of apartments" and "rehabilitat[ing] those . . . properties that were in deep problems that nobody else could deal with and bring them back online economically, and later sell those properties at a . . . tremendous profit." Id.

[11]TRX-2 at 32.

[12]TRX-2 at 17.

Although the $60 million in guarantees represented the majority of MACCO's unsecured debt, MACCO also identified vendors, service providers, and utilities as unsecured creditors. In addition, as of the petition date, several contract and/or tort claims against MACCO were in various stages of litigation, and thus constituted disputed and unliquidated unsecured claims.

On February 17, 2011, the United States Trustee (for convenience, counsel and staff serving the Office of the United States Trustee in the Western District of Oklahoma will be referred to herein as "UST") appointed a committee of unsecured creditors (the "Committee"). In their preliminary investigations, the UST and the Committee discovered that (1) the schedules filed by McGinnis were inaccurate and incomplete; (2) monthly operating reports filed by McGinnis were inaccurate and incomplete; (3) McGinnis withheld financial information, books and records, tax returns, and other documentation to which the UST, the Committee, and parties in interest were entitled; (4) McGinnis had commingled funds of MACCO and its subsidiaries (some of which were themselves debtors in possession) and used funds of one SPE (that is, cash collateral of that entity's lender) to pay operating expenses and secured debts of other SPEs; and (5) McGinnis had secretly settled, without Court authority, a fraud judgment entered against MACCO and some of its indirect subsidiaries that arose from the sale by MACCO and/or the subsidiaries of certain apartment complexes.[13] No notice of the proposed settlement was given to creditors, nor was Court approval sought as required.

---

[13]The settlement also disposed of a pending action against McGinnis personally.

The record indicates that prior to the settlement, the plaintiffs in that lawsuit – purchasers of the apartment complexes–had filed a proof of claim against the MACCO estate in the amount of the judgment, *i.e.*, $382,699.00. These plaintiffs still owed the selling SPEs approximately $1.8 million pursuant to a note and mortgage. In settling the $382,699.00 claim, McGinnis discounted the note to $1.375 million. The plaintiffs paid the discounted amount to McGinnis, and McGinnis caused the note to be canceled and the mortgage to be released. Although McGinnis and Price contended that MACCO had no interest in the note or the settlement proceeds, they refused to provide documentation to that effect. The UST and the Committee took the position that MACCO had an interest in some or all of the $1.375 million settlement proceeds.

Consequently, the Committee commenced an adversary proceeding[14] through which it obtained a temporary restraining order freezing the settlement proceeds and requiring McGinnis to produce documents relating to the lawsuit and settlement. Immediately prior to the restraining order hearing – of which McGinnis had notice–McGinnis distributed the proceeds (1) to several SPEs, (2) to a litigant in Utah to settle a claim against himself, and (3) to professionals whose employment and fees had not been approved by the Court. The Court ordered McGinnis to recover those transfers, and enjoined the transfer or expenditure of any of the proceeds pending a determination of ownership, or until further order of the Court. McGinnis appealed the Court's order enjoining use of the funds and continued to withhold documents he was ordered to produce to the Committee.

---

[14]<u>Official Unsecured Creditors Committee v. Macco Properties, Inc.</u>, Adv. No. 11-1053 (Bankr. W.D. Okla.).

-8-

The Committee's scrutiny of McGinnis's conduct as a fiduciary led McGinnis to attempt to disband the Committee by paying off the debts of its three members.[15] Nonetheless, the Committee continued to seek vital information by virtue of Rule 2004 examinations and depositions of Price and McGinnis, and additional document requests, which were met with sustained opposition.

On May 6, 2011, the UST filed a motion for appointment of a Chapter 11 trustee, citing as grounds: (1) McGinnis's unauthorized postpetition transfers of MACCO assets to insiders, including Price and himself, their wholly-owned companies, and the SPEs; (2) unauthorized banking and cash management practices, including the continued use of prepetition accounts; (3) chronic negative cash flow and bounced checks, including checks for UST fees; (4) the failure to timely file a plan and disclosure statement; (5) the failure to file required tax returns; (6) non-disclosure of prepetition transfers to insiders; (7)

---

[15]On May 5, 2011, the claim of one Committee member, Woodard Hernandez Roth & Day, LLC, in the amount of $25,076.47 was allegedly purchased by an associate of McGinnis, Richard Ledbetter, and Mr. Ledbetter sought to join the Committee. Doc. 439. Later, the Committee discovered evidence that McGinnis engineered the purchase of the claim using funds from MACCO's bank account and using Mr. Ledbetter as his straw man. The Committee filed an adversary proceeding against McGinnis, Price, Ledbetter, and First Enterprise Bank alleging, among other things, a conspiracy among the defendants to defraud the estate and intimidate the Committee, and seeking as relief the subordination of all defendants' claims. Official Unsecured Creditors Committee v. McGinnis, Price, Ledbetter, and First Enterprise Bank, Adv. No. 13-1013 (Bankr. W.D. Okla.). When defendants ultimately subordinated or withdrew and released their claims against the MACCO estate, the adversary proceeding was dismissed.

unauthorized payments to professionals; and (8) the unauthorized settlement of the judgment against MACCO.[16]  The Committee joined the motion.[17]

Price and McGinnis moved to dismiss the Chapter 11 case, claiming that the crisis that led to its filing had been resolved, and that the Committee was unjustly interfering in McGinnis's ordinary course of operating MACCO and its subsidiaries.[18]  Price and McGinnis also again  attempted to dissolve the Committee by seeking an order to allow them to pay off selected unsecured claims from their own personal funds.[19]  At that point, some of the lenders supported McGinnis's dismissal motion because dismissal would have resulted in the release of the settlement funds that McGinnis had planned to use to pay the debts secured by non-income producing properties or underperforming SPEs.[20]

At the hearing on the UST's motion to appoint a Chapter 11 trustee, Price and McGinnis consented to the appointment of Michael E. Deeba as Chapter 11 Trustee.[21]  One factor that motivated Price and McGinnis to agree to the appointment was the Committee's agreement to "stand down"–  that is, cease its investigation into the assets, liabilities, and

---

[16]TRX-5.

[17]TRX-6.

[18]TRX-9.

[19]TRX-8.

[20]See, e.g., TRX-9.  Bart Boren, counsel for three secured creditors, testified that although his clients initially supported dismissal of the case, they changed their minds and endorsed the UST's motion for appointment of a trustee after learning that McGinnis had allowed ad valorem tax liens to prime their mortgages.  Boren, Tr. 1/26/15 at 990-91.

[21]As more fully described below, Price and McGinnis later disputed the extent of their consent.

operations of MACCO. On May 31, 2011, the Court entered an Agreed Order Directing the Appointment of a Trustee and the Order Approving Appointment of Chapter 11 Trustee.[22] Soon thereafter, Trustee obtained authority to employ Janice Loyd and James Bellingham and the firm Bellingham & Loyd, P.C. as counsel, and MED PLLC as financial advisor and accountant.[23] An order granting the application to employ Christopher Stein, of counsel to Bellingham & Loyd, P.C., was entered on July 28, 2011.

### B.    Initial Trustee Period

In the first weeks after his appointment, Trustee engaged in crisis management.[24] MACCO managed and/or operated 41 properties or entities,[25] and in his initial investigation, Trustee discovered financial chaos and a complete dereliction of duties imposed upon debtors in possession during the seven months McGinnis served as MACCO's responsible person. Trustee's Initial Report[26] revealed:

- Post-petition payables for all entities exceeded $1 million and were delinquent by as much as five months.[27]
- Utility vendors refused to extend credit, and demanded cash or cashier checks, because checks had been returned for insufficient funds.
- Utility payments at the apartment complexes were two to six months behind–McGinnis deferred payments until cut-off notices were issued.

---

[22]TRX-10 and TRX-11.

[23]TRX-13 and TRX-15.

[24]Trustee's Initial Report dated August 19, 2011, TRX-37, describes in detail what transpired during this period. See also Transcript of hearing held on Trustee's first interim application for compensation held on July 18, 2012, TRX-172.

[25]MACCO was the controlling member/manager of the SPEs.

[26]TRX-37.

[27]Deeba, Tr. 1/26/15 at 1032-37; TRX-24.

- McGinnis implemented check kiting to conceal insufficiencies, to inflate account balances on the monthly operating reports, and to give the appearance of deposits in the tax and security deposit accounts.
- Most secured debts were in arrears.
- Property taxes were up to five years in arrears, accumulating fees and interest at penalty rates, and subjecting properties to the risk of tax liens and foreclosures; the total ad valorem tax arrearage exceeded $3 million.
- Post-petition tax reserve accounts were underfunded.
- Property and liability insurance companies had sent cancellation notices for post-petition non-payment of premiums; the premium finance company required certified funds because checks had been returned unpaid.
- Some of the single family properties were not insured, or insurance was force-placed by the lender.
- Some insurance policies designated McGinnis and/or Price as the insured, although MACCO owned the property and paid for the policy.
- Unpaid post-petition home owner association dues exceeded $75,000.00.
- Payroll estimates for workers compensation insurance for Oklahoma employees were grossly underreported, and employees in Kansas were not even covered by workers compensation insurance.
- Immediately prior to the appointment of Trustee, McGinnis had transferred payroll responsibilities from his own employee leasing company to a new company (which was ostensibly owned and managed by Richard Ledbetter, an associate of McGinnis) and payroll checks had been returned due to insufficient funds.
- McGinnis had routinely misappropriated one lender's cash collateral to pay installments to other lenders.
- No pre-petition tenant security deposit accounts were found and post-petition security deposit accounts were underfunded in the amount of $313,389.00; McGinnis had commingled security deposits with funds in general operating accounts.
- Tenant security deposit refunds were at least four months in arrears; McGinnis routinely wrote refund checks to tenants but held them for several months before mailing them. Trustee discovered unmailed checks dating as far back as December 2010.
- Essential books and records were missing, including management agreements, notes, mortgages, and insurance policies.
- None of the bank balances could be reconciled, ledgers were unreliable, and no controls were in place.
- McGinnis used prepetition accounts post-petition; some accounts were held by institutions that were not UST-approved as meeting the requirements of Section 345 of the Bankruptcy Code.
- Monthly operating reports were inaccurate.
- Post-petition transfers between MACCO and the SPEs constituted unauthorized post-petition borrowing and lending.

-12-

Although Trustee made efforts to work with Price and McGinnis, they were uncooperative and actively interfered in Trustee's performance of his duties, to-wit:

- They pressured Trustee on a daily basis, in person and in writing, to move funds between entities without receiving equivalent value, and to use cash collateral generated by operating entities to pay lenders whose claims were secured by under-performing or non-income producing properties. McGinnis's demands upon Trustee escalated to threats to "take you down" and "make sure you get hurt" unless Trustee agreed to turn cash management over to him.[28]
- Their lawyers advised Trustee on a daily basis that Trustee lacked authority to do anything but examine claims. These lawyers also continued to file pleadings on behalf of MACCO.[29]
- They withheld essential books and records, mail, and notices from Trustee, including utility cut-off notices.
- Trustee could not file a monthly operating report for June 2011 because he was not in control of the estate at the time and he had no confidence in the data provided to him by Price and McGinnis, and had difficulty obtaining credible information to file later operating reports.[30]

On June 16, 2011, Trustee sought authority to spend up to $300,000.00 of the impounded settlement proceeds to avoid immediate harm to the estate's assets, employees, and tenants. Insurance policies and utility services were about to be terminated, and no funds were available to pay employees to protect and maintain the properties. McGinnis agreed that the funds could be used, but argued that Trustee should also be required to pay other bills, installments, and claims selected by McGinnis (including a prepetition, unsecured claim in the amount of $300,000.00). Trustee was, of course, prohibited from preferentially paying

---

[28]Tr. 7/18/12 (TRX-172) at 64. The day after McGinnis issued the threats, Price filed a lawsuit against Trustee.

[29]Id. at 62-63.

[30]Deeba, Tr. 1/20/15 at 198.

$300,000.00 to a prepetition unsecured claimant.[31]  Trustee's motion to use the settlement proceeds was granted, and Trustee meticulously accounted for the use of such proceeds in a report filed on September 1, 2011.[32]

While attending to the initial financial turbulence, Trustee was also faced with the task of evaluating the physical properties, assessing the state of the rent rolls and collections, and obtaining competent assistance in operating a dozen multi-family apartment complexes in Oklahoma and Kansas.  Trustee's initial evaluation revealed:

• discrepancies between McGinnis's rent rolls and actual occupancy and collections;
• serious long term deferred maintenance;
• non-compliance with health and safety codes;
• a shortage of qualified employees; and
• suppliers and vendors delivering goods and services on a cash-only basis.

### C.    Challenge to the Legitimacy of Trustee

Approximately one month after Trustee was appointed, Price, in her capacity as sole shareholder of MACCO, began a multi-faceted assault on Trustee's legitimacy, integrity, and management.  On July 6, 2011, Price filed:

---

[31]Prior to the appointment of Trustee, McGinnis negotiated a settlement with the creditor (another purchaser of an apartment complex who sued MACCO and McGinnis for fraud and mismanagement) in which MACCO and its subsidiary, SEP Cobblestone Apartments, LLC, agreed to a judgment against them in the amount of $400,000.00, which could be satisfied by a cash payment of $300,000.00 on or before June 20, 2011.  If that payment was not made, the $400,000.00 judgment would be filed, and if the judgment was not satisfied by July 19, 2011, a separate judgment would be entered against McGinnis and Price.  McGinnis wanted MACCO to prefer one unsecured creditor over all the others, and pay the judgment, to prevent the plaintiff from entering judgment against him and Price.

[32]TRX-34.

- An adversary complaint against Trustee seeking (1) to enjoin Trustee from managing MACCO and to restore management to Price and McGinnis, and (2) damages for alleged breaches of fiduciary duties.[33]

- A motion for a preliminary injunction and expedited hearing.

- An emergency motion requesting that the District Court withdraw the reference of the entire MACCO Chapter 11 case.[34]

- A motion to dismiss the case, and/or to terminate Trustee's appointment, and/or to increase the bond requirement to $50 million, and/or to compel Trustee to pay actual, necessary costs of operating MACCO and its affiliates in the manner previously employed by McGinnis.[35]

- A motion for an expedited hearing on the motion to dismiss.[36]

Each of these actions was predicated upon allegations that (1) Price and McGinnis's consent to the appointment of a trustee was based on their belief that the trustee's authority would be limited, by agreement with the UST, to simply identifying the pool of unsecured creditors, and that Trustee had exceeded that limited scope of authority; (2) there was no evidence of fraud, dishonesty, incompetence, or mismanagement to warrant the appointment of a trustee; and (3) in ignoring McGinnis's directives to commingle funds and pay certain bills and expenses, Trustee had committed gross mismanagement and diminished the value of the estate.

In her motion to dismiss the case, Price represented that MACCO's creditors supported dismissal of the case or the termination of Trustee and reinstatement of prior management,

---

[33]Price v. Deeba, Adv. No. 11-1099 (Bankr. W.D. Okla.).

[34]Doc. 242.

[35]Doc. 244.

[36]Doc. 245.

which was false.  Quail Creek Bank ("QCB"), Sooner State Bank, All America Bank ("AAB"), and FAA Credit Union ("FAA"), after gaining access to previously undisclosed information about McGinnis's treatment of their collateral, both prepetition and during the Chapter 11 case, objected to dismissal.[37] The Committee, representing the unsecured creditors, also objected to dismissal.

Five days after filing the adversary proceeding against Trustee and her motion to dismiss the case, Price moved for another emergency hearing to compel Trustee to cause MACCO to make "adequate protection payments" on fifteen loans owed by various SPEs in the total amount of $442,850.00[38] using funds of other entities.  Price's counsel explained: "What we are asking . . . is for the Trustee to operate Macco in the ordinary course of business, which was for Macco to draw from bank accounts of any of its LLCs where there were excess funds and to in turn pass those funds over to the LLC that was in need of funds. . . .  We're seeking merely operation in the ordinary course, which was disrupted when

---

[37]Claims of these four secured creditors totaled over $40 million.  FAA was MACCO's largest creditor, holding claims in excess of $20 million, secured by four MACCO properties (single family residences) and five SPE properties.  Testimony of FAA's counsel, Max Tuepker, Tr. 11/3/14 at 142.  All nine loans were in default, and there were at least five foreclosures pending on the petition date.  Id. at 143.  FAA vehemently opposed reinstatement of prior management, in part because McGinnis, prepetition and post-petition, never made a single ad valorem tax payment on properties securing FAA loans, did not segregate security deposits, and did not adequately insure the properties, all of which breached the loan agreements.  "[W]e were looking for anybody to be in control, other than the [prior] management that was in control."  Id. at 144.  Prior to MACCO's bankruptcy, FAA had already obtained a receiver over one of the apartment complexes managed by McGinnis.  Id. at 145.

[38]Docs. 257, 258.  No adequate protection orders had been requested or entered in the MACCO or its affiliates' cases.  In addition, MACCO was neither required nor allowed to pay debts secured by property of SPEs; MACCO's liability on such debt was unsecured.

-16-

[Trustee] was appointed.  We've had the defaults that are alleged, $6 million of default, plus another $300,000, and he has not performed in the ordinary course."[39]

Trustee was negotiating peace with these lenders on behalf of MACCO and its subsidiary SPEs, obtaining forbearance pending his investigation of condition, value, cash flow, and performance of each property, and was appropriately segregating their cash collateral in separate SPE accounts.[40]  Price and McGinnis, on the other hand, argued for payment of unsecured debt so they would not be called upon to honor their guarantees.  The Court rejected the argument that Trustee had an obligation to continue McGinnis's ordinary course of business, and pointed out the obvious – that McGinnis's disregard of the entities' separate assets and debts violated the Bankruptcy Code, and had prompted the UST and the Committee to seek the appointment of a trustee in the first place.

In the meantime, on July 16, 2011, Trustee obtained approval to retain two professional property management companies.  Price Edwards and Company ("Price Edwards") was retained to manage the Oklahoma properties, which included five apartment complexes (approximately 750 units), and four parcels of commercial real estate.  Receivership Services Corporation, an affiliate of The Martens Company ("RSC"), was employed to manage seven apartment complexes (1,952 units) in Wichita, Kansas.  Price moved to vacate the retention orders, contending that the retention of outside managers would result in a "complete

_____

[39]Tr. 7/11/11 (TRX-217) at 7.  As previously discussed, the subject notes were already in default long before Trustee was appointed.  In addition, "ordinary course" for this debtor included check kiting (id. at 57-58) and paying operating expenses with tenant security deposit trust funds.

[40]Loyd, id. at 10-20; Deeba, Tr. 1/26/15 at 1038-39.

-17-

dismantling of the Debtor's business."[41] She characterized the move as "a greedy money grab by the Trustee," and an attempt by Trustee to "illegally abscond the Debtor's highly profitable business from its rightful owner, Price, solely for the purpose of selfishly obtaining large, unnecessary administrative expenses."[42]

MACCO was not a "highly profitable business."  Five of its affiliates were in bankruptcy, several properties faced foreclosure, and property taxes and utility services were persistently delinquent.  Management was crisis-driven.  MACCO faced multiple lawsuits premised on McGinnis's alleged false or deceptive representations concerning the profitability of the properties.  Price's motion to vacate the order approving Price Edwards and RSC was opposed by creditors whose cash collateral had been misappropriated, and whose tangible collateral was at risk due to tax liens, code violations, lack of maintenance and repair, and dubious insurance coverage.  In light of the number, location, and condition of the properties requiring oversight and competent management, Trustee was well within his business judgment in retaining two well-regarded firms with expertise in operating troubled multi-family properties.  Professional management was imperative to any hope of reorganizing the profitable parts of MACCO's enterprise.

On July 22, 25, 27, 28, and 29, 2011, a full evidentiary hearing was held to consider Price's motion to dismiss the Chapter 11 case and/or to remove Trustee, as well as her motion for preliminary injunction.[43]  On September 7, 2011, the Court issued its 52-Page Order,

---

[41]Doc. 276 at 1.

[42]Doc. 276 at 2.

[43]Price's multiple efforts to displace Trustee diminished the estate tremendously.  Fees

concluding that (1) there was no agreement to limit the powers of Trustee or to allow Price and McGinnis to continue managing MACCO; (2) dismissal was not in the best interests of MACCO, its creditors, or the estate; (3) ample cause existed to appoint a trustee; and (4) no cause existed to remove Trustee.  Judge Jackson found that "Price and McGinnis should not be restored to management under any interpretation of the evidence."[44]  The order was not appealed and these findings are binding herein.[45]

### 1.    Findings Supporting Denial of Motion to Dismiss

Judge Jackson found that although Price and McGinnis voluntarily caused MACCO to seek protection under Chapter 11, "once in bankruptcy, they flagrantly failed to comply with the rules and guidelines for debtors-in-possession and now ask to invoke a 'Kings X' so they can operate without judicial supervision."[46]  Price and McGinnis's pre-petition and post-petition conduct deceived and harmed the interests of creditors.  Dismissal would have prevented all interested parties from further investigating the conduct of prior management and seeking redress as necessary, by recovering preferential or fraudulent transfers, for

---

charged against the estate included those incurred by Trustee, Counsel, the Committee's counsel, and attorneys representing QCB, FAA, Sooner State Bank, Frontier State Bank, and AAB, all of whom invested extensive time responding to the various motions, attending some or all of the five-day trial (the transcript of which exceeds 2,200 pages), and submitting proposed findings of fact and conclusions of law.

[44]52-Page Order at 51.

[45]"The doctrine of issue preclusion prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit."  In re Corey, 583 F.3d 1249, 1251 (10th Cir. 2009).

[46]52-Page Order at 38, ¶ 7.

instance.[47]  Indeed, according to testimony of  a representative of the largest creditor, if the case were dismissed, "revenues and cash would again be subjected to the whims of prior management which would probably result in the necessity of obtaining receivers and multiple state foreclosure proceedings in as many as four states, with no coordinated oversight."[48]

> 2.     Finding of No Agreement to Limit Trustee's Powers

Price and McGinnis argued that they conditioned their agreement to the appointment of a trustee upon (1) remaining in operational control of MACCO and (2) limiting the trustee's power to determining allowable unsecured claims, paying such creditors in full, and dismissing the case.  Judge Jackson found, however, that "the credible evidence . . . supports a finding that there was no agreement to limit the trustee's powers solely to the determination of unsecured claims."[49]  "[T]he record is clear that the trustee was to have unfettered statutory powers."[50]  Judge Jackson also concluded that while Trustee initially intended to enter into a management contract with Price and McGinnis, he quickly realized that McGinnis's management left MACCO's affairs in "chaos,"[51] and that Trustee's fiduciary obligations precluded allowing McGinnis to continue in that role.

> 3.     Finding Cause to Appoint Trustee

---

[47]Id. at 38-39, ¶¶ 8, 9, 11.

[48]Id. at 20, ¶ 24.

[49]Id. at 20, ¶ 17.

[50]Id. at 40.

[51]Id. at 21, ¶ 18.

Although he found that Price and McGinnis consented to the appointment of a trustee, Judge Jackson also determined that "[a]fter hearing the evidence adduced at this hearing . . . the Court is of the opinion the UST would have been able to establish the truth of *all its allegations* had an evidentiary hearing been conducted" on the UST's motion to appoint a trustee.[52]

4.      Findings Supporting Denial of Motion to Terminate Trustee and<br>Reinstate Prior Management

Judge Jackson was not persuaded that Price and McGinnis would operate MACCO within the parameters set by the Bankruptcy Code or comply with contractual obligations to creditors if they were reinstated as management of MACCO.[53]  In addition, he found no credible evidence to suggest any grounds to oust Trustee.  Even taken in the light most favorable to Price and McGinnis, the evidence did "not indicate neglect, incompetence, malfeasance, or other impropriety by Trustee sufficient to support the claim that Trustee should be removed."[54]  Judge Jackson observed that MACCO's creditors "will have a better chance of being paid whether by operation of the properties by Trustee or through the sale of properties as part of a plan of reorganization" and that "sale by Trustee will generate better prices because prospective buyers will have more reliable information on the performance of each property than could be obtained from prior management."[55]

---

[52]Id. at 39, ¶ 12 (emphasis added).

[53]Id. at 42-43

[54]Id. at 29, ¶ 21.

[55]Id. at 30, ¶ 24. Notably, MACCO had been sued by multiple purchasers of apartment complexes as a result of financial and operational information provided by McGinnis that

-21-

Thereafter, a hearing on Price's motion to withdraw the reference was held, and Judge Jackson recommended that the District Court decline to withdraw the reference of the Chapter 11 case.[56]  The District Court then concluded that because the bankruptcy court had already invested considerable time and resources managing the case, and Price had no jury trial right with respect to any relief she was seeking, the motion should be denied.[57]

Even after Trustee's appointment was vindicated by the 52-Page Order, Price and McGinnis continued to refuse Trustee unfettered access to electronically stored books and records of MACCO and its affiliates, forcing Counsel to file a turnover motion.[58]  Meanwhile, Trustee methodically and diligently took steps to protect the vast portfolio of operating and non-operating properties, and to mitigate losses.  In August and September 2011, Trustee accomplished the following:

- Obtained authority from the Court to employ brokers to assist in evaluating the properties and creating marketing plans.
- Obtained agreement of QCB to advance funds to pay in excess of $265,000.00 in delinquent ad valorem taxes, to restructure the loans, and for forbearance agreements, for which he sought and obtained Court approval.[59]
- Sought authority to sell the membership interest in Charter Office Park, LLC.[60]

---

was alleged to be false.

[56]Doc. 446.

[57]Doc. 468.

[58]Doc. 457.  Two weeks later, Trustee obtained the requested information and withdrew the motion.  Doc. 485.

[59]Doc. 475, 490.  See also Boren, Tr. 1/26/15 at 989-90, 994.  QCB paid the taxes to prevent foreclosure of one property and to prevent further accrual of interest (at 15%) from eroding its secured claim.  Id. at 994-95.

[60]TRX-43.

- Sought emergency authority to use an additional $300,000.00 of the settlement proceeds to make necessary capital improvements and repairs required by municipal code enforcement, to pay utilities, and to cover operating losses of certain of the SPEs, which was granted by the Court.[61]
- Obtained an order establishing November 30, 2011, as the bar date for filing proofs of claim.[62]
- Caught up on MACCO's monthly operating reports.
- Negotiated and obtained authority to restructure three mortgage loans totaling approximately $6.3 million owed to Frontier State Bank.[63]
- Began discussions with Price, who offered to purchase the entire portfolio of properties and SPEs from the estate.[64]

On September 19, 2011, Trustee filed his first application to compensate Counsel, who had invested in excess of 750 hours representing Trustee during the first three months of his tenure. The application was unopposed, and an order allowing Counsel fees of $178,926.50 and expenses of $8,957.83 was entered on October 24, 2011.[65]

Trustee also filed his first application for compensation, seeking an interim award of $179,753.75 for providing 659 hours of services through August 31, 2011,[66] to which Price

---

[61]Docs. 490, 533.

[62]TRX-142-43. Price contends that Trustee should have requested a bar date as soon as he was appointed so that he could have quickly determined the extent of unsecured claims and paid them. The Court finds that under the difficult circumstances immediately facing Trustee, he and Counsel were diligent in seeking a bar date. Because McGinnis amended MACCO's schedules several times, the latest in July 2011, setting an earlier bar date would have been premature.

[63]Docs. 523, 554.

[64]Trustee was actively seeking buyers, but first had to work with the property managers to clean up the books and records of the complexes in order to evaluate the value of the properties. Under McGinnis's management, the rent rolls were exaggerated, and income and expenses were not attributable to individual apartment complexes. Loyd, Tr. 11/3/14 at 227.

[65]Doc. 526.

[66]Doc. 516.

-23-

objected.[67]  Trustee withdrew his application and did not file another application until June 13, 2012, more than one year after he was appointed.

### D.    The Global Agreement Period

In late September 2011, Trustee and Counsel, and Price and her Michigan counsel, Mr. Lieberman, negotiated what the parties termed the "Global Agreement."  Price and an affiliated entity (who, for convenience, will collectively be referred to only as Price), agreed to purchase, for the sum of $5 million, MACCO's membership interests in thirty-three SPEs and all real and personal property owned by MACCO, subject to all claims, debts, mortgages and liens against the SPEs and the properties (including tax claims and liens) (the "Purchase Agreement").[68]  Key to Trustee's willingness to sell virtually all the estate's property was Price's promise to obtain and deliver written releases from every lender holding a secured or guarantee claim against MACCO.[69]  Paragraph 1.3(d) of the Purchase Agreement provided:

> Purchasers will deliver to Seller Waivers/Releases in a form acceptable to Seller by which the holders of mortgages, security interests and liens on

---

[67]Doc. 537. At that point, Trustee was seeking interim compensation on an hourly basis.

[68]The Purchase Agreement is attached as Exhibit 1 to Trustee's sale motion, TRX-41.

[69]In a conference call, Price's counsel, Mr. Lieberman, made the offer to pay $5 million to the estate and represented that "he would make sure that all the secured creditors were taken care of."  Loyd, Tr. 11/3/14 at 229.  Loyd and Trustee agreed to sell only if Price obtained *releases* of MACCO's liability to those creditors, by whatever means – *i.e.*, refinancing, paying in full, obtaining substitute guarantors, etc.  Loyd testified: "[W]e didn't care what [Mr. Lieberman's] deals were with the individual creditors.  All we cared about is that any unsecured deficiency personal guaranty liability of the bankruptcy estate would be released.  That would be the only way $5 million would have been justifiable to bring to this Court, because at the time we had over $60 million worth of potential exposure, and if we didn't get those releases, then $5 million wasn't really going to do a whole heck of a lot."  Id. at 229-30.

-24-

properties owned by the limited liability companies being sold release all claims, debts, and liabilities, including any deficiencies, which said mortgage holders have against the Seller, the Trustee and the Bankruptcy Estate in Seller's capacity as guarantor of liabilities of the limited liability companies. **If this condition cannot be met to the satisfaction of the Seller, then this agreement will be null and void and the earnest money will be released back to the Purchaser.**[70]

On October 3, 2011, Trustee filed a Section 363[71] motion seeking authority to sell the assets pursuant to the Purchase Agreement.[72]  The motion reiterated that "under the terms of the Purchase Agreement if secured creditors do not release the Trustee and the Bankruptcy Estate of any claim, the Purchase Agreement will be null and void and the earnest money will be returned to the Purchasers."[73]  With a closing anticipated on October 31, 2011, the Court set an expedited hearing date of October 27, 2011.[74]

The Section 363 sale motion and the Purchase Agreement drew objections from several creditors.  AAB indicated it had "no intention of releasing its claims against MACCO" unless it was paid in full, fearing that its collateral would again be at risk if it were returned to prior

---

[70]Purchase Agreement at ¶ 1.3(d) (emphasis added).

[71]All references to "Sections" in this opinion are to sections of the Bankruptcy Code, Title 11 of the United States Code, unless otherwise stated.

[72]TRX-41.

[73]Id. at 6. To effect a truly global settlement, mutual releases were also to be exchanged between Trustee and the Committee (and their agents, etc.) on one hand and Price (and her agents, etc.) on the other, disposing of all litigation and disputes among them.  The Purchase Agreement was later amended to include McGinnis as a party who would execute mutual releases.  Parties in interest insisted on these releases because of the persistent threats by Price and McGinnis to sue Trustee, the Committee, and their agents and professionals.

[74]Docs. 513, 514, 515.

management.[75]  AAB also objected to releasing Price and McGinnis from claims the estate had against them.[76]  FAA echoed AAB's concerns.[77]  NBC Bank urged the Court to deny the motion until Price and McGinnis complied with the terms of the releases proposed by the bank.[78]

The Purchase Agreement was approved after a hearing, and the closing date was extended to November 7, 2011.[79]  At  Price's request, the closing date was moved to November 9, 2011.  Thereafter, again at Price's request, Trustee agreed to delay the closing date until November 17, 2011, conditioned upon Price's deposit of additional earnest money. Instead, Price sought to delay the closing to December 12, 2011.  After an emergency hearing, the closing date was continued to November 17, 2011.  The Committee, skeptical that Price could ever perform under the Purchase Agreement and alarmed by the magnitude of administrative expenses accruing during the contract period, objected to any further delay and requested Trustee to begin selling the properties piecemeal.[80]  Secured lenders represented that

---

[75]Doc. 519 at 2.  Secured creditors were united and adamant in opposing any sale subject to their mortgage liens if such sales resulted in the management of their collateral by Price and McGinnis.

[76]Doc. 519.

[77]FAA would not execute releases unless its claim was fully satisfied, objecting to any sale that left the creditors subject to "the abusive, wrongful, and contractually improper practices of the prior management of the Debtor."  Doc. 520 at 2.

[78]Doc. 521.

[79]TRX-42.

[80]Docs. 571, 576.  Trustee had retained brokers and listed the properties for sale, but progress was stalled by the extended pendency of the Global Agreement.  The motion to sell Charter Business Park, LLC to a third party had been pending since September 15, 2011. See, e.g., TRX-43.

Price was unwilling to agree to the terms they required for a release (*i.e.*, full payment). They, too, argued that the delay prejudiced opportunities to market and sell the properties to unaffiliated third parties.[81]

After another highly contested emergency hearing, closing was continued to December 12, 2011, conditioned upon payment of additional non-refundable earnest money in the amount of $100,000.00. The parties agreed, and the Court ordered, that "there will be no further extensions of the closing date for the Purchase Agreement."[82]

On December 8, 2011, in an effort to close the transaction, Trustee obtained an order on an emergency basis to accommodate one lender's request to modify the terms of its release.[83] On December 10, 2011, Price filed an emergency application to extend the closing date to December 14, 2011, ostensibly because one of the lenders wanted to meet personally with Price's investor.[84] Trustee and the Committee agreed to the extension on the condition that additional non-refundable earnest money be deposited to offset the costs incurred by the estate on account of the multiple extensions, and that strict deadlines for closing be imposed.[85] At that point, however, Price and her affiliates had "failed, and refused, to execute the agreement" that contained the conditions AAB set for its release of MACCO's unsecured

---

[81]Doc. 580.

[82]Order, Doc. 593.

[83]Docs. 612, 613, 614, 615.

[84]Doc. 619.

[85]Docs. 622, 623.

guarantees,"[86] and had not delivered to the closing agent other documents that FAA and other lenders required, so the transaction could not close on December 12th in any event.[87]  The Court held another emergency hearing on December 12, 2011, and an agreed order extending the closing to December 14, 2011, was entered.  In exchange for the final extension, Price, McGinnis, and entities within their control were required to waive their claims to the $1.375 million settlement proceeds, and those funds were forfeited to the MACCO estate.  Again, the order further provided that "there will be no further extensions of the closing date for the Purchase Agreement."[88]  The closing did not occur for various reasons, but primarily because Price did not obtain Frontier State Bank's release of MACCO's guarantee.

Efforts to consummate the Global Agreement spanned ten weeks, during which Trustee and his Counsel attempted to expedite matters to placate creditors, while accommodating Price's requests for more time to negotiate releases with secured creditors. Unsecured creditors, the UST, and undersecured creditors rebelled against delaying what they believed was inevitable–*i.e.*, the inability of Price to perform as promised under the Purchase Agreement.  The Global Agreement effort–which generated approximately 65 docket entries and seven hearings– consumed substantial resources that proved unproductive in the end.  Had the transaction closed in December 2011 and all creditors been paid from the $5 million purchase price, Counsel's attorney fees might have been limited to approximately $200,000.00, leaving millions of dollars to return to equity.

---

[86]Doc. 624.

[87]Doc. 626.

[88]Order, Doc. 629.

In arguing against Counsel's final fee application, Price and McGinnis blame Counsel for "killing" the deal that would have concluded the Chapter 11 proceeding in 2011. They insist that Loyd should have filed a motion to modify the Global Agreement to except Frontier State Bank's claim from the release requirement. The preponderance of credible evidence establishes that the Global Agreement failed because, after two months of delay and excuse, Price simply could not and did not provide what the lenders demanded in exchange for waiving their claims against the MACCO estate.

No credible evidence suggests that Loyd undermined the closing in any way. Trustee simply was not authorized to close without releases of deficiencies and guarantees. It is undisputed that no creditor would execute a release unless *all* creditors did.[89] Price claims that her investor, Ed Snyder, offered to indemnify the estate for any deficiencies. Trustee credibly testified, however, that no documents were ever provided to establish Mr. Snyder's willingness or ability to indemnify, nor did Mr. Snyder contact Trustee in connection with the transaction: "I wasn't allowed to talk to Mr. Snyder, the title company was not allowed to talk to Mr. Snyder, nobody was allowed to talk to Mr. Snyder but Mr. Lieberman and Mr. McGinnis, period. That was made abundantly clear."[90]

---

[89]FAA's counsel testified that it was critical to his client that *all* guarantees were released. If one secured creditor refused, FAA wanted to retain its right to assert the full amount of its claim and fully participate in any distribution to unsecured creditors. FAA's counsel also confirmed that Trustee and Counsel had *no role* in negotiations between his client and Price regarding the terms under which FAA would execute a release. Accordingly, neither Counsel nor Trustee had any influence regarding FAA's insistence upon the universal release of guarantees. Tuepker, Tr. 11/3/14 at 152, 161; Deeba, Tr. 1/20/15 at 198-99.

[90]Deeba, Tr. 1/20/15 at 203. McGinnis testified that Mr. Snyder "offered to provide . . . his financial statements, which would have reflected that there was over $100 million in cash that he had" and that Trustee "didn't take any action" and the proposal "was rejected."

-29-

The Court specifically finds that the extent of Trustee and Counsel's efforts to close the Global Agreement were reasonable and prudent in light of the time invested, the restlessness and skepticism of the active constituencies of the estate, Price's ultimate inability to fully perform the Purchase Agreement, and the lack of transparency of the proposed investor. Moreover, the Court finds that Trustee and Counsel more than accommodated Price's requests for additional time to perform, and finds no credible evidence of bad faith, gross negligence, or intentional misconduct.

### E.        Trustee's Sales of SPEs and Real Property[91]

After the Global Agreement failed to close on December 14, 2011, Trustee immediately sought authorization to sell estate assets to Price and McGinnis or their affiliates on a piecemeal basis.   In the last two weeks of December 2011, Trustee and Counsel negotiated and filed motions to sell sixteen properties or entities.   In contrast to the expeditious manner in which Trustee and Counsel drafted and filed the appropriate paperwork to set the sales in motion, Price and McGinnis again required numerous extensions of time to

---

Tr. 1/21/15 at 365.  The Court credits the testimony of Trustee (and others) that Mr. Snyder and his supposed agents were not forthcoming with documentation establishing Mr. Snyder's willingness and ability to honor a guarantee.  Price and McGinnis have never produced any documentary evidence of any offer by Mr. Snyder himself, or the terms of such an offer, and Trustee and Counsel were justified in not relying on hearsay.

Later in the case, Price represented that Mr. Snyder agreed to guarantee performance of her proposed plan, but again failed to make Mr. Snyder available to confirm his intentions or produce a credible written unconditional guarantee.

[91] All of Trustee's sales of estate property are evidenced by motions, orders, and reports of sale.  See TRX-41 to TRX-107, and TRX-109 to TRX-127.  TRX-128 is a summary of the transactions.

close; each delay resulted in wasted time and effort on the part of Trustee and Counsel, and increased the amount of fees incurred by all affected parties.

On December 16, 2011, the Court approved the sale of the Charter Office Park, LLC, to Price and 250 West, LLC, an affiliate of Price and McGinnis.[92]  The sale closed on December 19, 2011, extinguishing MACCO's guarantee of a loan in the amount of approximately $225,000.00 and generating net sale proceeds of $264,348.68.[93]  Trustee assigned the membership interest to Price.[94]  Also on December 16, 2011, Trustee filed a motion to sell MACCO's membership interest in Division Properties, LLC, which owned two large apartment complexes in Oklahoma City– Remington and Winslow– subject to all liens and claims.[95]  This sale closed on January 11, 2012, generating gross proceeds of $367,500.00.[96]  Trustee assigned the membership interest to Price.[97]

On December 27, 2011, Trustee moved to sell the estate's membership interests in six SPEs to 250 West, LLC.[98]  Four lenders and various tax entities had liens against the real

---

[92]TRX-44.  McGinnis signed all contracts on behalf of 250 West, LLC, as manager.

[93]TRX-45.

[94]TRX-46.

[95]TRX-48.

[96]TRX-50.

[97]TRX-51.  In an effort to avoid litigation or threats of litigation against Trustee, MACCO or the estate from entities MACCO conveyed to Price, McGinnis or their affiliates, Trustee required the entities, in addition to Price and McGinnis personally, to release or waive claims as a condition of sale.  TRX-52.

[98]TRX-62.  The six SPEs were Lake Villa, LLC; Reserve Properties, LLC; MacArthur Plaza, LLC; Northside Business Park, LLC; LP Battin Apartments, LLC; and 9900 OV, LLC.

property owned by these SPEs.  After four extensions,[99] the sale closed on March 30, 2012, resulting in proceeds of $400,000.00 cash to the estate, and claims in the amount of $5,788,185.08 released.[100]  The membership interests were assigned to Consolidated Capital Investments, LLC, or Crescent Capital Investments, LLC.[101]

On December 22, 2011, Trustee filed a motion to sell Northgate Office Park, LLC.  On March 30, 2012, again after several extensions, the property was sold to Price, resulting in cash proceeds of $9,050.00 and a release by Frontier State Bank of debt in the amount of $724,278.03.[102]

On December 22, 2011, Trustee filed a motion to sell to 250 West, LLC, the estate's membership interest in J&M Investors, LLC (which owned the "Dorchester Drive" residential property), as well as two single family residences owned directly by MACCO, one in Nichols Hills, Oklahoma ("Avondale"), and one in Dallas, Texas ("Turtle Creek 18D"), again subject to all liens and claims, and subject to obtaining releases from NBC Bank.[103]  After five

---

[99]TRX-65-67.  As during the pendency of the Global Agreement, Price consistently requested additional time to satisfy contractual requirements. For each extenstion, Trustee and Counsel had to meet and consult with closing agents, lenders and other lienholders, draft and file emergency motions, give appropriate notice, and obtain Court orders to accommodate Price's inability to close, substantially increasing fees and costs.

[100]TRX-68.

[101]TRX-70-75.  These entities are apparently owned by Price's investor, and managed by Price and/or McGinnis.

[102]TRX-60.  In this case, although the secured debt was assumed by the purchaser, Trustee and Counsel ultimately obtained a release of liability from Frontier State Bank. Deeba, Tr. 1/20/15 at 139-40.

[103]TRX-76.

extensions,[104] the sale closed on March 9, 2012, for $3,158,074.50, which after paying closing costs, taxes, delinquent homeowner association dues, mechanics and materialmens' liens, and mortgages, resulted in net proceeds to the estate in the amount of $100,000.00 and a release by the NBC Bank of deficiencies against MACCO, as well as a release of MACCO's guarantee of J&M Investors' liability in the amount of $1,530,167.56.[105] Trustee assigned the membership interest of J&M Investors, LLC to Price.[106]

On December 23, 2011, Trustee filed a motion to sell to 250 West, LLC, three non-income producing properties owned by MACCO ("Sara Road," "Overholser Drive,"[107] and "Gatewood") and a membership interest in FEB Red Fox Apartments, LLC.[108] FAA held mortgages on all these properties. After *seven* emergency Court-approved extensions,[109]

---

[104]TRX-78-82.

[105]TRX-83; Deeba, Tr. 7/18/12 (TRX-172) at 85-86.

[106]TRX-84.

[107]The Overholser Drive property was a large single-family residence owned directly by MACCO. In February 2011, while McGinnis was a fiduciary for the debtor in possession, the residence suffered extensive water damage from a burst pipe. McGinnis filed an insurance claim and collected approximately $192,000.00 in proceeds. Instead of paying the disaster mitigation contractor or the lender, FAA, or rehabilitating the property, McGinnis, without Court authority, diverted the proceeds to other entities and properties.

Consequently, when Trustee was appointed in May 2011, he was saddled with an uninhabitable property that could not be rehabilitated because it produced no income and McGinnis had dissipated the insurance proceeds. Moreover, the Overholser property was encumbered by a mechanics lien filed by the mitigation contractor in the amount of $73,274.74, which Trustee paid at closing. TRX-94; Deeba, Tr. 1/20/15 at 108

[108]TRX-85.

[109]TRX-87 to TRX-93. During the pendency of the sale agreement, FAA sought relief from the stay and abandonment in order to commence or complete foreclosure proceedings on the non-income producing Overholser and Gatewood residential properties. Doc. 855.

-33-

closing occurred on June 29, 2012, resulting in $300,000.00 cash paid to the estate and the release of secured claims in the amount of $4,042,408.10.[110]

On January 6, 2012, Trustee moved to sell the estate's interest in thirty-three vehicles to Price, subject to liens and the provision of releases. This sale closed on February 10, 2012, resulting in gross proceeds of $50,000.00.[111]

On January 20, 2012, Trustee sold two lots in Northside Business Park in Oklahoma City to a third party purchaser (*i.e.*, unaffiliated with Price and McGinnis) free and clear of liens. The sale generated proceeds in the amount of $165,620.00, all of which was distributed to taxing entities and the mortgage holder.[112]

On January 26, 2012, Trustee moved to sell the estate's interest in another three SPEs, subject to liens and claims, and on conditions similar to the prior purchase agreements with Price and her affiliates. On February 3, 2012, Trustee moved to sell the estate's interest in Vendamatic, LLC, to Price and 250 West, LLC, subject to liens and claims and the provision of releases. Both of these motions were conditioned upon the closing of earlier-approved purchase agreements. Price's inability to close the earlier sales resulted in denial of these motions, and earnest money in the amount of $10,000.00 was forfeited to the estate.

During the first three months of 2012, Trustee had disposed of all but one of MACCO's non-income producing properties and resolved all claims against those properties and the

_____

Trustee and FAA agreed to stay relief, and FAA withdrew its requests for abandonment.

[110]TRX-94.

[111]TRX-125.

[112]TRX-55.

-34-

estate.  The Court finds Trustee acted wisely and expeditiously in relieving the estate of

properties that could not support their own debt service or pay their own accruing

maintenance, utility, and insurance expenses.

In August 2012, the Court entered an order authorizing Trustee to jointly administer

the SPEs that were debtors in possession in their own Chapter 11 cases, namely MA Cedar

Lake Apartments, LLC (Case No. 10-16563); NV Brooks Apartments, LLC (Case No. 10-

16503); JU Villa Del Mar Apartments, LLC (Case No. 10-16842); and SEP Riverpark Plaza,

LLC (Case No. 10-16832), within the MACCO case.[113]  As trustee of their parent company,

MACCO, Trustee acted as responsible person on behalf of these debtors in possession,

overseeing operations, maintaining the books and records, and preparing monthly operating

reports in their separate cases.  From a practical standpoint, joint administration would

streamline filing and noticing in connection with future sales of these entities.[114]

In August 2012, Trustee located a "stalking-horse" bidder, Living Investments, LLC,

for the Brooks Apartment complex in Norman, Oklahoma, which was owned by NV Brooks

---

[113]Trustee filed motions for joint administration in June 2012, which drew objections
from Price.  On the date of the hearing on the Trustee's motions, Price withdrew her
objection.  That did not end the matter, however, as Price and McGinnis refused to consent
to the entry of a standard order of joint administration, seeking instead to add "enhanced"
language that would have tied the hands of Trustee and the Court in the future.  Trustee and
Counsel balked.  This stalemate required a hearing on Trustee's Motion to Settle Journal
Entry of Judgment, which was attended by counsel for six interested parties and resulted in
the entry of the order proposed by Trustee. Tr. 8/22/2012 (Doc. 1256).  The MA Cedar Lake
Apartments, LLC case was deconsolidated on January 30, 2013 at the request of the UST,
and the case was dismissed on March 20, 2013.  Doc. 1447, 1751.

[114]Trustee also was the designated fiduciary in the Holbrook Shopping Plaza LLC
chapter 11 case (Case No. 11-11235), which was not jointly administered with the MACCO
case.  That case was dismissed after Price purchased the SPE from the estate in February
2013.

-35-

Apartments, LLC. Trustee filed all the appropriate motions and notices in an attempt to obtain the highest and best bid, and ultimately sold the property to Living Investments for $4,500,000.00.[115] Notwithstanding an objection by Price,[116] the Court approved the sale, and the transaction closed in December 2012, resulting in the release of MACCO's guarantee of over $4 million to AAB, payment of over $285,000.00 in property taxes, and net proceeds of $85,941.19 to the estate. As part of the transaction, Trustee assigned to the purchaser the right to receive certain insurance proceeds due from First Specialty Insurance Corporation for pre and post-petition hail, tornado, and fire damage. To accomplish the assignment and comply with the terms of the agreement, Trustee filed an emergency motion and obtained an order requiring the insurer to issue proceeds to the Trustee, specific contractors, or the purchaser as directed.[117]

In 2012 and 2013, Trustee consummated sales of the Vendamatic laundry contracts to Price and an affiliated entity, netting approximately $35,000.00 to the estate.[118]

---

[115]TRX-122 to TRX-124. McGinnis testified that Price's investor declined to make an offer to purchase the Brooks property because "it could have cost a lot of money to correct the environmental problems." McGinnis blamed Trustee for the "environmental problems," *i.e.*, mold, alleging that Trustee failed to adequately tarp the property after a tornado struck in April 2012. Tr. 1/21/15 at 460-61. The Court finds that Trustee took responsible and reasonable actions to safeguard the property after the tornado. Further, the preponderance of the evidence indicates that the Brooks property was contaminated with mold from concealed water leaks and water damage long prior to Trustee's appointment.

[116]Doc. 1124. Price complained that the proposed Section 363 sale of the Brooks apartments constituted an impermissible "sub rosa" plan for which Trustee provided insufficient justification.

[117]Docs. 1176, 1199.

[118]TRX-126-128; Docs. 1671, 1692.

-36-

In November 2012, Trustee sold MACCO's membership interests in MA Cedar Lake Apartments, LLC, and 59th Street Business Park, LLC to Price and 250 West, LLC,[119] subject to all liens and claims, and subject to obtaining releases from the lienholders and everyone affiliated with Price and/or McGinnis.[120] This transaction resulted in proceeds of $300,000.00 to the estate, and a release of liability in the amount of $2,882,575.40 and the release of tax claims.[121]

In a separate transaction, Trustee also sold MACCO's interest in JU Madison Park Apartments, LLC and LP Chalet Apartments, LLC, to the same entity under the same conditions.[122] This sale resulted in proceeds of $400,000.00 to the estate and the release of claims of four lenders in the total amount of $7,178,603.12 and the release of tax claims.[123] Trustee assigned the membership interests to Price and 250 West, LLC.[124] McGinnis once again assumed management of the Cedar Lake entity and was its designated fiduciary. After reviewing the first monthly operating report McGinnis filed after the sale, the UST objected to McGinnis's questionable transfers of Cedar Lake's funds, and his failure to pay creditors

---

[119]TRX-104 to TRX-105.

[120]TRX-101 to TRX-103.

[121]TRX-103.

[122]TRX-95 to TRX-97.

[123]TRX-97.

[124]TRX-98-99.

that Price promised to pay as a condition of the sale (*i.e.*, taxing authorities), which prompted Judge Jackson to appoint an examiner in the Cedar Lake case.[125]

In November 2012, Trustee obtained authority to sell the estate's interests in the Holbrook Shopping Plaza entities, which owned a shopping center in Arizona. Holbrook, like Cedar Lake, was also a Chapter 11 debtor in possession. After *four* extensions, the sale closed on February 28, 2013, and MACCO's interest in the entities were assigned to Price.[126] MACCO's estate benefitted from net proceeds in the amount of $10,000.00 and a release of FAA's claim in the amount of $1,443,907.88.[127] Trustee ensured that all of Holbrook's creditors were paid through the closing process, and Holbrook's Chapter 11 case was ultimately dismissed.[128]

On August 28, 2013, after *seven* extensions,[129] Trustee sold the estate's membership interests in Chapter 11 Debtors JU Villa Del Mar Apartments, LLC and SEP Riverpark Plaza, LLC, generating $900,000.00 cash for the estate and the release by FAA and AAB of approximately $18 million in guarantee claims.[130] Trustee assigned the interests to 550 West, LLC and 400 West, LLC, respectively, entities for which McGinnis was manager. In addition, Trustee caused all creditors of these two debtors in possession to be paid in full from

---

[125] See TRX-107.

[126] TRX-113.

[127] TRX-112.

[128] Id.

[129] TRX-117.

[130] TRX-115 to TRX-118.

proceeds of the sale, including $2,136,073.00 in property tax claims, and their Chapter 11 cases were dismissed.

By August 28, 2013, Trustee had liquidated all real property and operating assets of MACCO. As a result of Trustee insisting on releases of potential deficiencies and guarantees in connection with the sales, claims against the estate in excess of $72 million were eliminated.[131]

Negotiations of these sales – and assuaging concerns of secured and unsecured creditors and the UST about returning the properties to prior management– required Trustee and Counsel to communicate and collaborate extensively with these constituencies. From Price and McGinnis's viewpoint, the cooperation among Trustee, Counsel, the Committee, the UST, and secured creditors amounted to a conspiracy among a close-knit bankruptcy community to deprive them of their life's work. It was Price and McGinnis who invoked the complex machinery of Chapter 11 of the Bankruptcy Code, however, which both guided and constrained the conduct of Trustee, Counsel and all professionals and parties involved. The Court finds that Trustee and Counsel meticulously abided by the law and rules, and exercised sound business judgment in the face of tremendous adversity. The direction of the case was preordained by the dire circumstances of the debtor and its subsidiaries, and the muddling of

---

[131]Loyd, Tr. 11/3/14 at 234. See also TRX-128 for a concise summary of all closed transactions indicating date, price, amount of claims – including direct mortgages, taxes, other liens, and guarantees – against the estate extinguished). See also Deeba, Tr. 1/20/15 at 107-08. Not included in the $72 million debt extinguishment figure are claims that were eliminated as a result of claim objections and resolutions. Unliquidated fraud claims asserted jointly against the estate and McGinnis exceeded $10 million. McGinnis took responsibility for paying many of those claims in compromised amounts, and obtaining dismissals. Deeba, Tr. 1/20/15 at 164-66. Trustee eliminated other significant claims by filing claims objections. See Docs. 1138-1150 (orders sustaining objections to claims).

-39-

their identities – and not by bad faith or improper motives of Trustee, Counsel, or their colleagues.

### F.    Abandonment of Properties

Early in the case, FAA obtained, with Trustee's consent, an order authorizing Trustee to abandon the estate's interest in one of the Turtle Creek condominiums.[132]  The property was non-income producing and encumbered by two mortgages, tax liens, and home owner association liens.  After abandonment, but before FAA could exercise its state law remedies against the property, Price conveyed the condo to a newly-formed entity and filed bankruptcy on behalf of that entity.[133]  FAA's experience was a cautionary tale to all secured creditors.[134]  Instead of seeking stay relief and abandonment, secured creditors preferred to leave their collateral under the safe umbrella of the MACCO Chapter 11 case in the hands of Trustee.[135]

---

[132]TRX-131 to TRX-132.

[133]TRX-133.  The stay relief and abandonment order was entered on August 24, 2011. On October 4, 2011, Price filed a Chapter 11 proceeding in the Northern District of Texas on behalf of the newly formed LLC.

[134]Loyd, Tr. 11/4/14 at 344 ("a great number of secured creditors . . . begged us not to abandon properties.  They wanted their properties left in a bankruptcy, which is pretty unusual, quite frankly.").  Deeba, Tr. 1/20/15 at 195 (FAA's counsel "begged me and my counsel not to abandon any properties, that they would pay the estate the administrative fees to keep these in bankruptcy" because he feared the properties "would end up in a bankruptcy in Dallas.")

[135]All debt related to the condo for which MACCO was liable was eventually paid by a third party after abandonment, resulting in FAA withdrawing its claim.  Deeba, Tr. 1/20/15 at 145-46.  Although Trustee did not arrange for that debt to be paid, and Price or her affiliates most likely did, the Court is well aware that Price and/or McGinnis were personally liable on the debt themselves.  The fact that Price's payment of her own guarantee liabilities resulted in the withdrawal of claims against the estate does not diminish the value of Trustee's steadfast strategy of eliminating claims against the estate in order to maximize the benefit to all creditors.

-40-

Also in the first month of Trustee's appointment, Trustee caused a MACCO subsidiary, Sovereign Office Park, LLC, to file its own Chapter 11 case[136] in order to halt Kirkpatrick Bank's mortgage foreclosure action so Trustee could investigate the value of the office park. After obtaining appraisals, Trustee determined the value of the property was less than the two mortgages and unpaid tax liens encumbering it. Trustee conceded to stay relief and abandonment, and dismissed the LLC's Chapter 11 case.[137]

On March 19, 2012, Trustee sought to abandon the Swan Lake Road property, citing its burden to the estate and the lack of equity. The motion was not opposed, and an order of abandonment was entered on April 10, 2012.[138] Although MACCO owned the property, the property was pledged as collateral on a note on which MACCO was not liable. Since MACCO had no liability to any lender directly or as guarantor, no releases were needed.[139]

On April 2, 2012, Trustee filed a motion to abandon MACCO's interest in four SPEs that owned apartment complexes mortgaged to Frontier State Bank.[140] Although Trustee again attempted to negotiate a sale of these properties to Price and McGinnis or their affiliates, Frontier still would not agree to release MACCO's guarantee. Frontier also refused to allow

---

[136]Case No. 11-13388 (W.D. Okla.).

[137]Deeba, Tr. 1/20/15 at 146-47. McGinnis acknowledged that no equity existed in Sovereign Office Park. Tr. 11/6/14 at 770-71. Ultimately, his investor bought the building and obtained releases of guarantees of Kirkpatrick Bank and First Enterprise Bank by obtaining a substitute guarantor. Id. at 772. Trustee makes no claim for compensation with respect to the release of these guarantees.

[138]Docs. 836, 858.

[139]Deeba, Tr. 1/20/15 at 143-44.

[140]TRX-129. These were Emerald Court Apartments, LLC; Newport/Granada Apartments, LLC; Parkwood Apartments, LLC; and Southeast Village Apartments, LLC.

-41-

Trustee to use cash collateral to repair the dangerously rotted stairwells and landings.[141]  An order authorizing abandonment was entered on April 16, 2012.[142]  Although Trustee did not obtain a release of the estate's guarantee from Frontier State Bank upon abandonment, the bank later withdrew its $6,143,528.56 proof of claim.[143]

In the exercise of sound business judgment, Trustee appropriately abandoned assets that were burdensome to the estate and that exposed the estate to actual and potential liabilities.

### G.    Trustee's Operation of Properties and Entities

Fundamental to Price and McGinnis's objections to compensating Trustee and his professionals is their belief that Trustee ignored his duty to maintain and protect the income-producing properties (*i.e.*, the apartment complexes, office buildings, and shopping center), and failed to operate them in a manner that maximized occupancy and revenues.  In this regard, they claim that when Trustee was appointed, the properties were well maintained and flourishing, that occupancy was high, and the properties were cash flowing.  They complain that Trustee intentionally "starved" the properties, ignoring their pleas to use other entities' funds for maintenance and repairs, so that when Price reacquired the properties during the

---

[141]Deeba, Tr. 1/20/15 at 85-88 and Tr. 1/26/15 at 1070-71.  Price presented photos of the deterioration of the four complexes mortgaged to Frontier State Bank, all of which showed the need for maintenance and repairs.  Price-McGinnis Exhibit ("PMX") 63/64 and Tr. 1/22/15 at 601-16.  Price blames Trustee and his property managers for failing to maintain the already depressed properties, but does not explain how Trustee could have done so without converting Frontier's cash collateral or invading some other entity's bank account.

[142]TRX-130.

[143]TRX-144.  See also Notice of Withdrawal of Claims by Frontier State Bank filed August 7, 2013, Doc. 1698.  Deeba, Tr. 1/20/15 at 142-43.

period spanning late 2012 to September 2013, they had deteriorated significantly, and income and occupancy had diminished.  They attribute these conditions to gross negligence or willful mismanagement by Trustee in (1) not providing sufficient oversight or security to prevent vandalism in some cases, and the theft of furnishings, copper, appliances, and equipment in others (and in one case, theft of rent checks); (2) not promptly repairing damage caused by storms and tornados, leading to water damage and the growth of mold; (3) not filing insurance claims; and (4) not diligently courting tenants and potential buyers.  With respect to MACCO's single-family residences, they claim Trustee failed to maintain or lease them.

At trial, Price introduced photographs that she testified were taken at the time she reacquired the properties–*i.e.*, from April 2012 through September 2013–as evidence of purported mismanagement and neglect by Trustee.[144]  As demonstrated by Trustee's credible testimony[145] and supported by his contemporaneous time records, however, Price had submitted these exact photographs to Trustee on January 8, 2012, long before she reacquired the properties.[146] These photographs actually represent the dilapidated condition of the properties Trustee inherited upon accepting his office.

As an example, photographs taken by one of the professional property managers employed by Trustee during her initial walk-through of an apartment complex in July 2011

---

[144]PMW 45-48, 62-66, 68-69.

[145]Deeba, Tr. 1/26/15 at 1041-53.

[146]See also TRX-267 (demonstrative aid showing selected photographs in Price's Exhibits compared with photographs in Trustee's Exhibit 221); TRX-268 (demonstrative aid listing of all photographs delivered to Trustee in January 2012 (Trustee's Exhibit 221) that are identical to photographs Price testified were taken when she reacquired the properties between April 2012 and May 2013).

depicted the *same* crumbling concrete stairs, and wood rot afflicting landings and catwalks, that appeared in photographs taken by Price as examples of Trustee's alleged mismanagement.[147]  The manager immediately barricaded the stairwell for the safety of the tenants, moved them to other units, and solicited several bids to renovate the stairwell.[148]  Trustee, however, could not hire anyone for the project because the lender that controlled the entity's cash decided to retain and pay *McGinnis* to make the repairs.[149]  While Price accuses Trustee of willfully neglecting this property, it turns out that Trustee and his professionals acted quickly and responsibly in insuring tenant safety and planning to repair the structural damage, but were undermined when McGinnis convinced the lender that he would make the repairs.

Frankly, none of Price's testimony blaming Trustee and his professionals for "running down" the properties can be trusted, and the Court finds that Price's testimony concerning the photographs was a blatant attempt to mislead the Court into believing that deterioration of the properties occurred during Trustee's watch.  The preponderance of the evidence indicates that these properties required structural, mechanical and/or cosmetic rehabilitation *prior to* Trustee's appointment, and the photographs Price took and delivered to Trustee before he sold any of the properties to Price reflect that existing deferred maintenance.[150]

---

[147]Sesock, Tr. 1/26/15 at 914-19; TRX-221 at 141-53.

[148]Sesock, Tr. 1/26/15 at 917.

[149]Id. at 918-19; Deeba, id. at 1063-65.

[150]Testimony of Price's own witness, Mr. Hoyt, indicated that when he inspected properties in Oklahoma City and Wichita in 2011, during the Chapter 11 case but prior to the appointment of Trustee, "[t]hey were beginning to show some problems that I had not seen

Moreover, Price's claim that Trustee's actions caused diminished occupancy presupposes that the initial occupancy rates claimed by McGinnis were accurate. Credible evidence established that those rent rolls were inflated, and therefore any decline in occupancy was not as pronounced as represented by Price. In fact, the evidence established that after delinquent and phantom tenants were evicted or removed from the rent rolls, occupancy in most of the complexes gradually and steadily increased during Trustee's tenure.[151] Moreover, health and safety concerns–as well as the lack of unencumbered funds to rehabilitate or refurbish–contributed to the number of unoccupied units Price complained of.

Price and McGinnis contend that the properties quickly depreciated within the first 45 days of Trustee's tenure, *i.e.*, before his professional property managers were in place. McGinnis testified that the properties "deteriorated in physical condition immediately because . . . there was no money being put back into those properties. In fact, [in] the first two weeks . . . there was absolutely no dollars spent to keep those properties maintained, and there were air condition[ers] going out. And I was paying for those on my own credit card . . . to preserve the asset and preserve the tenants."[152] However, this testimony only bolsters Trustee's position that the apartment complexes were already in a state of disrepair and

_____

before. Some of these properties I had seen a long time [ago], prior to, say 2009. So I noted that . . . there were some problems that were starting to occur, the maintenance of the properties, exterior. I didn't [do] . . . a full walk-through." Hoyt, Tr. 1/22/15 at 725-26.

[151]Martens, Tr. 1/26/15 at 815-17.

[152]Tr. 1/21/15 at 371.

economic chaos when he was appointed and that no unencumbered funds were available to maintain them.

Price derides Trustee's decision to exclude her and McGinnis from managing the properties and views Trustee's employment of professional property management firms as unnecessary, expensive, wasteful, and ineffective. In light of Judge Jackson's finding in the 52-Page Order that "Price and McGinnis should not be restored to management under any interpretation of the evidence,"[153] it is irrefutable that Trustee exercised sound business judgment in declining to employ Price and McGinnis, and in retaining professional property management firms with extensive experience in operating multifamily residential properties.

With the Court's approval, Trustee brought in Price Edwards to manage five multi-family complexes located in Oklahoma, which the parties identify colloquially as Remington, Winslow, Newport/Granada, and Brooks. Trustee retained Wichita-based RSC to manage properties located in Wichita, Kansas, identified as Cedar Lake, Madison Park, Villa Del Mar, Riverpark, Battin, Parkwood, and Southeast.[154] Managers were on site within 45 days of Trustee's appointment, and they observed and recorded both the condition of the properties and the state of the books and records. Testimony of the managers unambiguously established that the conditions they encountered were the result of long-term neglect that commenced

---

[153]52-Page Order (TRX-38) at 51.

[154]The Court notes that because four of the apartment complexes were owned by SPEs that were themselves in bankruptcy (some of which were assigned to another judge), Trustee and Counsel had to address matters such as seeking authority to employ management professionals in each separate case, multiplying their workload and fees. Trustee and Counsel prepared and filed monthly operating reports in each affiliate's case.

long before Trustee was appointed.[155] Many of the properties were located in high crime areas and were subject to frequent vandalism. Safety issues requiring immediate attention included missing smoke alarms and GFI receptacles, pools that did not comply with federal laws, and pools that had broken equipment or gates.[156] Some properties were full of trash, or infested with roaches or contaminated by mold. Unwanted furniture and trash littered the dumpster areas. The mechanical components of some units, *i.e.*, hot water tanks, refrigerators, air conditioners, and other appliances, had been cannibalized in order to fix or furnish other units. Exterior issues included dead trees, old and leaky roofs, missing soffits and siding, broken windows, termite damage, deteriorated fencing, unstable wrought iron railings and supports on catwalks and stairwells, drainage issues, broken pool gates, and wood rot. Existing on-site personnel lacked appropriate written policies and procedures for screening potential tenants or complying with federal and state housing laws. Rent rolls provided by Price and McGinnis were inaccurate, and did not account for vacancies occurring several months prior to Trustee's appointment, and the rolls were also exaggerated by listing non-paying tenants.[157]

Although occupancy–and revenues–dropped initially after Price Edwards and RSC took over, after a transition period, they rebounded.[158] The initial decrease was in part a

_____

[155]See, e.g., TRX-138, TRX-139.

[156]See, e.g., TRX-138; 52-Page Order at 32, ¶ 27.

[157]See TRX-138 at 12 (comparison of rent roll to actual occupancy). At the Remington complex, for instance, McGinnis's closing rent roll reported 94.5% occupancy rate, when occupancy was in fact 81%. TRX-138 at 8. See also Sesock, Tr. 1/26/15 at 977-79.

[158]Mr. Hoyt testified that after a change of management or ownership, or when a property is involved in a bankruptcy, it may take six months or longer for an apartment

-47-

function of the inaccurate rent rolls and in part because Price Edwards and RSC employed more stringent application policies and background checks–policies to screen out unreliable tenants.[159] Moreover, in the first months of Trustee's control, McGinnis had diverted in excess of $88,000.00 in rents from the Remington and Winslow complexes,[160] which also contributed to the lower initial revenues that Price attributes to Trustee's mismanagement.[161]

Price cites, as an example of neglect, an incident in which an on-site manager misappropriated $35,000.00 in rent checks from two Oklahoma complexes. However, the evidence supports finding that (1) the manager was originally a McGinnis hire, and Price Edwards kept her on the payroll after a background check; (2) the manager first claimed she was robbed of the checks at gunpoint, and was terminated by Price Edwards for failing to deposit checks daily according to policy; (3) the face amount of checks stolen was not $35,000.00, but approximately $8,000.00; (4) Price Edwards immediately mitigated the damage by alerting tenants and helping them stop payment on the stolen checks and issue new rent checks; (5) when Price Edwards learned that the manager perpetrated the theft, it pressed criminal charges against her; and (6) the manager ultimately paid $1,700.00 in restitution.[162] The Court finds that this incident does not reflect any neglect or mismanagement by Price Edwards or Trustee.

---

complex's occupancy to stabilize, in part because employees leave and tenants are apprehensive. Hoyt, Tr. 7/25/11 (TRX-218) at 203.

[159]Deeba, Tr. 1/20/15 at 96-97.

[160]TRX-38, 52-Page Order at 28, ¶ 21(i).

[161]Deeba, Tr. 1/20/15 at 202-03.

[162]Sesock, Tr. 1/26/15 at 962-63, 981, 984-85.

-48-

The Brooks apartment complex in Norman, Oklahoma, was a special case. Price and McGinnis testified that their investor had no interest in purchasing this complex because, they allege, Trustee failed to mitigate storm damage, necessitating remedial "environmental" work that the investor deemed too expensive. The evidence established, however, that when Price Edwards took over management in July 2011, they encountered units with signs posted by the City of Norman that warned: "Uninhabitable by Humans."[163] The Fire Marshal had condemned one of the eight-unit buildings in which a fire occurred in October 2010 (nine months prior to the appointment of Trustee). Two children perished in the fire.[164] Concerned for the safety of residents in other buildings, the City and the Fire Marshal planned to condemn the entire property due to McGinnis's failure to timely make electrical, plumbing and HVAC repairs to meet health and safety codes. Prior to Trustee's appointment, only two buildings in the complex had been brought up to Code.[165] Trustee and his management professionals met with City inspectors and the City Attorney to determine what needed to be done to remediate the violations. Over time, Trustee and Price Edwards obtained a clearance for occupancy from the City on several more buildings.

The Brooks complex had also suffered hail damage from two separate storms before Trustee took over, one in 2009 and one in 2011. Then, in April 2012, Brooks sustained extensive tornado damage, prompting Trustee and Counsel to react on an emergency basis to

---

[163]TRX-138 (The Brooks Apartments - Condition Report at July Takeover).

[164]Deeba, Tr. 1/20/15 at 99.

[165]"[T]here were 82 pending criminal code violations against McGinnis for not completing required rehabilitation for maintenance that had been pending since 2010." 52-Page Order at 33.

preserve property, ensure safety of residents, and determine insurance coverage.[166]  Trustee

retained a public adjuster to establish the estate's claims against the insurers[167] and began

working on repairing the property to ready it for sale.  That included asbestos removal and

mold remediation.  These multiple catastrophic events resulted in additional uninhabitable

units and a continued decrease in rental revenue.[168]  Notwithstanding these obstacles, Trustee

succeeded in obtaining a buyer for the complex which resulted in the payment of all

mortgages and other liens, with interest, and elimination of MACCO's guarantee liability.[169]

　　　　The Wichita, Kansas, apartment complexes, consisting of more than 1,900 units,

similarly suffered from deferred maintenance prior to Trustee's appointment.  RSC's Steve

Martens testified at the hearing held in July 2011 concerning the condition and status of the

Wichita properties.  His initial review revealed undocumented employees, an absence of

equipment to maintain the properties, an outdated rent control system, and a general lack of

---

[166]On April 14, 2012, Cedar Lake Apartments in Wichita, Kansas, also sustained tornado damage from the same storm system.

[167]Price objected to the retention of the adjuster in both the Brooks and Cedar Lake cases, which required Trustee and Counsel to spend time and resources to respond to and prepare for hearings, over the course of *three months*, in order to obtain orders approving retention.  Price withdrew her objection the day before the fourth continued hearing. Trustee's ability to obtain engineering reports necessary to determine the status and extent of insurance coverage and begin remediating the tornado damage was obstructed and delayed by Price's objection to hiring the adjuster.  Deeba, Tr. 1/20/15 at 105.

[168]Price testified from photographs she took at the Brooks complex on September 10, 2011, which showed a severe case of peeling paint on woodwork and soffits.  PMX-45. Price admitted that the property was under her and McGinnis's control until July 15, 2011, but nevertheless attributes the condition of the paint to Trustee's mismanagement, which the Court finds utterly unconvincing.

[169]Deeba, Tr. 1/20/15 at 102-03.

organization.[170]  The physical condition of the properties, which were built in the 1950s and

1970s, were "run down" and showed "signs of significant deferred maintenance, both on the

exterior and interior."[171]  In addition, rent rolls included tenants that had vacated the property

some time earlier.[172]  Tenant security deposits had not been segregated and tenant refunds had

been paid from operating accounts.[173]  Utility companies were on a cash only basis, and in

many units, where electrical service had been disconnected for a long period of time, the

meter had been removed.  Those units could not be occupied until city inspectors certified the

electrical systems and the meters were replaced.[174]  The city of Wichita reported 147 existing

code violations, including swimming pool violations involving drains, fences and equipment,

and chronic criminal activity at the vacant Battin apartment complex.[175]

Upon taking over management of the properties, Mr. Martens's team performed triage

to identify units that needed immediate attention such as water leaks, and to determine which

units could be made ready to lease with little expense and which could not be rented without

substantial investment. Trustee and management left vacant the units needing extensive

investment ("down units") and focused available resources on units that could be made

rentable by, for instance, moving appliances from mold or water damaged units to other units.

---

[170]52-Page Order, TRX-38, at 33-34, ¶ 28.

[171]Tr. 1/26/15 at 786-87.

[172]Id. at 787, 796.

[173]Id.

[174]Id. at 788-89.

[175]Id. at 795.

With respect to the code violations, pools that could be brought up to code were, and the few that had more extensive problems were drained and closed.[176]  RSC managers made efforts to improve occupancy by instituting  promotions, tie-ins, and referral discounts, and by advertising in the city-wide apartment guide.

With little to work with, Trustee and RSC made significant strides toward improving the safety, appearance, and services at the Wichita properties (within the confines of available funding), eliminated all code violations, evicted non-paying tenants, hired and trained competent maintenance and leasing personnel, established procedures, kept utilities and insurance current, established tenant security deposit accounts, and established reliable financial records.[177]

Occupancy, and employee morale, suffered from interference by Price and McGinnis, who contacted employees of the apartment complexes  with rumors that they would shortly be taking over management, which caused confusion and disruption.  When word got out that a property was under contract for sale, employees sought other employment, creating vacancies for on-site managers and maintenance personnel that were difficult to fill during the sometimes lengthy periods between contract and closing.[178]

Price and McGinnis both complained of broken windows at the Battin property, contending that Trustee neglected to secure Battin with fencing and on-site security.  It is

---

[176]Martens, Tr. 1/26/15 at 793-826; 852-53;  Sesock, 1/16/15 at 908.

[177]Martens, Tr. 1/26/15 at 825-26.  See also TRX-136, TRX-138, and TRX-139.

[178]Martens, Tr. 1/26/15 at 823-25.  Ms. Sesock also observed that Price and McGinnis's continued relationships with employees left them confused as to who they were working for and whether they would continue to be employed.  Sesock, Tr. 1/26/15 at 927.

undisputed, however, that the complex was 100% vacant when Trustee was appointed, and that LP Battin Apartments, LLC, lacked any source of income. A large complex built in the 1950s, Battin was located in a high crime area of Wichita and was subjected to repeated vandalism. In fact, even before Trustee was appointed, the City cited Price and McGinnis with code violation notices relating to the condition of the property.[179] When Mr. Martens inspected Battin before RSC was retained, he observed numerous broken windows and doors that had been kicked in. He considered the units too unsafe to even enter for inspection.[180] Trustee and his management team met with Wichita officials to address the code violations. Trustee used part of the $300,000.00 fund to fix violations, and then sought to abandon the property. In September 2011, Trustee, the lender, and Price and McGinnis agreed that in lieu of a formal abandonment, *McGinnis* would maintain the property and that the lender would advance funds to McGinnis for that purpose.[181] For Price and McGinnis to place blame for Battin's dismal condition on Trustee and RSC when the evidence established that serious code violations existed before Trustee was appointed, that Battin generated no income, and that McGinnis and the lender willingly assumed the burden of maintaining the property, is hypocritical and further underscores their utter lack of candor to the Court.

In most cases, however, Trustee was able to work closely and cooperatively with lenders and property managers to tackle deferred maintenance issues, providing lenders with

---

[179]Price, Tr. 1/22/15 at 665. On April 1, 2011, prior to Trustee's appointment, the City of Wichita notified Price and McGinnis of code violations. Deeba, Tr. 1/26/15 at 1059.

[180]Martens, Tr. 1/26/15 at 789-90, 834.

[181]Deeba, Tr. 1/26/15 at 1057-60.

rehabilitation plans, budgets, and progress and occupancy reports to justify his use of cash collateral.[182]  For example, with respect to the Cedar Lake property, Trustee obtained the lender's consent to use half of the rental income for maintenance and rehabilitation.[183]  Priority was placed on matters affecting safety of the tenants and on units that could be made ready for lease with minimal investment.  Most lenders would advance $1,000.00 to $2,000.00 per unit to increase occupancy.[184]  That said, many units required $15,000.00 to $20,000.00 in repairs.  It made no economic sense for lenders to advance funds to refurbish those units because rents would not offset the investment in any reasonable time period.[185]  In addition, it was well known that the apartment complexes were to be sold and the loans satisfied.  Price highlights these "down units" as examples of Trustee's neglect, but again, fails to explain how Trustee could have funded the rehabilitation of those units.[186]

The Court finds that Trustee made the best of a bad situation.  These were physically decrepit and financially troubled properties, many involved in foreclosure or bankruptcy proceedings.  They required significant investment of new money for maintenance and rehabilitation–money not available to Trustee.  Trustee properly refused to adopt McGinnis's unconventional methods of financing the maintenance and operations of these marginally

---

[182]Deeba, Tr. 1/26/15 at 1066-70.

[183]Deeba, Tr. 1/20/15 at 104.

[184]Deeba, Tr. 1/26/15 at 1067-70, and TRX-136.

[185]Deeba, Tr. 1/20/15 at 105.

[186]The Committee and unsecured creditors emphatically opposed using unencumbered funds, such as the $1.375 million in settlement proceeds, to improve the secured lenders' collateral.

habitable properties.  The Court deems Trustee's skills and business judgment in safe-guarding, operating, and selling the properties impeccable. Trustee focused on tenant health and safety, resolved code violations, protected and maintained the physical assets to the extent funds were available, constructed credible books and records, satisfied all the post-petition liabilities left unpaid by McGinnis, reduced the estate's guarantee liabilities, and negotiated sales resulting in cash to the estate to pay administrative expenses and unsecured creditors, all while fielding constant demands, threats and interference from McGinnis and Price.

## H.    Price's Proposed Plan and Disclosure Statement

In May 2012, shortly after Trustee disposed of MACCO's non-income producing properties, Price proposed a plan of reorganization in which she would retain her equity in MACCO.  Pursuant to the plan, creditors would retain their pre-bankruptcy claims and rights, which, she claimed, rendered them unimpaired and therefore not entitled to vote on the plan.[187] Price filed a separate motion seeking a declaration that such treatment of creditors did not impair their rights ("Impairment Motion"), drawing vehement objections from Trustee, the Committee, and several creditors.   Counsel for Price explained to the Court that Price desired to "attempt to confirm the plan by consents under 1129(a) as opposed to cramdown under 1129(b).  That's what this is about."[188]

On July 6, 2012, Price filed a second amended plan and a second amended disclosure statement, which also attempted to disenfranchise all classes of claims by labeling them

---

[187]Objections to the disclosure statement were filed by the UST, Trustee, QCB, AAB, FAA, and the Committee.

[188]Tr. 6/25/2012 (Doc. 1250) at 17.

unimpaired.[189]  This filing also drew objections by Trustee, UST, AAB, QCB, FAA, the Committee, and Louis F. Vargas, a litigation creditor.  These parties outlined dozens of instances of inaccurate or misleading information contained in the disclosure statement, as well as the omission of highly relevant information.  The objecting parties also argued that the plan itself was patently unconfirmable.  According to AAB:

> Best case, the Plan would: a) merely substitute [a new lender] for a relatively small percentage in dollar amount of Macco's existing creditors; b) force Macco's other creditors, who hold in excess of $16,000,000 in allowed claims and have been subject to this bankruptcy proceeding for years, to pursue their state court remedies in an effort to recover anything from Macco; and c) restore management over Macco to Ms. Price and Mr. McGinnis, despite this Court having previously rejected a motion to dismiss this case that would have led to control over Macco being restored to Ms. Price and Mr. McGinnis.  For the vast majority in dollar amount of Macco's creditors, the Plan would be the equivalent of a dismissal of this case.
>
> *****
>
> The Plan is nothing more than a backhanded effort by Price to restore control over Macco to herself and her husband.  As the Court well knows, Ms. Price and her husband were removed from management for cause and replaced with a trustee.  None of the reasons that led to the Court's replacing pre-petition management have changed, and none of those reasons are resolved by the Plan.  In substance, the Plan is merely a transparent, collateral attack on the Court's appointment of [Trustee], and a transparent collateral attack on the [52-Page Order].[190]

Another creditor echoed that sentiment.

---

[189]Docs. 934, 936.

[190]All America Bank'[s] Objection to Disclosure Statement to Accompany Second Amended Plan of Reorganization Dated July 6, 2012, Proposed by Jennifer Price (Doc. 992) at 4-5, 11.

Based on the historical data of the wrongdoing of Price and McGinnis in their operation of Macco, the Proposed Plan is not feasible because there is no realistic possibility of an effective reorganization under their management."[191]

On August 2, 2012, a few days before the scheduled hearing on the Impairment Motion, Price withdrew the motion.[192]  The Court then set a hearing on the adequacy of the second amended disclosure statement for September 12, 2012.  On August 20, 2012, however, Price filed her third amended plan and disclosure statement.  This time, she designated all claims as impaired, proposed to reaffirm and except from discharge all guarantee claims, and proposed to pay all other unsecured claims from funds drawn on a $5 million letter of credit. Price would retain her equity ownership in MACCO, with Price and McGinnis serving as its officers.[193]

The UST, Trustee, AAB, FAA, QCB, and the Committee filed new objections to this third effort. These parties had recently discovered that Division Properties, LLC – an entity Price purchased from Trustee in January 2012, and which owned and operated the Remington Apartments and the Winslow Glen Apartments in Oklahoma City– filed a Chapter 11 case in the Northern District of Texas.[194]  This was Division Properties, LLC's second Chapter 11 filing in two years.  The first case was filed in 2010 in the Western District of Oklahoma in

---

[191]Creditor Louis F. Vargas and Red Fox Garden Apartments, LLC's Objection to Disclosure Statement of Jennifer Price (Doc. 999) at 9.

[192]Doc. 1015.

[193]Doc. 1072.

[194]See Doc. 1095; TRX-150 (docket sheet for In re Division Properties, LLC, Case No. 12-34679 filed July 20, 2012 in the U.S. Bankruptcy Court for the Northern District of Texas).

order to stay Wells Fargo from proceeding with receivership and foreclosure actions.  In 2012, Division Properties, LLC, again under management of McGinnis, was in default of its loan obligations, and Well Fargo again sought a receivership and foreclosure, which prompted the second bankruptcy filing, this time in Dallas, Texas.  Moving to dismiss the bankruptcy, Wells Fargo alleged bad faith and venue shopping.  Three weeks into the case, the debtor in possession had not yet requested permission to use cash collateral, and Wells Fargo sought an order prohibiting any unauthorized use.  In September 2012, an agreed cash collateral order was entered requiring Division Properties to make substantial adequate protection payments to Wells Fargo, which McGinnis represented would be funded by Price's investor, Mr. Snyder. That order was immediately breached when adequate protection payments were not made. Supplemental negotiated orders to cure those defaults were similarly breached.  Thereafter, a proposed Section 363 sale to Mr. Snyder or his entity, who allegedly promised to satisfy the mortgage debts in full, failed to close, notwithstanding being afforded numerous extensions over a two-month period.   After being hindered from exercising its rights for more than six months, Wells Fargo obtained a dismissal of the case and a 180-day bar order.[195]

The Division Properties bankruptcy cast serious doubt on the feasibility of Price's proposed plan for MACCO.  None of the objecting creditors would consider entering into a reaffirmation agreement with MACCO in exchange for allowing Price and McGinnis to retake control of MACCO.  Creditors were also justifiably skeptical of the proposed $5 million letter

---

[195]Courts may take judicial notice of the existence of matters of public record. "[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."  St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979).

of credit.  No documentation of a firm commitment by the proposed funder had been provided.  Indeed, the latest Division Properties fiasco underscored the unlikelihood that the promised funding would be forthcoming.

The disclosure statement hearing set for September 12, 2012, was stricken upon Price's request to allow her to file a fourth amended plan and disclosure statement.  The Court afforded Price until September 21, 2012, to file a disclosure statement that appended a written commitment from the proposed grantor of credit.[196]  Price timely filed her fourth amended disclosure statement, but the so-called commitment attached was not by any means definite.  NBC Bank offered to fund a $5 million letter of credit only if various conditions were met, including the deposit of a $5 million CD, payment of a commitment fee of $400,000.00, bringing current loans made by NBC to other Price entities, and the execution of guarantees by various individuals and entities.[197]  Also attached to the disclosure statement were letters executed by Ed Snyder and David Lieberman, manager of an LLC affiliated with Price and McGinnis, promising to fulfill NBC Bank's conditions.  In yet another round of objections, Trustee, QCB, AAB, FAA, the Committee, and the UST expressed legitimate doubt that the contingencies attached to the proposed funding of the plan would ever occur.  Nothing in the disclosure statement established that the parties offering to meet these conditions had the financial means to do so.[198]  All objecting parties urged the Court to deny approval of the

---

[196]Order, Doc. 1131.  Although the $5 million letter of credit was a material term of the initial plan filed in May 2012, as of the September 12, 2012 hearing, no written commitment to issue a letter of credit existed.  Tr. 9/12/2012 (Doc. 1254) at 10-12.

[197]Doc. 1158, Exh. D-1.

[198]As early as June 25, 2012, Trustee and other parties requested personal financial

disclosure statement as lacking sufficient information, and as not conducive to a confirmable plan.  None of the objecting creditors wanted the fate of their claims resting in the hands of Price or McGinnis.  At Price's request, the hearing on the fourth amended disclosure statement was continued indefinitely.[199]

In the meantime, Price continued purchasing assets from the MACCO estate, resulting in the release of claims against MACCO by some of the objecting creditors. On December 21, 2012, Price tried again, filing her fifth amended plan and disclosure statement proposing to pay certain creditors in full and guaranteeing payment to others, underwritten by a $20 million line of credit again allegedly promised by Mr. Snyder.[200]  Again Trustee, UST, AAB, FAA, and the Committee filed objections, asserting concerns similar to those previously made. Weighing the long history of breached agreements, many creditors concluded that Price and McGinnis had no intention of complying with the plan terms if it were confirmed.

In her First Modified Fifth Amended Plan, Price designated a third party disbursement agent.  This plan was modified a second and third time in conjunction with discussions among the parties.[201]  However, the third modified disclosure statement remained objectionable to Trustee, the Committee, the UST, and secured creditors.[202]  Again, among other issues, there was no evidence of a binding commitment of any lender to supply a $20 million line of credit

information from parties identified as willing to fund the plan, including Mr. Snyder, McGinnis and Price.  Tr. 6/25/2012 (Doc. 1250) at 10-12.

[199]Doc. 1308.

[200]Docs. 1382, 1383.

[201]Docs. 1404, 1405, 1423, 1425, 1474, 1475.

[202]Docs. 1487, 1489, 1490, 1491, 1492.

to fund the plan.  Mr. Snyder's commitment, attached to the disclosure statement, was unsigned, and Mr. Snyder's financial ability to make such a commitment was again unaddressed.  The parties negotiated and collaborated on another disclosure statement, and each party filed supplemental objections.[203]  A fourth modified fifth amended plan and disclosure statement were filed on March 8, 2013.[204]  The commitment letter attached to the disclosure statement was not still signed.  At a hearing on March 11, 2013, the parties agreed to defer further proceedings on the plan until contracts to sell the last two operating SPEs closed and the lender, AAB, released its $18 million guarantee claim against MACCO, at which point the validity of the $20 million letter of credit commitment would be moot.[205]

Accordingly, Trustee moved to sell the two remaining SPEs, SEP Riverpark Plaza, LLC and JU Villa Del Mar Apartments, LLC, to Price and her affiliates.  The sale was scheduled to close in May 2013, but Price objected to fees and expenses included in the secured lender's claim – fees and expenses AAB was forced to incur in response to Price's litigiousness during the course of the bankruptcy case.[206]  The objection delayed the closing of the sale, as well as resolution of the plan and disclosure statement issues.[207]  On May 23,

---

[203]Docs. 1515, 1516, 1517, 1518, 1520.

[204]Docs. 1527, 1530.

[205]Tr. 3/11/13.

[206] See, e.g., Doc. 1622 (AAB's response to Price's objection to its claim).

[207]Doc. 1653 (setting June 10, 2013, deadline for Price to file a modified plan and disclosure statement); Doc. 1669 (setting deadline for Price to file a modified plan and disclosure statement to "the tenth day following the closing of the Chapter 11 Trustee's pending sale of Debtor's bankruptcy estate's membership interests in SEP Riverpark Plaza Apartments, LLC and JU Villa Del Mar Apartments, LLC").

2013, AAB and Price entered into a stipulation[208] as to the amount of AAB's claim. The sale of SEP Riverpark Plaza, LLC and JU Villa Del Mar Apartments, LLC did not close until August 28, 2013, however.  Price did not propose another modified plan.

Price's plan of reorganization failed for the same reasons the Global Agreement failed– Price and McGinnis promised more than they could or would deliver.  In both instances, Price claimed that all creditors would be paid and claims would be released, but she failed to produce written evidence of a credible funding source.  Since Price and McGinnis lacked any record of transparency or trustworthiness, Trustee and the Committee as fiduciaries, and the UST as watchdog, reasonably and responsibly required assurances that Price and McGinnis, or their affiliates, could financially perform their contractual obligations prior to relinquishing property of the estate.  Nor were creditors willing to give Price and McGinnis the benefit of the doubt. Unfortunately, the plan process was extremely time-consuming, and amplified fees and expenses across the board, including those of Counsel, MED PLLC, and Trustee.

## I.    Renewed Attempt to Disband the Committee

As noted, the Committee actively opposed the proposed plan's intended treatment of unsecured creditors.  Shortly after filing her first amended plan, Price filed a Motion for Order Declaring Cessation of Bona Fide Existence of Creditors' Committee, or in the Alternative, Determination of its Lack of Standing.[209]  Again, she argued that because the three original

---

[208]Docs. 1661, 1662.

[209]Doc. 908.  At the hearing on the motion, counsel for the Committee recounted the numerous documented efforts by Price and McGinnis to eliminate the Committee.  Tr. 7/20/2012 (Doc. 1252) at 37-46.

Committee members had been paid in full, the Committee should be dissolved.[210]  Two members continued overseeing the proceedings on behalf of the unsecured creditor body.  One of them, Jackie Hill, purchased a small unsecured claim after McGinnis paid his original claim, and therefore he was in fact an unsecured creditor.  Claiming to be victimized by the Committee's aggressive oversight, however, Price contended that "it is inexplicable that the United States Trustee has permitted the membership of the Committee to evolve to the point where it has become merely a tool for the non-economic agenda of a single creditor whose original claim has long since been satisfied."[211]  In its defense, the UST argued that the Committee was a distinct entity that had fiduciary responsibilities to the entire body of unsecured creditors, and could not be terminated simply because its individual members' claims had been strategically paid by a third party.[212]

Tellingly, no one but Price and McGinnis challenged the adequacy of the Committee's representation of the unsecured creditor body or Committee counsel's representation or cost to the estate.  The Committee had been an effective advocate; its original investigation of McGinnis's activity while operating MACCO as debtor in possession led to the appointment

---

[210]It bears repeating at this point that before Trustee was appointed, McGinnis withdrew estate funds, transferred them to an account in the name of his friend, Richard Ledbetter, and purchased the $25,076.47 claim of Committee member Woodard Hernandez Roth & Day, in Mr. Ledbetter's name, and attempted to substitute Mr. Ledbetter for the Woodward firm on the Committee in order to manipulate the direction of the Committee. Trustee recovered the estate's funds from Mr. Ledbetter in Adversary No. 12-1092. Mr. Ledbetter's purchased claim was later disallowed.  Docs. 1460, 1511.

[211]Motion, with Brief in Support, for Order Declaring Cessation of Bona Fide Existence of Creditors' Committee, or in the Alternative, Determination of its Lack of Standing (Doc. 908) at 4, ¶ 17.

[212]Doc. 931.

of Trustee and the preservation of the $1.375 million settlement proceeds; and its efforts during the sales to Price increased purchase prices and earnest money deposits, all to the benefit of unsecured creditors.[213]  The estate was fortunate that the two original Committee members agreed to continue in that role – the majority of unsecured creditors were disinclined to serve, having watched the existing Committee members intimidated, manipulated, and sued by Price and McGinnis.[214]

    After a full hearing, Price's motion to disband the Committee was denied.[215]  On July 23, 2012, the UST appointed two additional unsecured creditors to the Committee– Cobblestone Apartments of Tulsa and Louis F. Vargas.[216]  Approximately one week later, an entity controlled by Price and McGinnis purchased Vargas's claim.[217]

---

[213]See Tr. 7/20/2012 (Doc. 1252) at 26-27 (UST's summary of the Committee's accomplishments).

[214]Id. at 28.

[215]Doc. 988.  In its bench ruling denying the motion, the Court acknowledged the accomplishments of the Committee, deeming them "successful."  Tr. 7/20/2012 at 51-52.

[216]Doc. 985.  Vargas filed Claim No. 48 in the amount of $543,442.59.  In his proof of claim, Vargas alleged that McGinnis, individually and on behalf of MACCO, made false representations in connection with the sale of an apartment complex to Vargas; breached MACCO's contract to properly manage the property; breached fiduciary duties to Vargas; failed to pay property taxes or account for and document operating expenses; and converted funds belonging to Vargas, all of which jeopardized the solvency of the apartments and led to foreclosure.  Addendum to Proof of Claim No. 48.

[217]Docs. 1151, 1226.  The Committee moved to disallow Vargas's claim against MACCO in the hands of McGinnis.  Docs. 1374, 1418.  Because Vargas sued MACCO and McGinnis jointly, McGinnis's purchase of the claim settled his own personal tort liability, for which he was not entitled to reimbursement from the estate.  The claim was disallowed. Docs. 1454, 1478.  Throughout these proceedings, McGinnis had represented to the Court that he had purchased Vargas's claim, but in the recent Fee Hearings, he testified that he actually repurchased the apartment complex rather than the claim itself.  Tr. 1/21/15 at 434.

## J.    Adversary Proceedings

As required under Section 1104 of the Bankruptcy Code, Trustee and MED PLLC engaged in forensic accounting to determine potential recoveries to the estate for unauthorized post-petition transfers and for fraudulent or preferential transfers.[218]  Trustee and Counsel commenced or joined in at least twelve adversary proceedings.

### 1.    Pending Adversaries Seeking Recoveries from Price and McGinnis

In 2012, Trustee filed four complaints, and in 2013, two additional complaints seeking recovery of a total of approximately $6.5 million in transfers made by MACCO to Price, McGinnis, or an individual or entity affiliated with them.[219]  In December 2012, McGinnis filed a motion to suspend the prosecution of the 2012 proceedings to "reduce the distraction and expenses caused by this litigation, which increases the administrative costs and depletes the resources available to fund a 100% plan."[220]  The motion drew objections from Trustee and the Committee.  After a hearing, the motion was denied, and the Court set scheduling conferences in the adversary proceedings for May 6, 2013.[221]  At the scheduling conferences, the Court set the matters for trial on September 16, 2013.  On July 16, 2013, the defendants filed motions to withdraw the reference.  Judge Jackson suspended discovery and scheduling order deadlines pending the District Court's ruling on whether withdrawal of reference was

---

[218]Tr. 7/18/12 (TRX-172)at 75-79.

[219]TRX-152.

[220]Doc. 1369.

[221]Doc. 1479.

warranted.  The motions to withdraw reference have been under advisement since September 16, 2013.

In September 2013, Price and McGinnis again filed applications to stay or dismiss the adversaries against them because, they alleged, the estate had sufficient cash to pay all remaining claims in the case.  Again, the applications were denied.

In December 2013, in connection with Price and McGinnis's agreement to convert the Chapter 11 cases to Chapter 7, Trustee agreed to dismiss the adversary proceedings on the ground that *at that point* it did appear, in fact, that the estate had sufficient cash to pay Chapter 11 administrative expenses and unsecured claims.  Trustee duly filed motions to dismiss, and then withdrew them after Price and McGinnis failed to tender the required releases.  Once releases were in hand, Trustee refiled the motions to dismiss.  Two creditors and the UST have objected to dismissal of these adversary proceedings against Price and McGinnis, however, in light of the drain on the estate's cash resulting from the continued post-conversion litigation Price and McGinnis have pursued, which may render the estate administratively insolvent after all. All pending motions in these adversary proceedings will be addressed by the Court after all Chapter 11 administrative expense claims are determined by final orders.

2.    Adversary Seeking Subordination of Claims.

Trustee and Counsel were also drawn into the Committee's adversary proceeding against Mr. Ledbetter, McGinnis, Price, and First Enterprise Bank ("FEB"), in which the Committee alleged a complicated conspiracy to defraud the estate.[222]  Price, McGinnis and

---

[222]Official Unsecured Creditors Committee v. McGinnis, Price, Ledbetter, and First

FEB moved to dismiss the case, arguing that the Committee did not have standing to bring the action, and then objected when Trustee moved to intervene and be substituted as plaintiff.[223] The parties ultimately agreed to allow Trustee as substitute plaintiff, and the matter was successfully concluded shortly thereafter when Trustee obtained agreed subordinations. FEB withdrew its unsecured proof of claim in the amount of approximately $1.1 million on September 10, 2013, and the adversary proceeding was dismissed.

### 3.    First Specialty Insurance Corporation litigation.

In connection with NV Brooks's sale of the storm-ravaged Brooks apartment complex to Living Investments, LLC, Trustee assigned insurance proceeds, estimated to be in excess of $1.3 million, to the purchaser.[224]  The insurer, First Specialty Insurance Corporation ("First Specialty"), refused to pay the claim, and in September 2013, filed an action in New York County court against the members of NV Brooks Apartments, LLC (*i.e.*, MACCO (99%) and General Properties, Inc. (1%)), seeking a declaration that it was not obligated to pay the claim. As Trustee's Counsel did not have expertise in insurance matters and was not licensed to practice in New York, Trustee identified Oklahoma counsel with such expertise, and New York local counsel that agreed to charge Oklahoma rates, and filed a motion for authority to

---

Enterprise Bank, Adv. No. 13-1013 (Bankr. W.D. Okla.).

[223]Adv. No. 13-1013, Docs. 14, 15, 17, 20, 26, 27, 28, 29, 30, 31, 32.

[224]Approximately $200,000.00 of the proceeds would be retained by the NV Brooks estate.

employ the firms to defend against the First Specialty's New York action and to pursue a bad faith breach of contract claim against First Specialty in Oklahoma.[225]

Price and McGinnis objected to the retention of counsel, contending that General Properties, Inc., a McGinnis company, had already retained counsel to represent General Properties, Inc. and MACCO[226] in the New York action, and that Price, as MACCO's ultimate residual interest holder, did not want the estate to incur the expense of retaining additional counsel. Price further stated that she was "unwilling" to defend the declaratory judgment action or pursue the bad faith claim "regardless of the benefits she may receive."[227] Price's stated intent to abandon the insurance claim alarmed Living Investments, LLC, causing its counsel to enter an appearance in the MACCO case, file a response to the objection to the employment application, and prepare for and attend a hearing on the matter in order to advise Judge Jackson of the stakes involved.[228]

At the hearing, which was attended by six attorneys, Price abruptly modified her stance and stated that she was "just objecting to the hiring of lawyers in New York."[229] Trustee's

---

[225]Doc. 1815; Tr. 11/4/13 (Doc. 1858) at 8-10.

[226]First Specialty served its complaint on McGinnis rather than Trustee. Trustee did not learn of the lawsuit until MACCO was in danger of defaulting. Loyd, Tr. 11/4/13 at 6.

[227]Price contended that she was the only party that would be affected by First Specialty's declaratory judgment action, which, of course, was not true. NV Brooks did not have sufficient funds to pay its creditors and administrative claims, or to resolve any claim by the purchaser of the Brooks apartment complex. Doc. 1821; Tr. 11/4/13 at 8-10.

[228]Doc. 1835.

[229]Tr. 11/4/13 at 27-28.

motion to retain special counsel was granted.[230]  Price and McGinnis appealed the order to the

Bankruptcy Appellate Panel (the "BAP").[231]

Thereafter, Trustee commenced the bad faith breach of contract proceeding against

First Specialty in the district court of Cleveland County, Oklahoma, which  First Specialty

removed to federal court.[232]  Trustee also filed an adversary proceeding against First Specialty

alleging that the New York action was filed in violation of the automatic stay.[233]

The Court was recently informed that the three interrelated First Specialty cases have

been settled.

**K.    The UST's Motion to Convert vs. Price's Motion to Dismiss**

On September 10, 2013, shortly after the last of MACCO's operating assets were sold,

the UST filed a motion to convert the MACCO and NV Brooks cases to cases under Chapter

7.[234]  In addition to proceeds from Trustee's operation and liquidation of the hard assets,

MACCO and NV Brooks also held avoidance, recovery, collection, and insurance claims

against third parties, as described above.  The UST believed conversion was preferable to

dismissal because –

> it is essential for a trustee, exercising fiduciary authority, to remain at the helm
> of these estates to bring final resolution to these cases and liquidate the
> remaining assets –   not Price and McGinnis or their chosen surrogate.

---

[230]Docs. 1845, 1848.

[231]Notice of Appeal, Doc. 1861.  Assignment of BAP No. 13-085, Doc. 1871.

[232]The United States District Court dismissed the case on the ground of *forum non
conveniens*, which Trustee appealed to the Tenth Circuit Court of Appeals.

[233]Deeba v. First Specialty Ins. Co., Adv. No. 13-1103 (Bankr. W.D. Okla.).

[234]Doc. 1778.

> Conversion . . . provides the most economical method to bring finality for these long embattled bankruptcy estates.[235]

With the recent withdrawal of FEB's $1.1 million claim and the disposition of Trustee's other claims objections, unsecured claims in the MACCO case now totaled less $600,000.00 and the Committee requested a partial distribution to unsecured creditors upon conversion, which Trustee and the UST supported.

Price and McGinnis objected to conversion, and moved to dismiss the cases.[236]  Price again argued that all creditors and administrative expenses could be paid with cash on hand, and that pursuing the claims against herself, McGinnis, and their affiliates was unnecessary to complete the administration of the estate, and would result in needless additional administrative expenses.[237]   The Committee and unsecured creditors "overwhelmingly oppose[d] any dismissal of the case."[238]   Trustee argued that it would be a mistake to "put [Price and McGinnis] back in control of a substantial fund of money and trust that they will pay the legitimate creditors of the estate which include both unsecured and administrative creditors."[239]   Trustee also pointed out that NV Brooks lacked sufficient cash to pay its unsecured creditors in full; that claims by Living Investments, LLC, and the public adjuster were outstanding; and that Price did not intend to pursue the bad faith breach of contract claim

---

[235]Motion to Convert Case to One Under Chapter 7 (Doc. 1778) at 5, ¶ 16.

[236]Docs. 1793, 1794.

[237]Motion for Voluntary Dismissal of Jointly Administered Bankruptcy Cases (Doc. 1794) at 5.

[238]Doc. 1808 at 5.

[239]Doc. 1804 at 1, ¶ 2.

against First Specialty.  For those reasons, Living Investements, LLC and NV Brooks itself, through its own counsel, likewise opposed dismissal and wholeheartedly supported appointment of a Chapter 7 trustee to proceed with the multifaceted First Specialty litigation.[240]

Price and McGinnis then filed an amended dismissal motion, proposing that MACCO's accumulated funds be deposited into escrow and an outside escrow agent be appointed to insure that creditors and administrative claimants were paid.[241]  Trustee countered that a Chapter 7 trustee would do just that, but under the watchful eye of the bankruptcy court.[242] A hearing on the motion to dismiss and motion to convert was set for December 3, 2013.

During this period, Price and McGinnis served Trustee with substantial discovery requests, ostensibly in preparation for a hearing on the motion to convert and motion to dismiss, and requested the Court to shorten the time for Trustee to respond.[243]  Trustee objected to the scope and breadth of the requests, and after an expedited hearing, the Court ordered Trustee to answer just three interrogatories and one document request (modified by an appropriate time parameter) on an expedited basis.[244]  Price also filed a motion to deconsolidate the NV Brooks case from the MACCO case, to which Trustee and counsel for

---

[240]Docs. 1809, 1850.

[241]Doc. 1832.

[242]Doc. 1870.

[243]Doc. 1851.  Most of the discovery requests related to Trustee's strategy with respect to the First Specialty litigation.  Doc. 1853.

[244]Doc. 1888.

NV Brooks objected because both entities were embroiled in the First Specialty litigation, neither estate had been fully administered, and deconsolidation would serve no purpose.[245]

## L.    The Conversion Agreement

At the December 3, 2013, hearing on the UST's motion to convert and Price's motion to dismiss, the parties announced an agreement on the following terms (the "Conversion Agreement"): (1) the MACCO and NV Brooks cases would be converted to Chapter 7; (2) Trustee would be appointed as Chapter 7 trustee in each case; (3) the Committee would be dissolved; (4) a partial distribution (90%) would be made to unsecured creditors, with interest on the full amount of the claims added to the final distribution; (5) a Chapter 11 administrative expense claims bar date would be set; (6) Price would file tax returns for all the SPEs for tax years 2010, 2011 and 2012 within 60 days so MACCO could file its outstanding fiduciary returns; (7) the adversary proceedings pending against Price, McGinnis, and related parties would be dismissed in exchange for mutual releases; (8) Price would dismiss the appeal to the BAP of the order approving employment of special counsel in the First Specialty litigation; (9) the parties would cooperate in prosecuting and defending the three pending lawsuits involving First Specialty; and (10) Trustee would file monthly interim reports.[246]

Counsel for Trustee prepared an agreed order incorporating the terms of the Conversion Agreement announced in open court. Although Price and McGinnis refused to sign or approve the form of order, the Court entered it on December 16, 2013, and both cases

---

[245]Docs. 1889, 1905, 1912.

[246]Tr. 12/3/2013 (Doc. 1901).

were converted to Chapter 7.[247]  Trustee was appointed as the Chapter 7 trustee for both estates[248] and Trustee was authorized to retain Counsel to represent him.[249]  At that point, the MACCO estate had approximately $1.6 million in cash.

Trustee and Counsel immediately took action to implement the Conversion Agreement by (1) obtaining authority to distribute over $500,000.00 to pay 90% of each allowed unsecured claim, and making such distributions; (2) obtaining and giving notice of an administrative claims bar date of January 31, 2014; and (3) filing motions to dismiss in the adversary proceedings involving Price and McGinnis.

Not only did Price and McGinnis refuse to sign the agreed order, they also refused to comply with it.  On the very day of the hearing in which they *agreed to dismiss* the BAP appeal, Price and McGinnis filed a brief explaining why the appeal should *not* be dismissed as interlocutory.[250]  Two weeks later, they filed their designation of record on appeal and

---

[247]Order, Doc. 1909.   On the proposed order, Judge Jackson interlineated the following:

> Notwithstanding the absence of the signature of counsel for Jennifer Price and Lew S. McGinnis, this Order accurately reflects the terms of the parties' settlement read into the record by their counsel on Dec. 3, 2013, and affirmed by counsel for each person/entity involved in the settlement.

[248]Doc. 1914.

[249]Docs. 1916, 1933.

[250]Doc. 1894.  This document was filed at 7:52 p.m. on December 3, 2013.  Because Price and McGinnis mistakenly filed their brief with this Court rather than with the BAP, the BAP dismissed the appeal for failure to prosecute.  Doc. 1900.  On December 12, 2013, Price moved to vacate the dismissal, which the BAP granted.  On December 19, 2013, Price refiled her brief with the BAP.

statement of issues to be presented.[251]  On December 20, 2013, the BAP directed Trustee to respond to Price's argument that the appeal should not be dismissed as interlocutory.  Trustee filed his response on December 23, 2013.[252]  In the end, the BAP dismissed the appeal as jurisdictionally defective, but not before Counsel was forced to invest significant time responding to an appeal of a non-appealable order that Price and McGinnis had agreed to voluntarily dismiss – another complete waste of everyone's time and resources.[253]

Also in violation of the Conversion Agreement and agreed order, Price and McGinnis refused to provide Trustee with the mutual releases required as a condition for Trustee's dismissal of the adversary proceedings. Trustee filed motions to dismiss the adversary proceedings in good faith, but when the releases were not forthcoming, he was forced to withdraw his motions.  After releases were finally provided, new motions to dismiss were drafted, filed, and noticed.

As of the date of the Fee Hearings, Price had still not filed the SPEs' tax returns, although her counsel represented that most of the returns were completed and ready to be filed.[254]  One reason the returns had not been filed was that Price objected to Trustee's motion to pay the accountant that has been retained to complete the SPE's returns.

### M.    Contested Chapter 11 Issues After Conversion

---

[251]Doc. 1919.

[252]McGinnis and Price v. Deeba, BAP No. WO-13-085, Doc. 17.

[253]The Court identified 8.6 hours billed by Counsel in connection with the appeal, resulting in fees of $2,160.00.

[254]For his part, Trustee kept the IRS apprised of the status of his efforts to file returns and the reasons why he had been unable to file them.  Deeba, Tr. 1/20/15 at 200-01.

At the time of conversion, just a few matters remained to be resolved in order to complete the administration of the Chapter 11 estate –*i.e.,* determining and paying final administrative expenses and filing tax returns.  Those matters likely could have been completed within a few months but for Price and McGinnis's repetitive, baseless, and irresponsible challenges to the integrity, skill, professionalism, and effectiveness of Trustee and Counsel in administering these Chapter 11 cases.

1.    Objections to Fee Applications and Affirmative Claims

On January 8, 2014, Counsel timely filed its final application seeking allowance and payment of $76,585.00, and expenses of $2,048.85, for the period of July 1, 2013 to December 16, 2013, and for final approval of all approved and paid interim fees and expenses.[255]   On January 29, 2014, Price filed an objection, requesting disallowance of Counsel's administrative claim for fees and expenses in full.  Price also advanced affirmative claims against Counsel, alleging breach of fiduciary duty, misrepresentation, negligence, legal malpractice, gross negligence, mismanagement, gross mismanagement, slander, libel, and misuse of funds and estate property.

On January 27, 2014, MED PLLC timely filed its final application for compensation, seeking fees of $11,902.00 and expenses of $23.47 for the period of July 1, 2013 to December 16, 2013, and for final approval of all approved and paid interim fees and expenses.  On January 31, 2014, Trustee timely filed his final application.  At that time, Trustee would have been satisfied with a final payment of $82,145.74,[256] which represented compensation based

---

[255]Doc. 1935.

[256]Doc. 1967.

on the number of hours spent in that final time period.  Aware of Price's blanket objection to Counsel's fees and the tort claims lodged against Counsel, however, Trustee reserved the right to seek up to his full statutory commission under 11 U.S.C. § 326 in the event he had to invest substantial additional time seeking payment and defending himself.

Price objected to both MED PLLC's and Trustee's final applications, asking the Court to deny all compensation, and to recover and setoff damages for alleged breaches of fiduciary duty, misrepresentation, negligence, mismanagement, gross mismanagement, slander, libel, and misuse of funds and estate property.[257]  Soon thereafter, Price sued Trustee in the United States District Court on the same claims, and then on the eve of a hearing on Trustee's fee application, she filed a motion to withdraw the reference of the fee application dispute to District Court, delaying the hearing indefinitely.  Price also objected to compensating other professionals in the case and sued the property management companies that Trustee retained, all of which required Trustee's attention and participation.  Trustee, therefore, has exercised his reservation of the right to request compensation based on the full amount of commissions calculated under Section 326.  Based upon $48,821,986.27 in qualifying disbursements to creditors, Trustee is to entitled up to $1,487,910.00 under Section 326.  After deducting amounts paid under interim orders, the unpaid balance of the Section 326 commission is $748,387.22.[258]

On April 14, 2014, Bankruptcy Judge Sarah Hall held a settlement conference in an effort to resolve Price's objections to these fee applications.  When no settlement was reached,

---

[257]Docs. 1983, 1991.

[258]Doc. 2352.

Judge Jackson set hearings on Trustee's and MED PLLC's fee applications for May 5, 2014.

Trustee and Counsel spent the weeks after the settlement conference preparing witnesses,

exhibits, and briefs for trial on all issues and claims raised by Price.  At 5:56 p.m. on May 1,

2014, Price filed a motion asking the District Court to withdraw the reference of Trustee's and

MED PLLC's fee applications so that her fee objections could be tried with the civil lawsuit

filed in the District Court.[259]  Judge Jackson, *sua sponte*, entered an order striking the hearings

"to be reset if necessary after resolution of pending matters in the District Court."[260]  Between

the time of the failed settlement conference and the scheduled hearing date, Counsel spent at

least 90 hours (incurring $22,500.00 in fees), and Trustee and his assistants spent at least 100

hours (incurring $23,150.00 in fees), preparing for a trial that did not occur, again due to the

machinations of Price and McGinnis.[261]

## 2.     District Court Lawsuit

On or about March 17, 2014, McGinnis purchased an unsecured claim against

MACCO.[262] On April 2, 2014, McGinnis[263] and Price filed a complaint in the United States

---

[259]Docs. 2061, 2062.

[260]Doc. 2063.

[261]In preparation, Counsel and Trustee interviewed and prepared at least 12 witnesses, including two experts; complied exhibit books; and drafted histories, charts, timelines, tables, computations, and briefs as were necessary to counter Price's broad and ambiguous allegations of misconduct.  See TRX 209 at 6-18; TRX 212 at 4-9.

[262]Docs. 2013, 2014.

[263]McGinnis has denied that he purchased the claim in order to obtain standing to sue Trustee and his professionals in federal court, Tr. 1/21/15 at 384-85, but the fact that he sued them two weeks after purchasing the claim renders McGinnis's denial not credible.

District Court for the Western District of Oklahoma against Trustee and Counsel[264] alleging negligence, gross negligence, breach of fiduciary duty, gross mismanagement, breach of duty of loyalty, and legal malpractice, demanding not less than $39 million and a jury trial.[265]  As Counsel was a named defendant, Trustee was forced to hire separate counsel to defend himself.  On April 17, 2014, Price and McGinnis dismissed Counsel from the District Court lawsuit with prejudice, "provided that this dismissal shall not affect Plaintiffs' rights with respect to the defensive claims they have asserted . . . in connection with the fee applications of Janice Loyd and Bellingham & Loyd, P.C."[266]

Trustee and MED PLLC moved to dismiss the complaint on grounds that (1) the Barton doctrine barred Price and McGinnis from suing Trustee without leave of the bankruptcy court; (2) rulings in the bankruptcy case on the same set of facts precluded Price and McGinnis from reasserting the claims in the District Court; and (3) Trustee and his professionals were immune from suit for actions taken as court-appointed officers.[267]

---

[264]The complaint also named as defendants two former Committee members and the former Committee's counsel, and the two property management companies and their affiliates.   The property management companies, who were accused of gross mismanagement, each hired counsel to defend, and gave notice that they will likely seek indemnification from the estate.

[265]Price, et al. v. Deeba, et al., CIV-14-319-D (W.D. Okla), District Court ("D. Ct.") Doc. 1.

[266]Order Dismissing Janice Loyd and Bellingham & Loyd, P.C. With Prejudice, D. Ct. Doc. 13.

[267]Trustee had to file multiple motions to dismiss in order to respond to the multiple amendments Price and McGinnis made to the Complaint.  See D. Ct. Doc. 6, 14, 24, 44, 45, and 65.

As stated above, when Price and McGinnis filed a motion in the bankruptcy court asking the Court to recommend that the District Court withdraw the reference of the Trustee's and MED PLLC's contested fee applications, all contested professional fee applications were stayed by Judge Jackson. Trustee, the UST, and certain unsecured creditors filed objections to the motion to withdraw the reference. Price and McGinnis then filed a series of motions requesting this Court to authorize them, under the Barton doctrine, to sue Trustee and his professionals in the District Court, generating another flurry of responses and replies. Litigation in connection with the motion to withdraw reference and the Barton doctrine motions, and in the District Court lawsuit, consumed the summer and part of the fall of 2014.

On September 17, 2014, the District Court dismissed the complaint against Trustee and MED PLLC for lack of jurisdiction under the Barton doctrine[268] and denied Price and McGinnis leave to further amend the complaint against Trustee and MED PLLC. On October 31, 2014, Judge Jackson entered his Recommendation That District Court Decline to Withdraw Reference to Bankruptcy Court because (1) it was not timely filed; (2) the bankruptcy court had jurisdiction to hear and finally determine the matters before it; and (3) judicial economy, convenience, and uniformity and efficiency in administration of the estate, and conservation of the parties' resources all weighed against withdrawal of the reference.[269] Judge Jackson also denied Price and McGinnis's request for authority to sue Trustee under the

---

[268]Order, D.Ct. Doc. 97.

[269]Doc. 2188.

Barton doctrine.[270]   Price and McGinnis appealed the Order Denying Motion for Barton Doctrine Relief to the District Court.[271]

        3.     Fee Hearings

Counsel's fee application was tried on November 3, 2014 through November 7, 2014. Trustee's and MED PLLC's applications, as well as Price and McGinnis's claims against Counsel, Trustee, and MED PLLC, were tried on January 20, 2015 to January 27, 2015.  Over the course of more than a year after the Conversion Agreement, administrative expenses in this case swelled due solely to the litigiousness and vindictiveness of Price and McGinnis. Their failed attempts to sue Counsel and Trustee in the District Court and their aggressive pursuit of objections to fees substantially increased the level of Chapter 11 administrative expenses, thus reducing the amount potentially available to unsecured creditors, subordinated creditors, and Price herself.

    **N.**    **Trustee's First Application for Interim Compensation**

Before addressing Price and McGinnis's current objection to Trustee's final application, and the merits of their claims against Trustee, the Court notes that many issues now before the Court were raised and fully litigated in connection with Trustee's first application for compensation.

---

[270]Doc. 2193.

[271]Doc. 2214.  McGinnis, et al. v. Deeba, et al., Case No. 15-CV-06-F (W.D. Okla.). The appeal is fully briefed.

On June 13, 2012, Trustee applied for compensation for his initial nine-month period as trustee, requesting a fee of $227,416.58.[272]  Price objected, contending that Trustee's services "were not beneficial to the estate and were in fact detrimental to the estate;" "were neither reasonable nor necessary to the administration of the estate;" and not calculated properly.[273]  She alleged that when Trustee was appointed, the estate had approximately $2 million in cash and unsecured creditors of about $156,000.00, and although all properties "were being well managed by" McGinnis and Price, Trustee fired the entire staff and replaced them with professional management companies that mismanaged the properties.[274]  She further alleged that Trustee made no effort to determine the identity of creditors and "has done everything in his power to prolong the administration of the estate incurring needless professional fees in the process."[275]  Finally, she alleged that his fee should be calculated according to disbursements reported on the Monthly Operating Reports.

At that time, Trustee also filed the first application for interim compensation and reimbursement of expenses for MED PLLC in the amount of $190,694.85.[276]  Price objected to MED PLLC's application on the ground that the PLLC "is but the alter ego of Michael E. Deeba and his staff," that the Bankruptcy Code did not authorize employment of a trustee's own firm as a financial consultant, and that the services performed by the PLLC were

---

[272]TRX-170.  At that point, Trustee had served for over one year and had not yet been paid one penny.

[273]Doc. 943 at 1-2.

[274]Id. at 2- 3.

[275]Id. at 3.

[276]Doc. 889.

bookkeeping services that were duties of Trustee, and therefore were not separately compensable.[277]  In addition, Price objected to compensating two contract CPAs because they did not file affidavits of disinterestedness, and she objected to services rendered on behalf of the non-debtor SPEs.[278]  Price also contended that the rates charged were excessive.[279]  A hearing on the contested applications was set for July 18, 2012.

On Friday, July 13, 2012, only five days before the hearing, Price served sweeping generic subpoenas on Trustee, Counsel, the property management companies, and the UST demanding the production of, among other documents, "all communications, including emails, pertaining to the Estate of Macco Properties, Inc." by 9:00 a.m. on Tuesday, July 17, 2012. Each subpoenaed party was forced to quickly file a motion to quash the subpoenas, and in some cases, a motion for protective order to assert privileges.  As was her pattern and practice, instead of pursuing the subpoenas or addressing the motions to quash and for protective order, Price simply withdrew the subpoenas, having caused another needless increase in the cost of administering the estate.

At the hearing, Trustee presented compelling evidence refuting each of Price's objections to the applications for compensation.[280]  The evidence established that during the first interim period, Trustee devoted 80 to 90 percent of his total time to this case, precluding

---

[277]Doc. 942.

[278]Id.

[279]Id.

[280]The evidence presented at that July 18, 2012 hearing is consistent with the evidence presented at the hearings held in November 2014 and in January 2015.

him from taking other engagements. Trustee maintained detailed time records of services rendered, and meticulously differentiated between time spent on trustee functions (which he presented in connection with the application for a commission as Trustee)[281] and time spent on accounting and bookkeeping functions (which were detailed in MED PLLC's application).

In justifying retaining a contract CPA, Trustee testified that when he entered the case, he "noticed a runner running back and forth with large amounts of cash and checks, large amounts of checks made out to cash to run down to cash the checks at the banks [to prevent] utility cutoffs."[282]   None of the ledgers reflected unpaid utility bills, however.  To sort out what payables were outstanding, MED PLLC used the services of the contract CPA to review the ledgers, bills, and dozens of checking accounts, and to communicate with the utility and insurance companies in order to obtain accurate information.  This CPA was identified in the original application to retain MED PLLC, and was charged with "assess[ing] the debtor's accounting systems, to kind of do an internal control check."[283]  This CPA "had experience going into companies for banks, for creditors, and also companies calling him to come in and be their interim CFOs."[284]  Due to the disorderly state of financial records turned over to Trustee, the CPA's services were essential in order to establish a baseline for Trustee's

---

[281]Chapter 11 trustees are required to maintain detailed time records even though 11 U.S.C. § 326 restricts a trustee's compensation to a percentage commission based on distributions.  Had Trustee been compensated on an hourly basis for trustee functions, his trustee fee for the initial nine-month period would have exceeded $300,000.00.

[282]Deeba, Tr. 7/18/12 (TRX-172) at 40.

[283]Id. at 54.

[284]Id. at 54-55.

accounting for the estate.  Upon the resolution of the initial crisis, Trustee no longer needed the services of the contract CPA, and relied exclusively on MED PLLC support personnel for his accounting and bookkeeping needs.

With respect to the necessity for services of the second alleged "contract" CPA, Trustee explained that under McGinnis's management, no written agreement between MACCO and the supposed third-party employee leasing company had been signed,[285] workers compensation insurance was grossly insufficient, and payroll checks were bouncing.  This CPA, who was an employee of  MED PLLC and *not* a contract CPA, was asked to "mirror payroll" in order to insure that employees were insured and paid.

Trustee calculated his fee based on disbursements to third parties, and carefully avoided counting intercompany transfers.  Further, Trustee, as representative of the majority interest holder in the SPEs, collected and accounted for revenues and expenses within the SPEs; thus, payments to vendors and other post-petition creditors by the SPEs constituted disbursements made by Trustee.

At the hearing on the first application, Price also attempted to establish that Trustee failed to perform his duties under 11 U.S.C. § 1106, specifically that he did not "file a plan." Trustee credibly explained that in the first nine-month period:

> I have been busy selling properties, I've been busy defending the estate, I've been busy defending the trustee through litigation.  We have had several offers, we had the global offer, which put me behind by three months, we've had massive interference, and I have been extremely busy.  If you look at my time records you can figure out exactly what I've been doing. Now that I've gotten rid of all of the non-income producing properties, because those were the ones

---

[285]The employee leasing company was formed by Richard Ledbetter a few weeks before Trustee was appointed.  Mr. Ledbetter was a strawman for McGinnis.

that had the biggest deficiencies attached to them, . . . now I can concentrate on doing a plan. And we've talked about doing a plan.[286]

Price also renewed charges that Trustee failed to file a report concerning formulation of a plan,[287] that he mismanaged the apartment complexes, and that he caused a huge loss in value of the properties – claims made and rejected by the Court ten months earlier in the 52-Page Order.

Price also argued then, as she does now, that Trustee should have immediately paid off the unsecured creditors listed on the schedules drafted by McGinnis, and dismissed the case. Trustee testified that he would not and could not have done that:

> Trustee: You've got $58 million worth of contingent [liabilities] listing on schedules. I'm a trustee that comes in. You want me to disburse 155,000, which the unsecureds may have been 155,000, [but] there may have been deficiencies. So you wanted me to pay the unsecureds?
>
> Counsel for Price: Well, we've already identified that all of those contingent liabilities that were listed in that schedule essentially were guaranties, correct?
>
> Trustee: That is correct. So what if one of the guaranties came in? If one of the guaranties comes in and there's $2 million, then what have I done? I've disbursed the money that I should have done pro rata. No, sir. I would not have done that.[288]

The Committee supported Trustee's applications, applauding the transparency and accounting Trustee provided, and confirming his services as necessary to the administration

---

[286]Tr. 7/18/12 at 122-23.

[287]Trustee rebutted this charge with the introduction of his Initial Report dated August 21, 2011. Id. at 151-53.

[288]Deeba, id. at 128. See also id. at 153-54 (in addition to guarantees, disputed claims in excess of $7 million were filed by litigation creditors).

of the estate and as beneficial to creditors.[289]  Counsel for FAA supported the applications, "welcom[ing] the sense of trust that they obtained once the trustee became appointed and started acting."[290]  As counsel for the UST pointed out:

> Most of the costs of administration in this case have been driven by the actions of Price and McGinnis, and this has been a very litigious Chapter 11.  It's unfortunate, but it has been.  What [Trustee] has brought to this case is he's brought transparency, accountability, he's brought compliance with the bankruptcy statutes and the Code.  He's brought forth and attempted to negotiate and work in the spirit of cooperation with . . . Price and McGinnis.  He has negotiated with the secured creditors and he has negotiated with the unsecured creditors.[291]

Price's rehashed objections were again overruled, and the Court approved Trustee's and MED PLLC's applications in full.

Many of these twice-rejected objections have resurfaced in Price and McGinnis's objections to Trustee's and MED PLLC's final fee applications, but nothing presented by Price and McGinnis at the most recent hearings warrants a different result.

## III.    CONCLUSIONS OF LAW

### A.    Application of Chapter 11 Trustee

Trustee filed three interim fee applications, a final fee application, and three supplements to his final fee application, and seeks final approval of compensation in the amount of $1,487,910.00, the full amount of the commission on disbursements calculated

---

[289]Ruston Welsh, id. at 94.

[290]Max Tuepker, id. at 180.

[291]Charles Glidewell, id. at 179-80.

under Section 326.[292]   Trustee presented two highly respected experts, D.R. Payne and

Professor Jack Williams, in support of his application.[293]   Their unrefuted testimony was

especially helpful to the Court.

To the extent that Price objects to the form of the applications and billing statements,

the Court finds and concludes Trustee's time keeping and narrative was detailed and precise,

and allowed the Court to perform a meaningful review of the services provided to determine

whether the time spent was reasonable.[294]

Section 330(a)(7) of the Bankruptcy Code governs how the court "shall treat" the

compensation of trustees.  It provides:

---

[292]See TRX-170 (first interim application), TRX-173 (second interim application), TRX-175 (third interim application), TRX-177 (final application), TRX-179 (first supplement through April 2014), TRX-212 (second supplement through November 2014), and Doc. 2342 filed on January 25, 2015, as amended by Doc. 2352.

[293]D.R. Payne has over 30 years of bankruptcy/insolvency accounting and consulting experience, is managing director of a business valuation and appraisal firm, and has extensive experience serving as a trustee, examiner, officer, receiver and in other fiduciary positions. Professor Williams is the resident scholar for the Association of Insolvency and Restructuring Advisors (AIRA), has been resident scholar for the American Bankruptcy Institute, and is an attorney, financial advisor, and forensic accountant, and educates on all aspects of bankruptcy law.  He is also an expert in finance and accounting, and business management.

[294]Price complains that Trustee and his staff engaged in inappropriate block billing. "'Block billing' refers to the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks."  Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1554 n.15 (10th Cir. 1996).  Trustee's billing statements did not lump all tasks in a day into one time entry.  Several small tasks are described in one entry in some cases, but those tasks generally concern the same subject.  In any event, the time entries are sufficiently detailed to allow the Court to review whether the amount of time spent on the stated tasks was reasonable. Professor Williams also concluded that Trustee's applications provided, in detail, all the information one would need to determine whether the requested fees should be approved. Tr. 1/21/15 at 313-14.

-87-

> In determining the amount of reasonable compensation to be awarded *to a trustee*, the court shall treat such compensation as a commission, based on section 326.[295]

Section 326(a) provides a formula for calculating a trustee's commission as follows:

> In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee *for the trustee's services*, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.[296]

Section 330(a)(1) is the general provision governing the process of compensating estate professionals. It states:

> After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award *to a trustee*, . . . or a professional person employed under section 327 or 1103–
>
> > (A) reasonable compensation for actual, necessary services rendered *by the trustee*, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
> >
> > (B) reimbursement for actual, necessary expenses.[297]

A Chapter 11 trustee must establish that its request for compensation is reasonable under the same standards applicable to attorneys and other professional persons employed by the estate. These standards are set forth in Section 330(a)(3) and (a)(4), which provide –

---

[295]11 U.S.C. § 330(a)(7) (emphasis added).

[296]11 U.S.C. § 326(a) (emphasis added).

[297]11 U.S.C. § 330(a)(1) (emphasis added).

-88-

(3)   In determining the amount of reasonable compensation to be awarded to an examiner, *trustee under chapter 11*, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for –

(i) unnecessary duplication of services; or

(ii) services that were not–

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.[298]

Thus, in determining a Chapter 11 trustee's compensation, the Court must determine

the commission the Chapter 11 trustee would be entitled to under Section 326, based on

---

[298]11 U.S.C. § 330(a)(3) and (a)(4)(A) (emphasis added).

"moneys disbursed" by the trustee. Because Section 326 provides that "reasonable compensation" is "not to exceed" the amount calculated under the commission formula, that calculation sets a ceiling on a trustee's compensation.[299] The Court must also assess "reasonable compensation" under both Section 330(a)(3) and (a)(4). This analysis results in a "lodestar" based on the number of hours reasonably spent multiplied by reasonable hourly rates, which may be adjusted up or down depending on the circumstances. Finally, the Court has wide discretion to enhance or reduce compensation under certain circumstances after evaluation of the so-called <u>Johnson</u> factors.[300]

Since the 2005 amendments to the Bankruptcy Code, which added Section 330(a)(7) ("[i]n determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326"), it is unclear whether the Section 326 commission-based compensation should be "treated" as presumptively reasonable, subject to rebuttal by application of the Section 330(a)(3) and (a)(4) factors, or whether the lodestar analysis of Section 330(a)(3) and (a)(4) sets the presumptively reasonable fee, which can be enhanced by application of the <u>Johnson</u> factors,

---

[299]<u>See</u>  <u>Connolly v. Harris Trust Co. (In re MiniScribe Corp.)</u>, 309 F.3d 1234, 1241 (10th Cir. 2002).

[300]<u>See</u>, <u>MiniScribe</u>, 309 F.3d at 1243-45; <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974).

but only up to the Section 326 cap.[301]  The Court need not decide the issue, however, because under the circumstances of this case, it would arrive at the same result either way.

      1.     Section 326 Calculation

Trustee seeks as compensation the full Section 326 commission based upon disbursements of $48,821,986.27 (the "Section 326 Base").[302]  This figure appropriately does not include the value of abandoned property, or the value of releases of debt against the estate resulting from the assumption of the debt by another entity.[303]  Applying the graduated statutory commission percentages to the Section 326 Base results in a commission of $1,487,910.00.  Trustee has been paid $739,522.78 under interim compensation orders, leaving an unpaid balance of $748,387.22.[304]

---

[301]In MiniScribe, the Tenth Circuit held that "§ 326(a) sets the maximum compensation payable to the trustee; it does not establish a presumptive or minimum compensation. . . .  Accordingly, a court awarding trustee fees must begin by assessing reasonableness under § 330(a) before applying the percentage-based cap under § 326(a)." Id. at 1241.  MiniScribe was decided in 2002, three years before the BAPCPA amendments to the Bankruptcy Code which provided, for the first time, that the court "shall treat" a trustee's "compensation as a commission, based on Section 326." 11 U.S.C. § 330(a)(7).  The Tenth Circuit has not had an opportunity to decide whether Section 330(a)(7) requires courts to treat the Section 326 commission as presumptively reasonable compensation.  The Ninth Circuit Bankruptcy Appellate Panel, in a well-reasoned opinion, makes that leap.  See Hopkins v. Asset Acceptance LLC (In re Salgado-Nava), 473 B.R. 911 (B.A.P. 9th Cir. 2012).

[302]MED - Demonstrative Aid No. 1 (Corrected), Exhibit 1 to Supplement to Application of Chapter 11 Trustee for Approval of Final Fees for Chapter 11 Trustee (Doc. 2352).

[303]These do not qualify as "moneys disbursed or turned over in the case by the trustee to parties in interest." 11 U.S.C. § 326(a).

[304]Because no more disbursements will be made *in the Chapter 11 case*, Trustee's compensation for services rendered in administering the Chapter 11 case is capped at the amount he has requested, notwithstanding that he will be rendering additional services to

Expert witness D. R. Payne was asked to independently verify the numbers Trustee included in his Section 326 Base, including whether Trustee accurately backed out intra- and inter-company transfers. Mr. Payne reviewed all the relevant source documents used by Trustee, including bank statements and reconciliations, closing statements, accounting ledgers, and monthly operating reports of the five Chapter 11 estates for which he disbursed funds. Using the source documents, Mr. Payne's testing and analysis determined that every dollar for which Trustee claimed a commission could be verified as a disbursement, with a few immaterial deviations.[305] In his review, Mr. Payne identified disbursements made upon the sales of six properties that Trustee omitted from his commission calculation but which, in Mr. Payne's opinion, could have and should have been included.[306] After Mr. Payne's

---

finally establish the amount of administrative expenses of all estate professionals, to file tax returns, and to otherwise complete the administration of the Chapter 11 estate.

[305]Mr. Payne did not start his analysis with the source documents and independently compile a list of disbursements from those documents. Rather, he started with Trustee's list of disbursements and looked for documentary proof that the disbursements Trustee claimed to have made to claimants were actually made.

[306]Although Mr. Payne's method of verification was not designed to identify disbursements actually made for which Trustee was *not* claiming a commission, Payne later reviewed documentation of sales transactions and discovered several large disbursements missing from Trustee's Section 326 Base. These included disbursements to creditors resulting from Trustee's sales of MA Cedar Lake Apartments, LLC; Holbrook Shopping Center, LLC; 59th Street Business Park, LLC; Chalet Apartments; JU Madison Park Apartments, LLC; and Charter Business Park. Payne, Tr. 1/21/15 at 281, 287-88. Price was troubled by these omissions, contending that Trustee was "picking and choosing" which disbursements to include in his Section 326 Base. Id. at 288. But Mr. Payne was not troubled, explaining that because a Section 326 commission is a ceiling, the omission of legitimate disbursements, whether inadvertently or in the exercise of billing judgment, was not prejudicial to the estate.

-92-

testimony, Trustee supplemented his compensation request to add two of the inadvertently omitted disbursements identified by Mr. Payne, waiving the others.[307]

Price points to certain disbursements she contends should be excluded from the Section 326 Base.  First, she disputes the inclusion of disbursements made by the SPEs to their own creditors because they were not disbursements made in the MACCO Chapter 11 case and not reflected in MACCO's monthly operating reports.  Mr. Payne testified that because MACCO was a property management company operating a large "business enterprise" consisting of real property and SPEs that held real property, Trustee had a duty and responsibility to oversee, control, and account for all of the SPEs' disbursements.[308]  Trustee undertook these responsibilities and performed services that can be compensated only by including these disbursements in the Section 326 Base.

Price also argues that since the Court had not appointed Trustee in any of the Chapter 11 cases of the subsidiary SPEs, Trustee should not be compensated for trustee services rendered in those cases.  These SPEs were "debtors in possession."  MACCO was their sole managing member.  The only individual authorized to act on behalf of MACCO was Trustee.

---

[307]Professor Williams also testified that Trustee used appropriate source documents in determining his base and that the calculations were accurate. Tr. 1/21/15 at 314-16.

[308]Tr. 1/20/15 at 240, 258, 262-63.  Professor Williams agreed with Mr. Payne's assessment.  Tr. 1/21/15 at 321.  MACCO was not a simple holding company, as Price alleges.  Mr. Payne testified: "[I]f we were appraising the company, I would not describe it and characterize it in the appraisal as . . . a real estate holding company, I would characterize it as a property management company that holds interest[s] in special purpose entities."  Id. at 286.  McGinnis himself described the business of MACCO as one of acquiring properties, operating them to "maximum performance," and then selling them.  Tr. 1/21/15 at 354, 360. Trustee explained that MACCO was not only the majority interest owner and "managing member" of the SPEs, but was also obligated to manage the SPEs under management agreements.  Tr. 1/20/15 at 32-33.

Trustee became the fiduciary wholly responsible for managing and operating the debtor SPEs, complying with laws and regulations, paying the operating and administrative expenses, disposing of assets, paying creditors, filing reports, and otherwise fulfilling the duties of the debtors in possession. Notwithstanding that he had not been appointed trustee in those Chapter 11 cases, he functioned as trustee, as no other individual had authority to act on behalf of the SPEs.

Moreover, maintaining the businesses of all debtor and non-debtor SPEs, including receiving and disbursing funds, was necessary to preserve the value of MACCO's estate. Trustee's obligation to the MACCO enterprise *required* him to actively oversee and direct the operations of dozens of large multi-family and business properties, manage the demands of creditors, and determine how to realize from each asset the best result for the estate. All funds flowing through the entire business enterprise were managed and accounted for by Trustee. Again, Trustee rendered significant services that can be compensated only by including SPE disbursements in the Section 326 Base.

Price also argues that "constructive" disbursements cannot be included in the Section 326 Base, and contends that payment of secured debt at the closing of a sale of property by the title company or escrow agent is a "constructive" rather than an actual disbursement. Price is correct that "constructive" disbursements do not qualify as disbursements for Section 326 purposes, but she is incorrect in her definition of a "constructive" disbursement.

A "constructive" disbursement, according to case law, occurs when a trustee surrenders *property* to a secured creditor in full or partial satisfaction of its claim rather than liquidating the property and disbursing the proceeds. The majority position is that the value of

-94-

surrendered property does not constitute "moneys disbursed," and therefore "constructive"

disbursements must be excluded from the Section 326 base.[309]

Price has not identified any "constructive" disbursements in Trustee's Section 326

Base, however.  Trustee sold either real property or the estate's interest in an entity, converting

these assets into cash.  These moneys were generally disbursed by Trustee's agents, under

Trustee's direction, to parties in interest that were entitled to the funds.

> When . . . the proceeds of a sale or refinancing are disbursed by an escrow
> agent of a title company to secured creditors[,] the trustee is legitimately
> entitled to treat this as a trustee's *actual* disbursement (and not just a
> constructive disbursement).  The trustee's use of an escrow agent to make the
> direct disbursements is simply a less costly, conventional, and practical exercise
> of the trustee's legal and business judgment.  The important legal point for
> purposes of interpreting section 326 is that the title company remains an agent
> of the trustee, who is the principal, and as the principal, the trustee is entitled
> to treat the distributions to the creditors by the title company as essentially acts
> performed for the benefit of the creditors of the estate by the trustee's agent,
> acting under the direct supervision and direction of the trustee."[310]

---

[309]See Tamm v. United States Trustee (In re Hokulani Square, Inc.), 776 F.3d 1083,
1086 (9th Cir. 2015) (trustee was not entitled to a commission on the amount of lender's credit
bid; "[i]n a credit bid transaction, the trustee turns property over to the creditor, and the
creditor reduces the amount the estate owes him by the value of his bid.  The only thing
'disbursed or turned over' by the trustee is the underlying property. . . .  However broadly we
define 'moneys,' the term can't be expansive enough to encompass real estate[.]").  See also
In re Lan Assocs. XI, L.P., 192 F.3d 109, 116-18 (3d Cir. 1999); In re England, 153 F.3d
232, 235-37 (5th Cir. 1998).

[310]1-6 Collier Compensation, Employment and Appointment of Trustees and
Professionals in Bankruptcy Cases ¶ 6.02[2] (Matthew Bender & Co. 2014).  Both Professor
Williams and Mr. Payne considered disbursements to creditors by escrow agents or a title
company to be disbursements as agents of trustee and properly included in the Section 326
base.  Payne, Tr. 1/21/15 at 278-79; Williams, Tr. 1/21/15 at 315-16.  See also In re Rybka,
339 B.R. 464 (Bankr. N.D. Ill. 2006) (reflecting a split in authority, but concluding that the
more reasoned view is that where a trustee's services result in the sale of property, the fact
that the trustee does not insist on depositing the entire sale proceeds into a trustee account
and disbursing them himself to secured creditors, but instead employs an escrow agent to do
so, should not deprive the trustee of his commission for fully administering that property).

Trustee appropriately included disbursements of funds made at closings in his Section 326 Base.

Price also objects to including disbursements made to professionals in the case in the Section 326 Base.  Although some courts located in the Eastern District of New York agree with the position taken by Price,[311] the better view is that disbursements to administrative claimants under Section 503(b)(1) are not excluded from the Section 326 base.[312]  Section 326(a), which provides for commission-based compensation on "*all moneys* disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims,"[313] does not either explicitly or implicitly exclude "moneys disbursed" to administrative claimants or any subset thereof.

Price contends that Trustee's Section 326 compensation should be limited to disbursements reported in MACCO's monthly operating reports, which would result in maximum compensation of $27,316.00.[314]  The law does not require that result, and the circumstances of this case do not support that result.  Disbursements that Trustee made to

---

[311]See, e.g., In re Testaverde, 317 B.R. 51, 55 (E.D.N.Y. 2004).

[312]See, e.g., In re Orient River Investments, Ltd., 133 B.R. 729, 731-32 (Bankr. E.D. Pa. 1991).

[313]11 U.S.C. § 326(a)(emphasis added).  The authors of Collier Handbook for Trustees and Debtors in Possession, a treatise that summarizes prevailing case law, indicates that distributions to administrative claimants qualify as disbursements for Section 326 purposes. Both Professor Williams and Mr. Payne testified to the same effect.  Williams, Tr. 1/21/15 at 323-24; Payne, id. at 285-86, 294-95.

[314]PMX-121.

creditors of MACCO's subsidiaries with proceeds of the sales eliminated MACCO's exposure on its guarantees, and constituted valuable services to the MACCO estate.

The Court concludes that Trustee used an appropriate methodology to calculate his Section 326 Base, and properly calculated the commission under the Section 326 formula to be $1,487,910.00.

2.      The Adjusted Lodestar Test

In the Tenth Circuit, trustee compensation is tested for reasonableness using the adjusted lodestar approach, which requires the determination of (a) the lodestar (hours x rate) after evaluating the "nature, the extent, and the value" of services under Section 330(a)(3) and (a)(4); and (b) whether extraordinary results or other circumstances warrant an adjustment of the lodestar (by evaluating the "Johnson factors").[315]  The Court's Section 330(a)(3) analysis is as follows:

a.      *Time spent*

Trustee and his staff recorded 4,398 hours from May 31, 2011 to October 31, 2014, 3,208 of which are attributable to Trustee himself.[316]  On January 20, 2015, Trustee testified that he had expended an additional 180 hours since October 31, 2014.[317]  The Court notes that Trustee also spent time preparing for and attending the Fee Hearings in January 2015, which the Court conservatively estimates added another 60 hours.  The Court concludes that Trustee and his staff spent a minimum of 4,638 hours administering the Chapter 11 case.  In reviewing

---

[315]MiniScribe, 309 F.3d at 1243-44.

[316]Deeba, Tr. 1/20/15 at 44.

[317]Id. at 38-39, 66.

Trustee's time sheets, it is obvious to the Court that Trustee performed efficiently, delegated appropriately, and exercised stellar billing judgment. Trustee also incurred, and continues to incur, expenses that have not been applied for, including legal fees, copying costs, expert witness fees, and other out of pocket costs.[318]

b.    *Rates*

In his fee applications, Trustee billed his services at an hourly rate of $275.00, and billed his staff's services at rates ranging from $55.00 (accounting clerk) to $150.00 (CPA). The rates charged by Trustee and his staff are on the low end of the range of rates this Court has approved in other cases for professionals with comparable credentials and skills.[319] For example, from 2001 to 2007, the Court approved compensating professionals functioning as interim management and liquidating trustee at rates of $410 to $450 per hour.[320] In this case, witness David Payne, who has accepted similar assignments as Trustee, and practices in the

---

[318]Id. at 39.

[319]Trustee has over 28 years experience in accounting, tax, management, valuation and consulting, has been a financial analyst in the UST program, and has specialized experience in investigative and forensic accounting, acquisitions, management, and bankruptcy tax issues. He has served as a court-appointed trustee, receiver, examiner, personal representative, and expert witness.

[320]In re Commercial Financial Services, Inc., Case No. 98-5162-R (Bankr. N.D. Okla.) (F. Caruso and B. Sharp of Development Specialists, Inc.).

In addition, in 2003, the Court determined the appropriate rates for professionals retained as financial advisors to a committee by comparing each individual's experience and skills to other professionals employed in the case and arrived at rates of $275 (for the least experienced) to $400 per hour (for the more senior professionals), which determination was affirmed by the Tenth Circuit. See In re Commercial Financial Services, Inc., 427 F.3d 804, 810 (10th Cir. 2005). Trustee's experience and skills are comparable to the most senior of these professionals.

same region as Trustee, charges an hourly rate of $345.00.[321]  The Court finds that a reasonable hourly rate that would compensate Trustee for the broad spectrum of specialized services he efficiently provided in managing, operating, liquidating, and administering the five Chapter 11 estates should be no less than $345.00 per hour.

>    c.    *Services were necessary to the administration of the case, or beneficial at the time at which the service was rendered toward the completion of the case*

It has been established and justified multiple times that ample cause existed for the appointment of a trustee – specifically incompetence and gross mismanagement of the affairs of MACCO by McGinnis, both before and after the filing of the Chapter 11 case.  Once appointed, Trustee performed all necessary services to: bring the MACCO estate into compliance with the Bankruptcy Code and other federal, state and local laws; collect and protect property of the estate; segregate and protect secured creditors' cash collateral; pay unpaid administrative expenses and prevent termination of insurance; protect the interests of employees and tenants; employ experienced professionals; investigate the acts, conduct, assets, liabilities and financial condition of MACCO and its subsidiaries; investigate and stabilize MACCO's businesses and properties and determine whether financial and physical conditions warranted continued operations; furnish information to all parties in interest; examine, dispute, and settle proofs of claim as appropriate; determine whether reorganization or liquidation was appropriate; investigate transfers and potential recoveries; and bring

---

[321]Payne, Tr. 1/20/2015 at 233.  Mr. Payne has been in practice for more than 30 years and has accepted the same types of assignments as Trustee, including as interim management, trustee, examiner, expert witness and receiver.

adversary proceedings as appropriate.  Trustee's requirement for releases of guarantees in connection with sales of real property and the SPEs, and Trustee's cooperation with and reporting to lenders, was especially beneficial to all creditors.

All services performed by Trustee were necessary and beneficial toward the completion of the administration of the estate, even though the case dragged on for much longer than necessary.  As set forth in the findings of fact, with Price and McGinnis repeatedly challenging Trustee's authority, his competence, his business judgment, and his motivations, even the most routine tasks became monumental undertakings, consuming extraordinary resources – not only those of Trustee and Counsel, but also those of creditors and their counsel, the UST and its counsel, and the Court and its staff.  But services rendered by Trustee in responding to the unwarranted challenges were, unfortunately, *necessary* to the administration and/or *beneficial toward the completion* of the administration of the estate.

Objections by Price regarding the necessity and benefit of Trustee's services include an allegation that Trustee unnecessarily kept the case open for his own benefit.  No credible evidence supports that contention.[322]

---

[322]Price claims that under Tenth Circuit precedent, once it was apparent that MACCO could not be reorganized, Trustee had a duty to dismiss or convert the case.  Respondents' Post-Trial Brief (Doc. 2375) at 16, *citing* In re Lederman Enters., Inc., 997 F.2d 1321, 1323-24 (10th Cir. 1993) and In re Volador Equity/Income Fund '86-'87, 131 B.R. 739 (Bankr. W.D. Okla. 1991).  Price focuses on a single statement of Counsel that "at no time did we think a plan of reorganization was going to work" to conclude that no further services of Trustee were necessary or beneficial to the estate.  Brief at 16.  The fact that Trustee could not propose a plan did not render his services to the estate worthless.  Trustee accomplished what could not have been accomplished if the case were dismissed or converted– he operated the businesses and properties (and duly paid operating expenses from the appropriate revenue streams) so they could be sold as going concerns.  This orderly liquidation of operating businesses fetched purchase prices in excess of what could have been obtained in the context of a Chapter 7 liquidation of non-operating assets.  He obtained releases of tens of millions

Price also argues that Trustee should have quickly abandoned *all* the assets and dismissed the case so the estate could have avoided Trustee and professional fees.[323] FAA's counsel, Mr. Tuepker, testified that Trustee's decision to sell assets was far more beneficial to FAA, and other creditors, than abandonment of the assets would have been.  To illustrate, Mr. Tuepker related the nightmarish tale of a condominium that was abandoned at FAA's request early in the case.[324]  Once the property was returned to Price's control, she transferred it to a related entity and immediately filed bankruptcy on behalf of that entity in Dallas, Texas, which further delayed FAA's foreclosure.  Accordingly, FAA and the other secured lenders strongly preferred that Trustee maintain control of their collateral.  More to the point, MACCO's unsecured guarantees would not have been released had all assets been abandoned.

Price also argues that neither Trustee nor Counsel should be compensated for liquidating MACCO's real property and MACCO's interests in the SPEs because Price and McGinnis brought the purchasers to the table and caused the secured lenders to execute releases of their claims against MACCO.[325]  However, according to Mr. Tuepker, whose client

---

of dollars of unsecured claims.  He paid over a million dollars of past-due post-petition payables.  It is very telling that creditors universally and whole-heartedly supported maintaining the case in Chapter 11 until all properties were liquidated.  Creditors have been made almost whole through the efforts of Trustee.

[323]Respondents' Post-Trial Brief at 20.

[324]See TRX-131 to TRX-133; Tuepker, Tr. 11/3/14 at 162.

[325]Price, Tr. 11/6/14 at 684-85.  Because Price and McGinnis personally guaranteed the debts, it was also in *their* best interest that the secured lenders be paid in full.  Loyd testified that Trustee and Counsel did not believe it was appropriate to interject themselves into McGinnis's negotiations concerning the terms under which the secured lenders would release MACCO. Trustee's duty to the estate compelled him only to "eliminate as best we could unsecured deficiency potential claims.  And the method we chose to do that was to

possessed a "huge" contingent deficiency claim,[326] both Trustee and Price were critical to

getting his client paid.[327]  Although Price was the purchaser (or agent for the purchaser), and

negotiated the sales terms with Trustee, Mr. Tuepker insisted that FAA would not have been

fully paid had Trustee not required the release of MACCO guarantees as a condition of the

sales of the SPEs holding the collateral.[328]  Like the other creditors holding guarantee claims,

after FAA was paid in full, it withdrew its claims against MACCO, significantly reducing the

pool of unsecured creditors.  Trustee's and Counsel's insistence upon releases was of extreme

and vital benefit to the estate and its creditors.[329]

Indeed, the fact that Price purchased the properties, arranged for someone else to

purchase the properties, or obtained an investor or lender to facilitate the purchase of the

properties is irrelevant to the question of whether Trustee's services benefitted the estate.

Trustee was interested in disposing of the properties in a way that best benefitted the estate

– it did not matter who the purchaser was or how the purchaser obtained the money to close

the transaction.  He testified: "As long as I got a release and the secured creditors were taken

---

negotiate these purchase offers that Mr. McGinnis was bringing to us with the notion that
every single sale of a membership interest had to come to us with a release of the secured
creditor claim against the Macco [bankruptcy] estate."  Loyd, Tr. 11/3/14 at 233.

[326]Tuepker, id. at 178.

[327]Id. at 163-67.

[328]Mr. Boren, counsel for QCB, testified that he and his client dealt directly with
Trustee and Loyd regarding the necessity and forms of releases.  Tr. 1/26/15 at 992.

[329]Price contends that Trustee catered to secured creditors at the expense of unsecured
creditors, whose interests should have been paramount.  Respondents' Post-Trial Brief at 19-
20.  Price ignores the fact that lenders that were secured by the SPEs' real property held tens
of millions of dollars in unsecured guarantee claims against the MACCO estate.

care of and the taxing authorities were taken care of and the post-petition payables were taken care of, . . . and the unsecureds [of the SPEs in their own Chapter 11 cases] were taken care of, that was my responsibility.  My responsibility wasn't to trace to where Ms. Price was getting her money."[330]

In the end, Trustee accomplished extraordinary results, relieving the estate of in excess of $70 million in direct and potential liability arising from secured claims.  Trustee resolved all outstanding fraud litigation against MACCO for which $11.5 million in claims had been filed.  He also obtained the withdrawal of the $1.1 million claim of FEB, ultimately reducing unsecured claims from $60 million to approximately $600,000.00.  Trustee then paid 90% of those allowed claims.  During the course of the case, Trustee worked cooperatively with lenders and professional property managers to maintain properties and address deferred maintenance, and preserved the going concern value of the operating properties through the dates of sale.  Trustee managed to pay in excess of $1 million in post-petition debts left unpaid by McGinnis, and contested and settled other administrative claims that arose when McGinnis operated MACCO as debtor in possession.

d.    *Amount of time spent was commensurate with the complexity, importance, and nature of the problem, issue, or task addressed*

The task of preserving, operating, and administering an estate that encompasses four or five luxury residences in three states, several office and business properties, a shopping center, vacant land, and more than thirty large low-income multi-family housing complexes held in debtor-controlled SPEs – and addressing $100 million dollars in claims – would be a

---

[330]Deeba, Tr. 1/20/15 at 192.

complex and time-intensive task in the best of circumstances. Regrettably, the complexity was intensified by the prior mismanagement, lack of cooperation, and obstruction by Price and McGinnis. They refused to turn over the estate's books and records and interfered in the management of the real properties; left a chaotic state of financial affairs that lacked controls and appropriate cash management systems and properties suffering severe deferred maintenance; deployed a barrage of legal challenges to Trustee's authority; wasted time on transactions by consistently failing to perform as agreed; and initiated unnecessary contested matters, for which Trustee had to prepare for and appear in court, many of which were withdrawn at the last minute. The Court finds that the number of hours spent by Trustee and his staff was commensurate with the complex overlay imposed by its former management. In spite of all the challenges, Trustee performed extremely efficiently. He sparingly assigned accounting/financial management tasks to MED PLLC, consistent with the allocation of duties mandated by Section 328(b).

> e.  *Professional person is board certified or otherwise demonstrated skill and experience in the bankruptcy field*

Although Trustee is an appointed trustee, and not a "professional person" retained under Section 327 or 1103, Trustee is undoubtedly experienced and skilled in the bankruptcy field as established by his extensive resume which was admitted as Trustee's Exhibit 216. He has been a Certified Public Accountant since 1986, is a Certified Insolvency and Restructuring Advisor, and is certified in financial forensics by the AICPA. His numerous fiduciary assignments include appointments as Chapter 11 trustee, examiner, financial advisor, liquidating trustee, and state court receiver, including one assignment in which he

was entrusted with operating and managing nineteen financially distressed nursing homes.[331]

Price argues that Trustee's decision to maintain the case in a Chapter 11 posture, manage and operate the businesses and properties, and sell property – allegedly for the sole benefit of secured creditors – was not a course of action a "reasonable professional" would have taken.[332]  Although Trustee's sale of real property and/or interests in the SPEs resulted in the payment of *the SPE's secured creditors*, those same creditors possessed large unsecured guarantee claims against MACCO, and the elimination of those guarantees greatly benefitted all of MACCO's unsecured creditors.  Professor Williams concluded that, in his expert opinion, "the trustee's approach has been reasonable and in the best interest of the estate, and certainly in furtherance of the effective and equitable closing of the case, including the operating the debtor's business."[333]  Price did not present any expert testimony on any issue, and failed to rebut Professor Williams's opinion with any competent evidence concerning what direction a "reasonable professional" would have taken. Moreover, the Court, over a four year period, authorized or approved every substantive step in the course of Trustee's administration of the estate, after notice to all constituents of the estate.  The "reasonableness" of Trustee's approach was never questioned by the UST, the Committee, individual creditors, or the Court.

---

[331]See TRX-216 at 3-5; TRX-265, MED Demonstrative Aid No. 3 (representative fiduciary and bankruptcy assignments).

[332]Respondents' Post-Trial Brief at 22-24.

[333]Williams, Tr. 1/21/15 at 321.

>    f.    *Compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than bankruptcy cases*

A Chapter 11 trustee does not exist in cases other than bankruptcy cases, and Section 326 provides the statutory formula to calculate trustee compensation, subject to a reasonableness analysis.  Whether other court-appointed fiduciaries are paid more or less than what Trustee requests is a function of other statutory schemes, and comparing results under non-bankruptcy law would be an exercise in second-guessing the adequacy or excessiveness of those schemes rather than the reasonableness of Trustee's request.

Upon consideration of the Section 330(a) factors, the Court finds that a reasonable hourly rate for Trustee's services is $345.00 and reasonable rates for his staff are as billed. The Court further finds that all hours billed were reasonable and necessary to the administration of the estate.  Applying the applicable rates to hours billed by Trustee and his staff results in a lodestar of $1,243,889.75.[334]  Trustee also incurred unreimbursed expenses related to the Chapter 11 case in the amount of $20,028.36.

---

[334]This figure is the result of compiling the hours set forth in Trustee's final application (summarized in Exhibit A to the application) together with hours recorded in Trustee's first and second supplements, plus the hours Trustee testified to having spent between the second supplement and the January 2015 trial, plus the amount of time estimated for preparing for and attending the five-day trial in January 2015, and multiplying by what the Court has concluded are reasonable hourly rates.  The calculation is as follows: Trustee: 3,448 hours x $345 ($1,189,560.00); CTS: 393.1 hours x $75 ($29,482.50); ARH: 39.4 hours x $150 ($5,910.00); AC: 65.3 hours x $55 ($3,591.50); JAB: 59.3 hours x $95 ($5,633.50); JAB: 157.3 hours x $35 ($5,112.25); Mgr/acct cons. I: 17.6 hours x $75 ($1,320.00); Mgr/acct cons. II: 35.5 hours x $85 ($3,017.50); and AM: 3.5 hours x $75 ($262.50).

3.    <u>Johnson</u> Factors

Under the <u>MiniScribe</u> case, the Court may adjust the lodestar to arrive at an appropriate fee.[335]  The fee may not exceed the amount derived under Section 326's commission formula, however.  To determine whether an adjustment is appropriate, the Court must assess the twelve <u>Johnson</u> factors: (1) The time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the services properly; (4) the preclusion of other employment due to accepting the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the professionals; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[336]

*a.    The time and labor required*

Trustee and his staff were required to invest substantial time and labor dealing with relentless maneuvers to oust him, to frustrate his legitimate efforts to operate and manage the properties, and to otherwise obstruct the administration of the estate with meritless motions and objections.  Almost every transaction between Trustee and Price and McGinnis required multiple continuances, multiplying the number of hours spent in closing the sales (and in the case of the Global Agreement, the transaction spanned three months and never closed).  Much time was wasted addressing Price's unconfirmable plan over the course of more than a year.

---

[335]<u>See</u> <u>MiniScribe</u>, 309 F.3d at 1244-45.

[336]<u>See</u> <u>In re Market Center East Retail Property, Inc.</u>, 730 F.3d 1239, 1247 (10th Cir. 2013), *quoting* <u>Johnson</u>, 488 F.2d at 717-19.

The state of the books and records, the condition of the properties, and the prior commingling of assets, all required that Trustee invest far more time and labor stabilizing the estate than would ordinarily be necessary. The raw number of hours billed establishes that this case was labor intensive.

### b.    The novelty and difficulty of the issues

The structure of MACCO and its subsidiaries added a level of complexity to the administration of the estate. Trustee's duties expanded to include not only operating and administering MACCO's own assets, but also to operating, protecting, and preserving the SPEs' property as well. In addition, the case was made difficult from Trustee's first day on duty to the present day by the overbearing demands, threats, and lawsuits directed at him by Price and McGinnis. This factor weighs strongly in favor of enhancing Trustee's compensation.

### c.    The skill required to properly perform the services

Trustee's credentials are exceptionally suited to the issues that arose in this case, and his expertise and experience, as well as his integrity and patience, produced outstanding results. Trustee stabilized the business operations, preserved the properties, resolved code violations, sold assets and obtained releases of tens of millions of dollars of guarantee liabilities, resolved all secured claims, and paid 90% of unsecured claims. Trustee's extraordinary skill set warrants compensation at rates in excess of those billed.

### d.    The preclusion of other employment due to accepting the case

In the early stages of Trustee's tenure, ninety percent of his total billing time for all clients was devoted to this case.[337]   In the first nineteen months, this case comprised approximately 72% of Trustee's overall billable time, which precluded him and his firm from taking other work.[338] Spending hundreds of uncompensated hours over the last 18 months just trying to get paid for his extraordinary service to the estate has also precluded him from working on compensable matters for paying clients.  This factor weighs in favor of an enhancement of the lodestar.

> e.    *The customary fee and whether the fee is fixed or contingent*

Section 326 sets an absolute limit on the amount of fees Trustee may be awarded, yet Trustee must continue to devote time to complete the administration of the estates notwithstanding the Section 326 cap.  Trustee will be expending additional time not only attending to ordinary Chapter 11 duties, such as filing tax returns, but also defending himself and his firm against Price's appeals of orders dismissing her claims against them.  Every hour spent litigating further dilutes Trustee's effective hourly rate.[339]  As satellite litigation pursued by Price and McGinnis against Trustee and other estate professionals continues to consume estate resources, Trustee also faces a risk of non-payment or reduced payment due to possible administrative insolvency.  This factor weighs heavily in favor of allowing Trustee the maximum compensation allowed.

---

[337]Deeba, Tr. 1/20/15 at 46-47, and MED Demonstrative Aid No. 2 at 3.

[338]Id.  See also Williams, Tr 1/21/15 at 330.

[339]See Deeba, Tr. 1/20/15 at 66 ("trustee fees stop with disbursements" and there will be "no more disbursements to calculate for 326"); Tr. 1/27/15 at 1173-74.

f.    *Time limitations imposed by the client or the circumstances*

The circumstances of this case required Trustee to act quickly and decisively to remedy the serious operational issues at various points in the case.  Especially in the initial stage, Trustee devoted his full time and attention to the case in order to address emergencies, such as lapsing insurance policies, utility cutoff notices, tenant safety issues, commingling of cash, and all the other issues set forth in Trustee's Initial Report.[340]  Other unforeseen circumstances complicated Trustee's duties, including a tornado that devastated apartment complexes in Norman, Oklahoma, and Wichita, Kansas.

The use of Trustee's time was also dictated by Price and McGinnis's efforts to sabotage Trustee's expeditious administration of the estate.

g.    *The amount involved and the results obtained*

As stated above, Trustee accomplished extraordinary results, relieving the estate of in excess of $70 million in direct and potential liability arising from secured claims, resolving all outstanding fraud litigation against MACCO for which $11.5 million in claims had been filed, and ultimately reducing unsecured claims from $60 million to approximately $600,000.00 in allowed claims, of which Trustee paid 90%.  Trustee worked cooperatively with lenders and professional property managers to maintain properties and address deferred maintenance, and preserved the going concern value of the operating properties through the dates of sale.  Trustee also paid in excess of $1 million in post-petition debts left unpaid by McGinnis.  If not for the interference of Price and McGinnis, administrative claims would

---

[340]TRX 37.  See also Section I(B), *supra*.

have been insubstantial, unsecured creditors would have been fully paid, and funds would have been available to equity.

h.    The experience, reputation, and ability of the professionals

Professor Williams recognized Trustee's excellent reputation, locally and nationally.[341] In his 52-Page Order, Judge Jackson found clear evidence that Trustee had the expertise and experience required to operate MACCO and its subsidiaries.[342] This Court finds that Trustee has demonstrated the highest caliber of stewardship under the most challenging circumstances that this Court has ever witnessed.

i.    The "undesirability" of the case

To say this case was undesirable is an understatement. Generally, a Chapter 11 trustee will have the cooperation of displaced management, "particularly if there were guaranties."[343] Such parties "are trying very hard usually to get the information to the trustee, they are trying very hard to right the ship, they are trying very hard to reestablish or reaffirm relationships."[344] That did not happen in this case. Displaced management hid information, held the proceedings hostage, laid obstructions in front of every step Trustee took to fulfill his duties, and filed objections with no intention of pursuing them, withdrawing them at or on the eve

---

[341]Williams, Tr. 1/21/15 at 330.

[342]52-Page Order, TRX 38, at 23.

[343]Williams, Tr. 1/21/15 at 318.

[344]Id. at 319.

of hearings.  Displaced management was an obstacle to orderly administration.  Challenges to Trustee's authority took the guise of threats and frivolous lawsuits.

This case, in the opinion of Professor Williams, "is not the type of case that's contemplated by the structure of the code, particularly the fee structure for Chapter 11 [trustee] services."[345]  "When you start to pile on a lot of litigation that's not the type that would be contemplated in a bankruptcy case, . . . you can easily start to approach – and then bust through the Chapter 11 trustee fee caps that are [in] Section 326."[346]  "In many jurisdictions and many districts, somebody of Mr. Deeba's caliber would not have taken this case as a Chapter 11 trustee.  They may have taken the case as an examiner without the [Section] 326 caps, or as an expert witness under [Rule] 704, which is kind of a construct that's been designed to in some instances circumvent some of the limitations of the code.  But in a situation like this with so much litigation that's ancillary to the efficient administration of the bankruptcy case, the close of that case and the operations of the debtor's business, it is going to be more and more difficult to find qualified people who would be willing to take this assignment."[347]

Professor Williams further opined that due to the animosity directed at Trustee, "what should have taken hours took days, and what should have been resolved in days took weeks

---

[345]Id.

[346]Id.

[347]Id. at 320.

or months. And that increases the expense, it increases the pressure, increases the tension unnecessarily so."[348]

Emblematic of Professor Williams's observation is the episode in which Price attempted to thwart Trustee's retention of a public adjuster to professionally assess property damage suffered by the Brooks apartments in Norman, Oklahoma, and the Cedar Lakes apartments in Wichita, Kansas. Typically, routine motions to employ professionals to assist in identifying compensable elements of damage in order to obtain a full and fair insurance settlement for the estate would draw no objections. Indeed, the Court granted Trustee's motions within a day of filing, and the adjuster commenced work. One month later, however, Price filed a two-page motion asking the Court to *vacate* the orders, complaining that she did not have a chance to weigh in, and she thought the terms were unreasonable. Trustee filed a response explaining the extraordinary benefits of a public adjuster, particularly in cases with complicated multiple claims. Already, the public adjuster had identified three distinct yet inter-related claims, including hail damage from a 2009 storm, fire damage from the 2010 fire that resulted in two deaths, and the 2012 tornado damage.[349] And Trustee noted that the proposed fee was below the fee customarily charged by public adjusters.

Hearings on Price's motions were set in both the Brooks and the Cedar Lake cases. Trustee filed notices of witnesses and exhibits and prepared for the hearings. Two days prior to the scheduled hearings, Price moved to continue the hearings due to McGinnis's

---

[348]<u>Id</u>. at 318.

[349]Trustee noted that McGinnis had not filed claims in connection with the 2009 and 2010 incidents.

unavailability, and they were continued one week. Again, Price moved for and obtained a continuance and the hearings were moved two weeks out. Trustee's adjuster was not available on the continued date, so the hearings were reset a fourth time. On the day before the *fourth* scheduled hearings, Price withdrew her motions.

Price caused Trustee and Counsel, as well as the public adjuster, to needlessly respond to Price's complaints and prepare for hearings that were never held. This routine employment authorization took three months to finalize. As a result of Price's motions to vacate, Counsel billed for services that included drafting, filing, and noticing at least eight pleadings; conferring with Trustee; calling and emailing Price's counsel; conferring with Court personnel to schedule and notice four hearings; and preparing witnesses, exhibits and argument for four hearings, none of which occurred. Time entries for these services total, at the very least, 16 hours, resulting in fees of $4,000.00.

Trustee expended at least 18.6 hours ($5,115.00) reacting to the objection. His time included preparing exhibits; researching fees in the industry; analyzing options and costs; meeting with the adjuster's personnel; meeting with Counsel; preparing for hearings multiple times; attempting to renegotiate the adjuster's fees; and preparing worksheets and aids to the Court to explain the three separate damage events, the need for a public adjuster, and the basis for the fee structure. In the ordinary case, retention of the adjuster would have cost the estate at most a couple hundred dollars in legal fees. In this case, the exercise exploded into a three month ordeal costing the estate more than $10,000.00, and more importantly, delaying the adjuster's work and the estate's insurance recovery.[350] Counsel and Trustee's time sheets also

---

[350]The Court's estimation of hours billed on this matter was based on search

illustrate the lengths to which Counsel and Trustee would go to try to accommodate Price's concerns.

Another example: Trustee's application to employ special litigation counsel to sue First Specialty for refusing to pay more than $1.3 million in insurance claims also drew baseless objections by Price and McGinnis.  Retention of extremely well-qualified counsel on extremely reasonable terms to preserve the estate's insurance claim and honor the estate's obligations to the purchaser of the Brooks apartments under a Court-approved sale should not have been controversial.  Counsel spent more than 28 hours[351] (and incurred fees of almost $7,000.00) over the course of *two* months – responding to objections that lacked any factual basis, consulting with myriad parties with actual interests at stake in the litigation, and preparing for and attending a hearing – to accomplish what should have taken at most one or two hours.

The adjuster and special counsel examples are relatively puny matters.  Larger matters provided greater opportunities for Price and McGinnis to hinder the efficient administration of the estate, to obstruct Trustee in carrying out his fiduciary duties, to delay resolution of uncontroversial issues, and to intimidate all constituents of the estate by misusing the legal

---

parameters that undoubtedly did *not* capture all the time spent by Trustee and Counsel.

[351]Loyd, Tr. 11/3/14 at 237.

process.[352] Their misplaced zeal resulted in a severe dissipation, and frankly, exhaustion, of estate and judicial resources.

Trustee has not been paid for any work on this case since September 2013, an exceptional delay in the payment of fees due to litigation that has been exceptionally protracted. Serving the public as a Chapter 11 trustee, an appointed fiduciary with no interest in the outcome of the case, should not result in hardship. As Professor Williams stated: "Mr. Deeba was appointed the Chapter 11 trustee in the case. He didn't file the motion for the appointment of the Chapter 11 trustee, *he stepped up and agreed to do the job*, and did it consistently with the orders and directives of Judge Jackson in the case."[353]

The Court also takes to heart Professor Williams's concern that highly skilled professionals, such as Trustee, are and will continue to be reluctant to accept Chapter 11 trustee appointments because they risk being inadequately compensated.[354] The structure of the Chapter 11 compensation regime is partly at fault. The Section 326 ceiling on trustee compensation presupposes that a commission on disbursements is rationally related to the reasonable value of services provided by a Chapter 11 trustee. When the goal is reorganization, as opposed to liquidation, however, there is no relationship between the amount of estate funds disbursed and the amount of time and effort required of trustee to

---

[352]As pointed out by Trustee, accusations of willful and intentional misconduct are not without consequence to a professional whose livelihood comes from acting as a trusted financial advisor, fiduciary such as a trustee or receiver, or an expert witness. It is certainly not desirable to accept an engagement that requires defending one's integrity and reputation against careless or malicious insinuations of misconduct.

[353]Williams, Tr. 1/21/15 at 318 (emphasis added).

[354]Id. at 319-20.

manage and operate the enterprise, negotiate with creditor groups, propose a plan, and otherwise satisfy all fiduciary responsibilities and requirements imposed on Chapter 11 trustees by the Bankruptcy Code. When a Chapter 11 appointment is accepted, the trustee has no way to predict whether the end result will be reorganization, liquidation, dismissal, or conversion, or whether *any* disbursements will be made by the trustee.

The risk of inadequate compensation also arises when, as in this case, litigation consumes the Chapter 11 trustee's time and prevents the orderly administration of the Chapter 11 case. The Bankruptcy Code does not provide a mechanism for Chapter 11 trustees to be compensated for unexpected or unwarranted diversions from the ordinary tasks that lead to disbursements to creditors. Both risks add to the undesirability of accepting an appointment as Chapter 11 trustee.

The "undesirability of the case" factor weighs overwhelmingly in favor of compensating Trustee as fully as the Section 326 compensation cap allows.

> j.    *The nature and length of the professional relationship with the client*

This factor is inapplicable to the circumstances of this case.

> k.    *Awards in similar cases*

No evidence was submitted with respect to what trustees have been awarded in similar cases. Trustee states that "it is difficult to compare the services and time required of the Trustee where the level of acrimony evidenced in the motion practice and ancillary litigation pursued by Price and McGinnis are virtually unprecedented in this jurisdiction."[355] The Court

---

[355]Closing Argument of Chapter 11 Trustee, Michael E. Deeba, and Michael E. Deeba, PLLC (Doc. 2374) at 29.

agrees, and therefore assigns no weight to this factor one way or the other.  The Court notes, however, that enhancements in professional fees based on just a few <u>Johnson</u> factors, such as "outstanding services that generated exceptional results," have been upheld,[356]  and that bankruptcy courts have "'considerable discretion' when determining whether an upward or downward adjustment of the lodestar is warranted."[357]

Based upon the arduous and undesirable nature of this case; the extraordinary results achieved in spite of the obstacles; the hardship imposed on Trustee and his firm, who have been precluded from taking other clients and have not been paid since September 2013; and the likelihood of having to continue to provide services to complete the administration of the Chapter 11 estate, the Court finds and concludes that Trustee is entitled to an upward adjustment to the lodestar of *at least* 20%, resulting in a reasonable fee of at least $1,492,667.70.  The application of the Section 326 ceiling on compensation mandates reduction of the award to $1,487,910.00, of which he has been paid $739,522.78, leaving a balance due of $748,387.22.  Trustee is also awarded expenses in the amount of $20,028.36.  Trustee's administrative expense claim is therefore allowed in the amount of $768,415.58.

---

[356]<u>In re Pilgrim's Pride Corp.</u>, 690 F.3d 650, 658 (5th Cir. 2012) (citing <u>Rose Pass Mines, Inc. v. Howard</u>, 615 F.2d 1088 (5th Cir. 1980) (16% enhancement for excellent services from highly expert and competent professionals producing an outstanding result); <u>In re Lawler</u>, 807 F.2d 1207, 1213 (5th Cir. 1987) (70% enhancement for substantial and unexpected recovery leading to plan that paid 100% of claims); <u>In re ASARCO, LLC</u>, 751 F.3d 291, 295-99 (5th Cir. 2014) (affirming a 20% enhancement for efficient use of exceptional legal talent leading to rare and exceptional results).  <u>See also</u> <u>In re Vista Foods USA, Inc.</u>, 234 B.R. 121 (Bankr. W.D. Okla. 1999) (a reasonable fee for services in an involuntary case required 130% upward adjustment of lodestar, increasing fee from $15,000 to $35,000).

[357]<u>Pilgrim's Pride</u>, 690 F.3d at 656 (citation omitted).

-118-

### B.    Application of MED PLLC

MED PLLC is a professional corporation established by Trustee through which he practices as a Certified Public Accountant, Certified Insolvency and Restructuring Advisor and Certified Financial Forensics professional.  The firm employs a staff of financial professionals with various levels of skills, expertise, and experience, whose services are billed accordingly.  The firm's services include business assessment, financial reorganization, crisis management, turnaround management, transaction advice, insolvency consulting, forensic investigation, and litigation support.[358]  All staff members are experienced in bankruptcy matters.[359]

The Court approved Trustee's retention of MED PLLC as financial consultant and accountant to assist Trustee in assessing the business and performing financial and accounting duties, including cash flow analysis and budgeting; cash management; cash collateral control, reporting, and negotiation with lenders; assessing reorganization strategies and plan development; account reconciliation; forensic analyses of prepetition and debtor in possession books and records; compilation of records and figures for preference and fraudulent transfer evaluation; and preparing tax returns and monthly operating reports.[360]

MED PLLC filed three interim fee applications, a final application, and a supplement.[361]  Pursuant to the orders granting the three interim applications, MED PLLC has

---

[358]TRX-13 at 2-3.

[359]Deeba, Tr. 1/20/15 at 26.

[360]TRX-13, TRX-15.

[361]TRX-180, TRX-182, TRX-184, TRX-186, TRX-188.

been paid a total of $297,138.75 for services rendered and $10,908.45 for expenses advanced from May 31, 2011, through June 30, 2013.[362]  MED PLLC was last paid for services in this case two years ago, in September 2013. In its final fee application and supplement, MED PLLC requests final approval of all interim compensation paid, and the allowance and payment of $20,327.97 for services rendered and expenses advanced from July 3, 2013, through April 14, 2014.[363]  Price's objections to paying MED PLLC are identical to her objections to compensating Trustee, *i.e.*, she contends that the services were not necessary or beneficial to the estate.[364]

As a professional employed under Section 327, MED PLLC is entitled to reasonable compensation as assessed under Section 330(a)(3) and (a)(4), and adjusted by the <u>Johnson</u> factors, if necessary.  Section 330(a)( 3) and (a)(4) provide:

> (3)   In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including--
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;

---

[362]TRX-181, TRX-183, TRX-185.

[363]TRX-186, TRX-188.

[364]In her objection, Price also argued that MED PLLC's compensation is subject to the Section 326 cap.  Doc. 1983 at 14-15.  The Court notes that Section 328(b) specifically provides that a trustee that renders services as an accounting professional is entitled to compensation for that work under Section 330.  Any limitation on compensation resulting from the Section 326(a) cap applies to "trustee's services" only.  Because Trustee properly allocated trustee services to Trustee's application and accounting/financial consulting services to MED PLLC's application, Section 326 has no bearing on MED PLLC's compensation.

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for–
    (i) unnecessary duplication of services; or

    (ii) services that were not–

        (I) reasonably likely to benefit the debtor's estate; or

        (II) necessary to the administration of the case.[365]

As an initial matter, it is not unusual for a trustee to hire his own accounting firm to

provide accounting and financial consulting services in connection with a bankruptcy case.[366]

---

[365]11 U.S.C. § 330(a)(3) and (a)(4)(A).

[366]Payne, Tr. 1/20/15 at 212.  "There are synergies when you can serve in a fiduciary capacity and manage accounting and administrative professionals to carry out those functions, so there are some efficiencies.  If you can capture those efficiencies, you have to be cognizant of having the controls and procedures to not abuse that in any way, vis-a-vis fee applications or procedures or protocols.  So you have the firm carry out . . . what are traditionally accounting-type duties versus the fiduciary duties."   The estate also benefits from a firm that has the specialized experience in accounting in bankruptcy proceedings.  Id. at 212-13.  Deeba, Tr. 1/20/15 at 26.

The Bankruptcy Code anticipates that a trustee may serve and be compensated separately for these dual roles in Section 328(b):

> If the court has authorized a trustee to serve as an . . . accountant for the estate under section 327(d) of this title, the court may allow compensation for the trustee's services as such . . . accountant only to the extent that the trustee performed services as . . . accountant for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an . . . accountant for the estate.[367]

Thus, when a trustee retains his or her own firm to perform professional services–whether legal, financial advisory, or accounting – additional scrutiny is warranted to insure that "trustee" services are not billed as "professional" services.   Trustee described the methodology he employed in segregating trustee services from professional services; he also testified that unless a service was clearly an accounting service, he recorded it as trustee time rather than professional time.[368]   Mr. Payne testified that after performing a side-by-side testing review of Trustee's time sheets and MED PLLC's time sheets, it was his expert opinion that Trustee properly allocated his and his employees' time to trustee functions and accounting/financial advisor functions according to the Bankruptcy Code and professional standards.[369]   The Court, in its own review, finds that Trustee's applications and MED PLLC's applications include comprehensive and detailed narratives of the services performed, and concludes that MED PLLC's fee applications contain only time entries reflecting accounting/financial advisor services.

---

[367]11 U.S.C. § 328(b).

[368]Deeba, Tr. 1/20/15 at 40.

[369]Payne, Tr. 1/20/15 at 219-20.

1.      Time spent and whether it was reasonable in light of the complexity, importance, and nature of the problem, issue, or task addressed

MED PLLC billed the estate for 2,395.5 hours of services, approximately 80% of which were rendered by staff members whose billing rates are significantly lower than Trustee's rate.[370]  The Court finds and concludes, for the same reasons as set forth above in connection with its Section 330(a) analysis of Trustee's compensation, that the number of hours expended by MED PLLC, although large, is reasonable considering the complex and difficult circumstances of this case.

2.      Rates charged and whether rates are consistent with those charged by comparably skilled professionals in non-bankruptcy cases

Professional services rendered by Trustee were billed at an hourly rate of $275.00, and other MED PLLC professionals billed at rates ranging from $55.00 (accounting clerk) to $175.00 (CPA). Mr. Payne testified that MED PLLC's rates are comparable to rates charged and approved in bankruptcy and non-bankruptcy cases, and in Oklahoma's business community.  Mr. Payne opined that the overall fee charged for the case is reasonable under the circumstances of the case.[371]  The Court concludes that MED PLLC's rates are reasonable and are comparable to rates charged by financial professionals in bankruptcy and non-bankruptcy cases.

_____

[370]Deeba, Tr. 1/20/15 at 45.  Trustee billed 526.3 hours for professional services in the MED PLLC application, and other professionals billed 1869.2 hours.

[371]Payne, Tr. 1/20/15 at 220-21.

### 3. Skill and experience in the bankruptcy field

As set forth above, Trustee is a member of the American Insolvency and Restructuring Association, an organization that provides specialized training to professionals serving in bankruptcy and restructuring cases. All professionals employed by MED PLLC have extensive experience in accounting and financial consulting in bankruptcy cases.

### 4. Whether services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, the case

When Trustee was appointed, he took control of the day-to-day operations of dozens of apartment complexes and became controlling member/manager of dozens of SPEs whose cash and finances had been commingled with MACCO's or with other SPEs. Wearing his financial consultant hat, Trustee quickly assessed the financial status, cash flow, and profitability of various real estate holdings, and accounted to lenders for use of cash collateral. Throughout the case, the estate benefitted from the financial consulting services of MED PLLC's bankruptcy-savvy staff, who assisted with accounting for revenues and payables, claims research and analysis, evaluating property sales, locating and reconciling bank records, and performing economic analyses for litigation or reporting purposes. The Court concludes that the services rendered by MED PLLC were necessary and beneficial, and that Price's contentions otherwise are unsupported by the evidence.

With respect to the Johnson factors, the Court adopts its findings and conclusions stated above in connection with Trustee's application for compensation, but concludes that no adjustment to lodestar is necessary to adequately compensate MED PLLC. Accordingly,

MED PLLC's final application should be allowed in the amount of $20,327.97, and all fees previously applied for and paid should be allowed on a final basis.

### C.    Application of Counsel

The Court approved Trustee's employment of the firm of Bellingham & Loyd, PC, to advise Trustee with respect to his rights, duties, and obligations under the Bankruptcy Code and other applicable law; assist in preparation of all pleadings and documents; assist in identifying and analyzing claims against the estate and in objecting to claims; represent Trustee in all bankruptcy proceedings, contested matters, and adversary proceedings; and represent Trustee with respect to any other matters that may arise in connection with the estate.[372]

Counsel filed five interim fee applications, all of which were unopposed and were approved by the Court.[373]  Counsel has been paid fees in the amount of $697,917.50 and has been reimbursed for expenses in the amount of $25,252.28, for at total of $723,169.78.  In its final fee application and two supplements, Counsel seeks allowance and payment of an additional $196,475.00 in fees and reimbursement of $4,328.63 in expenses, for a total of $200,803.63.[374]

Counsel's client, Trustee, meticulously reviewed each of Counsel's fee applications, compared Counsel's time entries and descriptions with his own time sheets, and concluded

---

[372]TRX-195, TRX-196.

[373]TRX-197 through TRX-206.

[374]Docs. 1935, 2026, and 2177.

that the time spent and fees requested were both reasonable.[375]   Trustee also reviewed Counsel's application for fees for services rendered to Trustee as Chapter 7 Trustee, and determined that $7,500.00 requested in that application (30 hours) should be allocated to the Chapter 11 fee application.   Accordingly, Counsel requests the allowance of fees and reimbursement of expenses as a Chapter 11 administrative expense in the total amount of $208,303.63.

Price and McGinnis believe that none of Counsel's fees or expenses should be allowed. They contend that (1) Counsel's services and advice to the Trustee did nothing to protect or benefit the estate but, on the contrary, diminished the value of the estate to the detriment of creditors and equity owners, and any benefit to creditors in this case resulted solely from the efforts of Price and McGinnis; (2) Counsel was motivated by the desire to "plunder" the estate by accruing excessive fees for unnecessary services;[376] (3) Counsel knew or should have known that reorganization was never a viable possibility and therefore should have advised dismissal or conversion of the case; (4) time spent litigating their fee applications is not compensable;[377] and (5) the fee applications do not comply with the United States Trustee Guidelines for fee applications, and should be summarily overruled for that reason alone.

---

[375]Deeba, Tr. 1/20/15 at 118.

[376]In the objection, Price claims that Counsel "provided no benefit to Macco's estate, and, in fact, have done nothing but milk Macco's case for fees, especially in light of the Trustee's and [Counsel's] continued failure to protect Macco's assets."  Doc. 1963 at ¶ 11.

[377]The Court addresses this objection in Section D below.

1.    Objection to Form and Content of Fee Applications

Dealing with the last objection first, the Court notes that the Guidelines for Reviewing

Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330

("Guidelines")[378] are guidelines only and have no force of law.[379]  By local custom and

practice in the Western District of Oklahoma, and with tacit approval of the UST, fee

applicants do not strictly adhere to certain of the Guidelines.  For example, the UST and other

parties that review fee applications in the district prefer that fee applicants report all services

in chronological order rather than segregating them by project category as suggested by the

Guidelines.[380]  However, as was customary, Counsel did tag each service with a project

_____

[378]28 C.F.R. Pt. 58, App. A.

[379]Rule 2016-1 of the Local Rules for the Bankruptcy Court for the Western District of Oklahoma provides that "[a]ll fee applications must substantially comply with the . . . Guidelines . . . unless otherwise authorized by the Court or the United States Trustee."  This rule was not in effect prior to December 1, 2013, and therefore did not govern any but the final fee application.  The Court may waive any provision of the local rules on its own motion (see Local Rule 1001-1(C)).  In this case, a waiver is appropriate as Counsel's fee applications and time records are meticulously detailed and informative, even in the absence of strict adherence to the Guidelines.

The Guidelines "focus on the disclosure of information" to "facilitate review by the Court, the parties, and the United States Trustee," and United States Trustees may allow deviations from the Guidelines "when circumstances warrant different treatment." Guidelines, §§ (a)(1) and (a)(5).  In this case, the UST "waived strict compliance with the guidelines as they pertained to the professionals in this case.  The UST reviewed all of the compensation requests [of Trustee, Counsel and MED PLLC] at issue . . . and the UST approved all said compensation requests."  Closing Argument of the United States Trustee (Doc. 2372).

[380]Welsh, Tr. 11/3/14 at 40-41, 116; Loyd, id. at 218.  The Guidelines provide that "[t]he United States Trustee has discretion to determine that the project billing format is not necessary in a particular case or in a particular class of cases. Applicants should be encouraged to consult with the United States Trustee if there is a question as to the need for project billing in any particular case." Guidelines, § (b)(4)(ii).

category code (*i.e.*, claims administration, asset disposition, litigation, etc.) so that the total number of hours and fees associated with each category could be calculated. Counsel provided those totals in its fee applications.

Price also alleged that Counsel violated the Guidelines by not billing in tenths of an hour and by "block billing." The Court finds, however, that Counsel recorded time contemporaneously with providing services using TABS billing software, and did in fact bill in tenth of an hour increments (as opposed to, say, quarter-hour or half-hour increments).

"'[B]lock billing' refers to the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks."[381] In the recent BP Pipelines case, the Tenth Circuit noted that it has "never mandated a reduction or a denial of a fee request based on block billing."[382] In any event, Price did not present a single witness, expert or otherwise, to establish that Counsel's applications contained inappropriate block-billing. All witnesses that testified about the issue concluded that Counsel billed in tenths of an hour and did not "block bill," and

---

[381]Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1554 n.15 (10th Cir. 1996); see also BP Pipelines (North America) Inc. v. C.D. Brown Construction, Inc., 473 Fed. Appx. 818, 2012 WL 991933 (10th Cir. 2012); Flying J Inc. v. Comdata Network, Inc., 322 Fed. Appx. 610, 617, 2009 WL 1040289 at *6 (10th Cir. 2009) ("So-called block billing consists of attorneys recording large blocks of time for tasks without separating the tasks into individual blocks or elaborating on the amount of time each task took.").

[382]473 Fed. Appx. at 835, *citing* Cadena v. Pacesetter Corp., 224 F.3d 1203, 1215 (10th Cir. 2000) (regardless of the state of the time records, trial courts have wide discretion in determining whether those records are detailed enough to allow the court to determine what tasks were performed and whether the time billed for such tasks was reasonable). See also In re Reconversion Technologies, Inc., 216 B.R. 46, 58 (Bankr. N.D. Okla. 1997) (even if multiple tasks are "lumped" into one daily time entry, bankruptcy courts still have discretion to award fees without reduction).

confirmed that Counsel's time records permitted them to determine what services were performed and whether the time spent was reasonable.[383]

The Court has reviewed each and every time entry contained in Counsel's applications.[384] Each entry delivers a precise, detailed, and thorough narrative of the services performed, and the amount of time spent on such services. The Court is able, without difficulty, to determine the necessity, nature, extent, and value of each service, and therefore whether the time allocated to such service was reasonable. Price's objections to the form and content of the fee applications are overruled.

2.    Standards for Review of Counsel's Fee Applications

Counsel is a "professional person" whose compensation is subject to Section 330(a), which provides in pertinent part –

> (1) After notice . . . and a hearing, and subject to sections 326, 328, and 329, the court may award to . . . a professional person employed under section 327 . . .
>
> > (A) reasonable compensation for actual, necessary services rendered by the . . . professional person, or attorney . . .; and
> >
> > (B) reimbursement for actual, necessary expenses.
>
> (2) The court may, on its own motion or on the motion of . . . any other party in interest, award compensation that is less than the amount of compensation that is requested.
>
> (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall

---

[383]Committee counsel Ruston Welsh, Tr. 11/3/14 at 36-42; expert witness Mark Toffoli, Tr. 11/5/14 at 422-23; FAA counsel Max Tuepker, Tr. 11/3/14 at 155-56; Loyd, Tr. 11/3/14 at 240-41; 245-46.

[384]The billing statements attached to the applications total 728 pages.

consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

> (A) the time spent on such services;

> (B) the rates charged for such services;

> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for –

> (i) unnecessary duplication of services; or

> (ii) services that were not–

>> (I) reasonably likely to benefit the debtor's estate; or

>> (II) necessary to the administration of the case.[385]

Again, the process includes determining a lodestar under Section 330(a)(3) and (a)(4) and determining whether an adjustment is appropriate under the so-called Johnson factors[386] to arrive at a reasonable fee.

---

[385]11 U.S.C. § 330(a).

[386]Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974).

### 3.    Section 330(a)(4) Analysis

Price's central objection to compensating Counsel hinges on her view that Counsel's services and advice to Trustee did not result in a benefit to the estate, but instead, in her opinion, diminished the value of the estate to the detriment of creditors and equity owners. It is essentially an objection under Section 330(a)(4) that Counsel's services are not compensable because they were not "reasonably likely to benefit the estate."[387] Price takes the position that Counsel knew or should have known that reorganization was never a viable possibility, and services rendered in pursuing any course other than dismissal or conversion were unnecessary and therefore not compensable.[388]

Price cites several cases that deny fees for a lack of benefit to the estate where counsel forged ahead knowing that there was no reasonable possibility of a successful reorganization,[389] including the Tenth Circuit case of In re Lederman Enterprises, Inc.[390] In Lederman, the Tenth Circuit affirmed the bankruptcy court's denial of attorney fees for services rendered to a debtor in possession that filed a Chapter 11 case and proposed a plan in bad faith. The Tenth Circuit stated that "the beneficial nature of legal services must be determined before a reasonableness inquiry may even be conducted."[391] Entitlement to

---

[387]11 U.S.C. § 330(a)(4)(ii)(II).

[388]Price further accuses Counsel of directing the case in a manner that allowed Counsel to accrue excessive fees for services Price deemed unnecessary. Price produced not one shred of credible evidence tending to suggest that Counsel prolonged the administration of the estate for financial gain.

[389]Respondents' Post-Trial Brief at 16 nn.30, 33, 34.

[390]997 F.2d 1321 (10th Cir. 1993).

[391]Id. at 1323.

attorney fees for legal services rendered to a trustee turned on whether the services were "actual" and "necessary," and that "[a]n element of whether the services were 'necessary' is whether they benefited the bankruptcy estate."[392] Lederman's counsel's services were not compensable because they "provided no demonstrable benefit to the bankruptcy estate" and therefore were not "necessary."[393]

Lederman was decided before Section 330(a) of the Bankruptcy Code was amended in 1994. Prior to 1994, Section 330(a) provided *in full* as follows:

> (a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney–
>
> > (1) reasonable compensation for *actual, necessary* services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
> >
> > (2) reimbursement for actual, necessary expenses.[394]

Lederman's implication that only services that provided a "demonstrable benefit" to the estate were "necessary" and therefore compensable is unsustainable in light of the complete revision of Section 330 in 1994.[395] Currently, Sections 330(a)(3)(C) and (a)(4)(A) explicitly

---

[392]Id.

[393]Id. at 1322.

[394]11 U.S.C. 330(a) (1993) (emphasis added).

[395]The Court notes that all the cases cited by Price for the proposition that services that do not benefit the estate are not "necessary," and therefore not compensable, predated the

direct courts to allow compensation for services "necessary to the administration of, *or* beneficial at the time at which the service was rendered toward the completion of, a case"[396] and to deny compensation for "unnecessary duplication of services" and "services that were not (I) reasonably likely to benefit the debtor's estate; *or* (II) necessary to the administration of the case."[397]

Contrary to Price's assertions, legal services may be "reasonably likely" to benefit a Chapter 11 estate even if no plan of reorganization is proposed or confirmed. Benefit to the estate "is not restricted to success measured by confirmation of a plan or the prospect of confirming a plan."[398] For example, counsel's advice and services may benefit the estate, as happened in this case, "by maximizing value for creditors through an orderly or emergency liquidation of assets by Section 363 sales."[399] Moreover, "[t]he appropriate time for measuring benefit to the estate is as of the time the services are provided, and not at the time the court ultimately reviews the fee application. . . . Courts may allow compensation where counsel's services promoted the bankruptcy process and contributed to the administration of the estate,

---

1994 amendments to Section 330. The Fifth Circuit recently recognized this shift in emphasis in In re Woerner, 783 F.3d 266, 273-78 (5th Cir. 2015), *overruling in part* In re Pro-Snax Distributors, Inc., 157 F.3d 414 (5th Cir. 1998). In *Pro-Snax*, the Fifth Circuit required fee applicants, in order to be compensated, to establish that their services "*resulted* in an identifiable, tangible, and material benefit to the bankruptcy estate." Id. at 273 (citation omitted) (emphasis original). In Woerner, the Circuit concluded that the 1994 amendments to Section 330 "foreclosed an actual-benefit test by requiring that the court evaluate the likelihood of benefit to the estate at the time the service was rendered." Id. at 276.

[396]11 U.S.C. 330(a)(3)(C) (emphasis added).

[397]11 U.S.C. 330(a)(4)(A) (emphasis added).

[398]In re Kitts Development, LLC, 474 B.R. 712, 721 (Bankr. D. N.M. 2012).

[399]Id.

but did not otherwise provide an economic benefit to the estate."[400]  In addition, "[n]ecessary and actual fees are allowable in situations where the fees are unavoidably incurred," such as responding to events not subject to counsel's control, "even if they are not of a benefit to the estate."[401]

With these principles in mind, the Court will assess the validity of Price's specific contentions that Counsel's fees were not necessary, beneficial, or compensable.  First, the Court notes that the appointment of a Chapter 11 trustee occurs only when the affairs of the debtor have been mishandled prepetition, postpetition, or both.  Accordingly, legal advice and services rendered to a Chapter 11 trustee will necessarily depend on the evolving "facts on the ground"– *i.e.*, the realities facing the trustee and the estate– rather than an abstract notion of how a Chapter 11 case should proceed.  Unforeseeable and irregular situations beyond counsel's and trustee's control must be addressed, sometimes on an emergency basis and without fully developed information.  That happened in this case in spades.  For example, Counsel worked hundreds of hours in the first months of the case responding to unforeseeable, threatening, and ultimately meritless challenges to Trustee's legitimacy and scope of duties.  Services rendered to prevent Price and McGinnis from retaking management of MACCO and its SPEs were absolutely beneficial to the estate and necessary to the administration of the case because, as testified to by numerous creditors as well as by expert witness Mark Toffoli, Trustee and Counsel brought stability, order, integrity, trust, cooperation, and transparency

---

[400]In re Schupbach Investments, LLC, 521 B.R. 449 (Table), 2014 WL 6680122 at *8 (B.A.P. 10th Cir.).

[401]In re Ricci Inv. Co., 217 B.R. 901, 907 (D. Utah 1998).

to the businesses and to the Chapter 11 proceedings, and were crucial to preserving the estate and ultimately insuring creditors were paid according to the priorities set forth in the Bankruptcy Code.

The Court also notes that Counsel had no role in *filing* MACCO's Chapter 11 case, and therefore cannot be faulted for commencing a case that had no reasonable possibility of success.   Nor can Counsel be blamed for not timely developing and filing a plan of reorganization in light of the initial disorder, dysfunction, and hostile legal proceedings that consumed the early months after Trustee's appointment, which was immediately followed by a three-month effort to consummate the Global Agreement with Price, which was followed by piecemeal sales of non-income producing properties to Price, which was followed by sales of operating entities to Price and responding to Price's own proposed plan, followed by conversion to Chapter 7 once all operating assets had been liquidated and claims determined. Counsel's advice and services were necessarily rendered to advance the case toward completion.

With respect to the Global Agreement, Price contends that had Counsel sought modification of the agreement to exclude the Frontier Bank release, the transaction could have closed, the estate would have reaped $5 million in cash, and the case could have been wrapped up quickly, saving hundreds of thousands of dollars in administrative expenses.  In addition, she alleges that because the piecemeal sales of the same assets generated only $2.5 million, Counsel's decision not to seek modification caused the estate to lose $2.5 million.  Thus, she argues, Counsel's services were not beneficial to the estate.[402]  Section 330(a)(3)(C), however,

---

[402]See Tr. 11/6/14 at 695-97.

requires the Court to look at whether "services were . . . beneficial at the time at which the service was rendered toward the completion of" the case.  The weight of the evidence establishes that there were many obstacles to the closing of the Global Agreement, including the lack of support by the Committee, the wariness of the secured lenders, and the questionable commitment of the mysterious investor.  When it became obvious that Price was unable to close after many extensions, Counsel immediately (within a day or two) drafted and filed motions to sell non-income producing properties, which benefited the estate by reducing expenses that were not offset by revenues, and diligently continued to move the case toward its conclusion in an orderly, systematic manner.

Price persists in arguing that when Trustee was appointed, Counsel should have advised Trustee to quantify unsecured claims, pay the claims from funds to which MACCO had access, and dismiss the case, and that all other services rendered by Counsel were unnecessary.  As stated above, however, the evidence establishes that the small pool of unsecured claims Price contends should have been paid in 2011 did not reflect dozens of multimillion dollar potential deficiency/guarantee claims, and therefore Counsel properly advised Trustee that his fiduciary duties prohibited the payment of a few selected unsecured creditors.  In the end, after Trustee obtained releases of guarantees, the final amount of prepetition unsecured claims was still in excess of four times the amount of claims Price identified for payment in 2011.  Moreover, at the time Trustee was appointed, the estate did not have any uncontested funds to pay these unsecured creditors, and these creditors could not have been paid in any event until one million dollars in accrued unpaid priority administrative expenses were satisfied.  Counsel's advice to Trustee was sound.

4.      Section 330(a)(3) Analysis

    a.      *Time spent*

Counsel billed a total of 3,674.8 hours for services rendered in the Chapter 11 case through November 3, 2014.  An additional thirty hours of Chapter 11 services that were inadvertently billed to the Chapter 7 estate brings the total time spent to 3,704.8 hours.[403]

Some of the time billed falls outside the scope of the orders authorizing Trustee to retain Counsel, however.  One of the lawyers who performed services, Christopher Stein, who was "of counsel" to Counsel's firm, first provided services on July 5, 2011. He filed affidavits of disinterestedness on July 7, 2011, and July 8, 2011,[404] but an application for authority to employ Mr. Stein as additional counsel to Trustee was not filed until July 26, 2011.[405]  Ms. Loyd testified that at the time she assigned certain urgent matters to Mr. Stein, she believed that the original application referenced "of counsel" to the firm and that his employment had been authorized, but later, upon review of Counsel's original application, she discovered it did not mention Mr. Stein or "of counsel."[406]  Mr. Stein performed 60.3 hours of valuable services to Trustee prior to seeking authority to be retained.  Unfortunately, these hours must be subtracted from the number of compensable hours.

---

[403]Deeba, Tr. 1/20/15 at 119-23; TRX-215.3.

[404]Docs. 248, 254.

[405]The application was granted on July 28, 2011.

[406]Inadvertence does not justify the failure to obtain approval of counsel's employment in a timely manner. See In re Schupbach Investments, LLC, 521 B.R. 449 (Table), 2014 WL 6680122 at *7 (B.A.P. 10th Cir.), *citing* In re Land, 943 F.2d 1265 (10th Cir. 1991).

Ms. Loyd also billed some time outside the scope of the retention orders. Prior to the date the order appointing Trustee was entered and an application to retain Counsel was filed (June 2, 2011), Ms. Loyd spent 9.2 hours familiarizing herself with the MACCO Chapter 11 case and related Chapter 11 cases, preparing for the hearing on the appointment of Trustee, and advising Trustee concerning immediate matters. A paralegal spent 5.0 hours preparing files for Counsel's review. The Court concludes that extraordinary circumstances prevented Counsel from filing an application on behalf of Trustee for approval of Counsel's employment prior to spending 9.2 hours of attorney time and 5.0 hours of paralegal time on the case, *i.e.*, the impossibility of filing a document on behalf of a trustee who had not yet been appointed.[407] These hours are compensable.

Some "estimated time" must also be subtracted from the total hours billed. Counsel's second supplement to the final fee application, which was filed a few days before the Fee Hearings began in November 2014, included estimates of 35.0 hours to prepare witnesses and exhibits for hearings on Trustee's and MED PLLC's fee applications, and 16.0 hours to attend the hearings and present evidence. Because Trustee and MED PLLC were represented by other counsel by the time their fee applications were heard in January 2015, another 51.0

---

[407]Unlike counsel for a Chapter 11 debtor, who is able to bill and obtain payment for prepetition work from the debtor *prior to filing the case*, counsel for a Chapter 11 trustee cannot bill the debtor or the prospective trustee for such work. Counsel for Chapter 11 trustees should not be expected to invest significant time preparing to represent a Chapter 11 trustee without the prospect of payment.

hours must be deducted from the total time spent.[408]  These deductions result in a total of 3,593.5 compensable hours.

Although the number of hours appears large, the Court is satisfied that Counsel applied meticulous billing judgment.  Counsel's billing statements reflect numerous "no charge" entries where more than one attorney was involved or where amendments to pleadings were necessary.  Duplication of services among the three lawyers working on the case was avoided. Counsel made a concerted effort to reduce administrative expenses by negotiating rather than litigating with creditors, and greatly succeeded in limiting contested matters to a minimum, with the exception of matters contested by Price and McGinnis, over which Counsel had little control.  Counsel kept travel to a minimum and reduced hourly rates for travel time by half. Moreover, Counsel did not bill the estate for a significant amount of time spent litigating with Price and McGinnis post-conversion.[409]

The Court recognizes that the number of hours spent on this case is larger than typically seen in a Chapter 11 case due to "responses necessitated by the maneuvering of the

---

[408]The Court is aware that Mr. Stein attended the hearings in January 2015, but did not participate in representing Trustee or MED PLLC, and did not present any additional evidence for consideration of Counsel's application.  The Court is not saying that some or all of these hours are or are not compensable, but simply declines to speculate as to the amount of time spent.

[409]Counsel underbilled the time spent representing Trustee in connection with Price's motion requesting the District Court to withdraw the reference of Trustee's fee application and in connection with Price's Barton Doctrine motions in the summer of 2014.  Ms. Loyd testified that "we didn't bill for half the work we did during this time frame.  I mean, there came a point in time . . . that we just got exhausted.  There were briefs being filed left and right, 40- and 60-page briefs that we were responding to.  We didn't bill for all the time that we worked."  Tr. 11/3/14 at 245.

other side."[410]  "[P]art of an attorney's calculus of the amount of time reasonably necessary for

a case is the vigor which the opponents bring to the dispute."[411]  The number of hours Counsel

spent in this case is quite reasonable in light of the fierce opposition they encountered.

### b.    Rates charged

Mr. Bellingham and Ms. Loyd billed the estate at the rate of $250.00 per hour, and Mr.

Stein billed the estate $200.00 per hour.   Expert witness Mark Toffoli testified:  "For the

levels of experience that those three [individuals] have, [they are] chronically low billing

rates, in my opinion."[412]   In 2011, when Counsel was retained, "seasoned bankruptcy

lawyer[s]" were charging $280.00 to $300.00 per hour.[413] Both Mr. Bellingham and Ms. Loyd

billed the estate at $250.00 per hour even after they increased their rates to other clients to

$300.00 per hour.  Price has not objected to Counsel's rates.

The  Court finds and concludes that Counsel's rates are at the lowest end of the range

of rates it has seen in Chapter 11 cases in the past eighteen years on the bench, and the rates

are more than reasonable in light of the decades of relevant bankruptcy experience possessed

by these lawyers, the prevailing rates in the region, and Counsel's efficient and effective use

of resources.

---

[410]Ramos v. Lamm, 713 F.2d 546, 554 (10th Cir. 1983).

[411]Robinson v. City of Edmond, 160 F.3d 1275, 1284 (10th Cir. 1998), *citing* City of
Riverside v. Rivera, 477 U.S. 561, 580 n.11 (1986) (plurality opinion) ("'The government
cannot litigate tenaciously and then be heard to complain about the time necessarily spent by
the plaintiff in response" (internal quotation marks and citation omitted)).

[412]Toffoli, Tr. 11/5/14 at 419.  Mr. Toffoli's rate was $280.  Id. at 427.

[413]Id. at 420.

> c.  *Whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title*

Counsel's services were necessary to Trustee's administration of the estate. Counsel's advice and services insured that Trustee met his responsibilities under the Bankruptcy Code and Rules and that all transactions were properly documented, noticed, and approved. Counsel appeared and represented Trustee at numerous hearings, and defended Trustee against removal and lawsuits. Counsel represented Trustee in adversary proceedings seeking recovery of estate property, and in fulfilling his duties as a managing member of the debtors in the associated Chapter 11 cases. Counsel drafted and reviewed thousands of pleadings, briefs, notices, orders, agreements, reports, loan documents, releases, correspondence, and all other documents necessary to the administration of the estate.

As detailed in the sections analyzing Trustee's and MED PLLC's fee applications, the hours Counsel necessarily spent on otherwise routine matters ballooned as a result of pointless objections raised and pursued by Price and McGinnis. Nevertheless, Counsel persevered in rendering high-quality advice and legal representation to Trustee. Ultimately, all secured lenders were paid in full, guarantees were released, and unsecured claims were reduced to a handful and recieved 90 cents on the dollar.

> d.  *Whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed*

This was a complex and difficult case. The docket sheet in the MACCO case exceeds 400 pages. MACCO owned four SPEs that were also debtors and whose cases required

-141-

significant services of Counsel.  The case was especially complicated by animosity and litigiousness not of Counsel's making.  Counsel was efficient and did not overstaff or overbill. The Court finds Counsel's ability to address all the unique, complex, and important issues arising in this case with only three lawyers is a testament to their deep experience and well-honed skills.

> e.      *Whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field*

All three lawyers are experienced bankruptcy practitioners.  Ms. Loyd has practiced in excess of 25 years.  She served as a panel trustee for 22 years, administering more than 20,000 cases. Her experience with Chapter 11 cases includes representing debtors, debtors-in-possession, trustees, creditors, and committees.  She has been appointed as a Chapter 11 trustee and a liquidating trustee. Her experience, reputation, and abilities as a highly experienced bankruptcy practitioner led to her appointment, in 2014, to the bankruptcy bench. Also highly experienced and regarded, Mr. Bellingham has practiced in the commercial litigation and bankruptcy fields for over 40 years, and Mr. Stein has practiced for in excess of 15 years in the bankruptcy and litigation arenas.

> f.      *Whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title*

Counsel's rates are eminently reasonable when compared to other non-bankruptcy litigators and transactional lawyers of their caliber in the region.

Based upon these Section 330(a)(3) considerations, the Court concludes that Counsel reasonably spent 2,824.8 hours from May 27, 2011 through July 22, 2013,[414] and was paid interim compensation of $697,917.50, from which $12,060.00 (60.3 x $200.00) must be backed out, resulting in a lodestar of $685,857.50 for the interim period. Counsel's blended rate during this period is $242.80, which the Court finds very reasonable and appropriate.

Since July 22, 2013, Counsel has accrued in excess of 768.7 hours,[415] for which Counsel has not been paid. Because Counsel charged other clients up to $300.00 per hour as of the date of the fee hearing, the Court concludes that these hours should be compensated at the rate of $300.00 to adjust for the significant delay in payment, a cost that should not be

---

[414]This number is the sum of the hours billed in the five interim fee applications, 2,885.1, less the 60.3 hours deducted from the first fee application for time spent by Mr. Stein before his employment was approved.

[415]The Court arrives at 768.7 hours as follows: (A) 309.2 hours in final fee application (TRX-207); plus (B) 206 hours in first supplement (TRX-208); plus (C) 274.5 hours in second supplement (TRX-209); plus (D) 30 hours from Counsel's application for fees in Chapter 7 case; minus (E) the estimated 51.0 hours billed in the second supplement in anticipation of future hearings on Trustee's and MED PLLC's fee applications.

borne by Counsel.[416]  Accordingly, the Court sets the lodestar for services rendered after July 22, 2013, at $230,610.00.

> 5.    <u>Johnson</u> Factors

With respect to the <u>Johnson</u> factors that overlap the Section 330(a)(3) considerations, the Court will not repeat its findings, but incorporate them by reference into the <u>Johnson</u> factor analysis. These overlapping topics are: (1) The time and labor required (see subsection *a* above); (2) The skill requisite to perform the legal service properly, and the experience, reputation, and ability of the attorneys (see subsection *e* above); and (3) The customary fee (see subsections *b* and *f* above).

> a.    *The novelty and difficulty of the questions*

---

[416]In <u>Ramos v. Lamm</u>, a civil rights fee-shifting case, the Tenth Circuit determined:

> The hourly rate at which compensation is awarded should reflect rates in effect at the time the fee is being established by the court, rather than those in effect at the time the services were performed.  The lawyers seeking fees usually will not have been paid for their services until the court makes its allowance.  We think that awarding compensation at current rates will roughly approximate periodic compensation adjusted for inflation and interest and will obviate the necessity of guessing when periodic billings would have been made and paid in an analogous private practice situation.

<u>Id.</u>, 713 F.2d 546, 555 (1983).  Although bankruptcy cases are not fee-shifting cases, the principle of compensating attorneys for extreme delays in payment has like merit in bankruptcy cases.  It is well established that Congress intended bankruptcy professionals to be compensated comparably to professionals that practice in areas of law other than bankruptcy.  Absent such parity, "[b]ankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service."  H.R. REP. 95-595, 330, 1978 U.S.C.C.A.N. 5963, 6286.

Although Price and McGinnis claim that early conversion or dismissal was the most reasonable and economical disposition of the case, they overlook the complexity they created by launching MACCO into Chapter 11 and then ignoring their own fiduciary duties as representatives of the debtor in possession.  Their mismanagement, misappropriation, self-dealing, and lack of accounting, combined with their unwarranted interference with Trustee's performance of his duties, required Trustee to obtain legal advice and legal services above and beyond those routine to the administration of a Chapter 11 estate.  The case would not have been a "simple" one in any event, due to the magnitude of debt, the number and condition of properties and businesses, and the necessity of managing SPEs in and out of bankruptcy, but those challenges were intensified by the antagonism and lack of cooperation on the part of Price and McGinnis.[417]

> b.    *The preclusion of other employment by the attorney due to acceptance of the case*

Counsel advises that "the engagement did not preclude [Counsel] from accepting other engagements."[418]

> c.    *Whether the fee is fixed or contingent*

Because satellite litigation pursued by Price and McGinnis against Trustee and other estate professionals continues to consume estate resources, Counsel faces a risk of non-payment or reduced payment due to possible administrative insolvency.

------

[417]When asked what made this case difficult, expert witness Mark Toffoli identified "displaced management and its course of conduct going forward after its displacement."  Tr. 11/5/14 at 421.

[418]Closing Argument (Doc. 2373) at 16.

> d.    *Time limitations imposed by the client or the circumstances*

Early in the case, Counsel had to react to issues discovered by Trustee on an emergency basis (*i.e.*, obtaining funds to pay delinquent post-petition payables, such as wages, insurance, taxes, etc.).  Price and McGinnis's threats, demands, and obstructions were additional circumstances that imposed short time triggers on filing responses and preparing for hearings.  Price and McGinnis's inability to close transactions caused Counsel to have to file multiple pleadings to extend closing dates and obtain hearings, also resulting in wasted time and duplication of services for which Counsel was not at fault.[419]

> e.    *The amount involved and the results obtained*

Counsel's effective representation of Trustee, beginning with its defense against Price's multiple motions and suits seeking to remove Trustee, led to remarkable results in spite of the circumstances.  On behalf of FAA, the single largest creditor with a claim in excess of $20 million, Mr. Tuepker testified that Counsel's services benefited the estate in that Trustee, with Counsel's legal advice and assistance, provided trustworthy information, operated MACCO and the SPEs in a manner consistent with fiduciary duties and contractual obligations to lenders, and protected the value of the collateral and the estate.  FAA was paid in full, which Mr. Tuepker attributes to displacing Price and McGinnis with Trustee and Counsel.[420]

---

[419]Expert Payne's review and tabulation of the docket sheets of the five bankruptcy cases in which Trustee and Counsel were involved from June 1, 2011 to December 31, 2014 revealed 1,258 substantive docket entries and 1,451 procedural entries (motions to shorten time, set hearing, notices, mailings, etc.).  Expert Toffoli testified that much of the time and labor spent was "reactionary" to pleadings filed by Price.  Tr. 11/5/14 at 421.

[420]Tr. 11/3/14 at 155-60, 190.

The estate was relieved of in excess of $70 million in direct and potential liability arising from secured claims, all outstanding fraud litigation against MACCO was resolved, and unsecured claims were reduced from $60 million to approximately $600,000.00 in allowed claims, of which 90% has been paid.

f.    The "undesirability" of the case

Of the MACCO case, Ms. Loyd testified "in the first three days, it was desirable. . . . After then, it wasn't."[421]  Mr. Tuepker testified that he "wouldn't have wanted that work for a million dollars."[422]  Mr. Toffoli testified that the acrimonious nature of the case made it undesirable, remarking:  "I would probably concur with Mr. Tuepker's observation the other day, that I wouldn't do this case for a million dollars."[423]  The case generated "a sustained level of animus that I don't think I've ever seen in 32 years."[424]  In addition, Price and McGinnis repeatedly accused Counsel of usurping Trustee's role and of committing malfeasance, and they ultimately brought suit against Counsel in District Court, seeking $40 million in damages.  Although Counsel has devoted up to 100% of their time to this case, Counsel has not been paid since September 2013.   For a three lawyer firm, non-payment of over $200,000.00 of earned compensation constitutes a hardship.  The Court concludes that the undesirability factor alone weighs strongly in favor of enhancing Counsel's fee award.

---

[421]Tr. 11/4/14 at 302.

[422]Tr. 11/3/14 at 187.

[423]Tr. 11/5/14 at 418.

[424]Id.

g.    *The nature and length of the professional relationship with the client*

Counsel represented Trustee in previous cases, and in this case they complimented each others' efforts effectively and efficiently.

h.    *Awards in similar cases*

Evidence of an opponent's expenditure of time is relevant to judge the reasonableness of the time spent by Counsel.[425]   Price testified that it was her "best guess" that she and McGinnis incurred $300,000.00 to $500,000.00 in attorney fees during the course of the bankruptcy case.[426] Counsel, however, had to not only react to Price's involvement in the case with equal vigor, but also provide advice and legal services necessary for Trustee's ordinary and proper administration of the case, including retention of various professionals, stay and abandonment matters, Section 363 sales transactions, business and insurance issues, recovery litigation, and communicating with and responding to creditors and other parties in interest.

In the Court's experience, the fees requested by Counsel in this case are commensurate with fees the Court has awarded in other Chapter 11 cases that were less complex and unquestionably less adversarial.  Expert witness Mark Toffoli, too, testified that he recalled two other recent Chapter 11 cases in the district that were "nowhere remotely close to being

---

[425]In Robinson v. City of Edmond, for example, the Tenth Circuit justified the fees sought by plaintiffs, in part, by the time and effort spent by the other side.  "The effort expended by the defendants suggest at least that they viewed the case as sufficiently complex and serious to warrant the expenditure of large amounts of attorney time, and it highlights the tooth-and-nail litigating approach the [defendant] used in this case.  In light of this tenacious effort by the [defendant] and its lawyers, the amount of attorney time expended by the plaintiffs begins to look more reasonable, not less."  Id., 160 F.3d 1275, 1284 (10th Cir. 1998).

[426]Price, Tr. 1/22/15 at 693.

-148-

this contentious" where the Court approved fees to counsel "every bit as large as what these fees are today."[427]

The Johnson factors bolster the Court's view that Counsel's representation of Trustee throughout the course of the case was highly professional, ethical, and commendable, and produced outstanding results under the most unpleasant and difficult circumstances. The Court is reluctant to adjust the fee upward, however, only because it appears that administrative expenses are likely to exceed assets, and any increase would come at the expense of unsecured creditors and other administrative expense claimants.

The Court concludes that Counsel is entitled to a total fee for services rendered to Trustee in the Chapter 11 case in the amount of $916,467.50,[428] of which $697,917.50 has already been paid. Counsel is also awarded reimbursement of expenses in the amount of $4,328.63. Accordingly, Counsel's final allowed administrative expense claim consists of unpaid fees in the amount of $218,550.00 and unpaid expenses in the amount of $4,328.63.

## D.    Effect of the **ASARCO** Decision

On July 6, 2015, Price and McGinnis filed a supplemental brief, arguing that in light of the United States Supreme Court's decision in Baker Botts LLP v. ASARCO LLC ("ASARCO"),[429] the Court must disallow "**all** fees requested by any of Movants for **any**

---

[427]Tr. 11/5/14 at 425.

[428]This figure is the sum of allowed interim fees in the amount of $685,857.50 and allowed fees incurred after July 23, 2013 in the amount of $230,610.00.

[429]576 U.S. __, 135 S.Ct. 2158 (2015).

litigation of their fee applications."[430]   After a careful reading of <u>ASARCO</u>, the Court concludes that the decision is not applicable to the facts of this case.

In <u>ASARCO</u>, the bankruptcy court authorized ASARCO, as debtor in possession, to retain Baker Botts[431] as counsel to represent ASARCO and assist in administering the Chapter 11 estate.   After ASARCO successfully reorganized, Baker Botts filed its final application for compensation under Section 330, seeking to be paid by the reorganized ASARCO.   ASARCO objected to the amount of compensation, initiating a contested matter between ASARCO and its former lawyers (the "Compensation Dispute").   The Bankruptcy Court awarded Baker Botts compensation for representing the estate, and also awarded Baker Botts the fees it incurred litigating the Compensation Dispute with ASARCO.   The United States Supreme Court held that the American Rule prohibited the bankruptcy court from awarding fees to Baker Botts for litigating the Compensation Dispute with ASARCO because in Section 330(a), "Congress did not expressly depart from the American Rule to permit compensation for fee-defense litigation by professionals hired to assist trustees in bankruptcy proceedings."[432]   The American Rule prohibits shifting attorney's fees from one party to the litigation to the other absent statutory authority.   The Supreme Court held that allowing Baker

---

[430]Supplemental Respondents' Post-Trial Brief (Doc. 2390) at 2 (emphasis original). The Court notes that Price and McGinnis have not done the work of itemizing which particular time entries contained in the movants' numerous fee applications they believe fall within the scope of their objection.

[431]The case involved two law firms employed by the ASARCO estate, but for simplicity's sake, they will be collectively referred to as "Baker Botts."

[432]<u>ASARCO</u>, 135 S.Ct. at 2164.

Botts to collect the fees incurred litigating the Compensation Dispute from its adversary, ASARCO, would violate the American Rule.

In the MACCO case, Trustee, Counsel, and MED PLLC ("Estate Professionals") seek payment of compensation from the estate, but unlike <u>ASARCO</u>, *the estate* does not oppose compensating the Estate Professionals.  Trustee, as sole representative of the estate, fully supports payment, and is advocating in favor of granting the Estate Professionals' applications in order to complete the administration of both the Chapter 11 estate and the Chapter 7 estate.  Determining the amount of administrative expenses is also one of the prerequisites to determining whether the estate is solvent, and whether various pending adversary proceedings against Price, McGinnis and their affiliates should be pursued by Trustee for the benefit of the unsecured creditors.

Unlike <u>ASARCO</u>, the dispute in this case is between the Estate Professionals and third parties, Price and McGinnis, and the dispute is *broader* than simply an objection to the amount of compensation sought.  Price and McGinnis's objection to compensating the Estate Professionals is grounded in the belief that *they* have personally have been damaged, and that by denying all compensation to the Estate Professionals, the estate would be flush with funds with no where to go but to Price, as the equity holder.  The American Rule precludes fee shifting between these two sets of adversaries, but does not apply to preclude the Estate Professionals from being compensated by the estate for defending themselves from tort claims asserted by Price and McGinnis.[433]

---

[433]The claims Price and McGinnis assert against the Estate Professionals in the guise of fee objections mirror the tort claims they asserted against the Estate Professionals in the District Court lawsuit, <u>Price v. Deeba</u>, Case No. CV-14-319, which was dismissed.  Price and

Under the American Rule  "'[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.'"[434]  Citing <u>Alyeska Pipeline Service Co. v. Wilderness Society</u>,[435] the Supreme Court observed that Section 330(a)(1) is a statutory provision that authorizes courts to award attorney's fees in certain circumstances –

> To be sure, the phrase "reasonable compensation for actual, necessary services rendered" permits courts to award fees to attorney for work done to assist the administrator of the estate . . . .  No one disputes that § 330(a)(1) authorizes an award of attorney's fee for that kind of work.  (Citation omitted).  But the phrase "reasonable compensation for actual, necessary services rendered" neither specifically nor explicitly authorizes courts to shift the costs of adversarial litigation from one side to the other – in this case from the attorneys seeking fees to the administrator of the estate – as most statutes that displace the American Rule do.
>
> Instead, § 330(a)(1) provides compensation for all § 327(a) professionals – whether accountant, attorney or auctioneer – for all manner of work done *in service of* the estate administrator.[436]

Legal services provided by Counsel to defend Trustee's and MED PLLC's fee applications from objections and setoff claims asserted by Price and McGinnis are clearly services to the "administrator of the estate."[437]  The estate has an obligation to pay all

---

McGinnis's objections are not about whether the Estate Professionals' fees are reasonable; rather they are attempts to deprive the Estate Professionals of their hard-earned fees so that Price can claim all estate funds remaining after payment of the unsecured creditors.

[434]<u>ASARCO</u>, 135 S.Ct. at 2164, *quoting* <u>Hardt v. Reliance Standard Life Ins. Co.</u>, 560 U.S. 242, 252-53 (2010).

[435]421 U.S. 240, 260 & n.33 (1975).

[436]<u>ASARCO</u>, 135 S.Ct. at 2165 (emphasis original).

[437]Trustee and MED PLLC were represented by Counsel through November 2014, and therefore up to that point, attorney fees incurred in defending Trustee and MED PLLC from Price and McGinnis's objections and setoff claims are contained in Counsel's application. Fee for those services, services requested by Trustee, are clearly outside the scope of <u>ASARCO</u>.

professionals that represent the trustee. Services rendered by Counsel in defending its own administrative expense claim from third party objections and setoff claims are also "actual, necessary services rendered" to assist Trustee in completing the administration of the estate. Trustee cannot complete the administration of the estate until all administrative expense claims are liquidated. Let it be said again: Trustee has no objection to compensating Counsel in the full amount billed by Counsel, and Counsel is not litigating against the estate.

The Supreme Court also noted in <u>ASARCO</u> that where attorneys seek compensation from an estate that opposes the compensation, an adverse relationship between attorney and the estate is created, which precludes the "services" rendered in litigating compensation from falling within Section 330(a)(1).

> [T]he phrase "'reasonable compensation for services rendered' necessarily implies loyal and disinterested service in the interest of" a client. (Citations omitted). Time spent litigating a fee application *against the administrator* of a bankruptcy estate cannot be fairly described as "labor performed for" – let alone "disinterested service to" – that administrator.[438]

There is no issue as to loyalty of Counsel to Trustee and the estate, or of Counsel's disinterestedness. Counsel and Trustee are not adversaries. Counsel is instead defending itself, and its fees, from baseless claims of malfeasance asserted by Price and McGinnis, who

---

Trustee has spent significant time prosecuting his compensation request and defending himself from setoff claims but (1) he is not an attorney so his fees are not "attorney fees" and (2) his compensation is a commission based on his performance in making disbursements to creditors, and he earned his compensation long before the fee dispute arose. The <u>ASARCO</u> case is not relevant to compensation of a Chapter 11 trustee.

MED PLLC is not seeking recovery of fees for any of its own time spent in defense of its fee application, so none of its compensation request is affected by <u>ASARCO</u>.

[438] <u>ASARCO</u>, 135 S.Ct. at 2165 (emphasis added).

argue that Counsel is not entitled to *any* compensation for representing Trustee and assisting him in, among other things, disposing of over $70 million in claims against the estate.[439] Counsel is stuck in this litigation simply because it *has* diligently, loyally, and professionally performed services for Trustee and the estate.

For these reasons, the Court concludes that ASARCO is inapplicable to the facts of this case, as the Estate Professionals have and are continuing to provide services to the estate by defending against Price and McGinnis's objections and setoff claims in order to establish the amount of administrative expenses so that Trustee may finalize the administration of the Chapter 11 and Chapter 7 estates.

### E.    Price's Claims

In her objections to the fee applications, Price asserted affirmative claims against Counsel, Trustee, and MED PLLC seeking damages she alleges she suffered as a result of their administration of the estate, and she asks that the damages be offset against their fees.

---

[439]The Court recognizes that the Supreme Court rejected the argument of the Government that "uncompensated fee litigation in bankruptcy will be particularly costly because multiple parties in interest may object to fee applications, whereas nonbankruptcy fee litigation typically involves just a lawyer and his client." ASARCO, 135 S.Ct. at 2168. The argument was premised upon the Government's theory that such multiple objections would make bankruptcy work less attractive to attorneys, which the Supreme Court rejected because the Government had taken the opposite position below, and because "this argument rests on unsupported predictions of how the statutory scheme will operate in practice[.]" Id. Because ASARCO itself, the proposed payor of the fees, objected to Baker Botts' compensation application, comments concerning objections by other parties in interest are pure dicta, and the Court declines to draw any inference that the American Rule (precluding fee shifting between the litigating parties) precludes professionals from being paid *from the estate* for defending against claims and objections asserted by a party *other than* a duly appointed representative of the estate.

As a matter of procedural history, the Court observes that the claims asserted in the objections are identical to claims asserted in the April 2014 lawsuit Price and McGinnis filed against these professionals in the District Court. But because Price and McGinnis failed to seek leave from the bankruptcy court before suing Trustee and his professionals in District Court, their lawsuit was dismissed for violating the Barton Doctrine.[440] Price and McGinnis then filed motions in the bankruptcy court seeking permission to sue Trustee and his professionals in District Court, but Judge Jackson denied such relief. Accordingly, this Court is the only court with jurisdiction to adjudicate these claims.[441]

   1. Claims against Trustee and MED PLLC

Price's allegations of gross negligence, breach of fiduciary duties, mismanagement, and intentional misconduct against Trustee have now been actually and fully litigated over the course of three trials in the bankruptcy court.[442] Upon consideration of the facts found above and applicable law, the Court concludes that Price has not established by a preponderance of the evidence the elements of any of these claims.

---

[440]See, e.g., Richardson v. Monaco (In re Summit Metals, Inc.), 477 B.R. 484, 494-98 (Bankr. D. Del. 2012) for an exhaustive explanation of the history, purpose, and application of the Barton Doctrine.

[441]Price's counsel clarified that the claims were being asserted "in the defensive posture only as offsets against the fees being sought, not to affirmatively recover damage over and above the amount of fees being sought." Tr. 11/5/14 at 384. She also orally limited the claims to breach of fiduciary duty, mismanagement, gross mismanagement and gross negligence, and waived jury trial on those claims. Id. at 385-98.

[442]July 22, 25, 27, 28 and 29, 2011 (TRX 218); July 18, 2012 (TRX 172); and January 20, 21, 22, 26, and 27, 2015 (Docs. 2346, 2347, 2348, 2358, and 2360).

a.     *Breach of fiduciary and statutory duties*

Price advances a litany of statutory duties she contends Trustee breached.  First, she claims that Trustee violated his duty under Section 1106(a)(5) of the Bankruptcy Code to file a plan, explain why he could not file a plan, or recommend conversion.  Trustee was not able to propose a plan in the first few months of his trusteeship because Price and McGinnis were attacking Trustee's legitimacy and powers.  Trustee was in the process of determining the status of the debtor, the SPEs, the various income and non-income producing properties, and over fifty bank accounts; identifying assets, debts, and creditors; addressing the one million dollars of post-petition payables left by McGinnis; managing and operating the SPEs, including reinstating utilities and insurance and retaining management professionals in two states; and protecting the assets of the estate from loss.[443]  After the entry of the 52-Page Order, Price immediately proposed the Global Agreement in which all of MACCO's assets would be sold to her and/or her investors.  There was no reason for Trustee to propose a plan of reorganization under those circumstances, and Price and McGinnis, as the instigators of the liquidation efforts, are estopped from complaining that Trustee should have proposed a plan rather than working with them to liquidate the assets.

Although Loyd testified that it "was clear from within probably the first six months that a plan of liquidation was probably going to be what we were going to be pursuing,"[444] it also became clear that since Price and her affiliates planned to purchase the assets on an expedited basis, and large chunks of the unsecured guarantee debt would be eliminated with each sale,

---

[443]Deeba, Tr. 1/20/15 at 153-57.

[444]Tr. 11/3/14 at 227.

it was unnecessary to incur the expense of proposing and confirming a plan. Moreover, immediately after Trustee completed the sales of all the non-income producing assets, and eliminated MACCO's direct secured debt, Price herself proposed a plan.  Trustee acted reasonably by not filing a competing plan and by attempting to steer Price's disclosure statement and plan toward confirmation.[445]

Price and McGinnis also fault Trustee for not filing an investigative report as required by Section 1106(a)(4), but Trustee did in fact file an extensive interim report on August 19, 2011, detailing his findings.[446]  Price argues that Trustee did not address the likelihood of filing a plan or converting the case in the report.  However, in the report, Trustee stated that he had –

> been in discussions with the unsecured and secured creditors towards developing a plan.  For the formulation of a plan the trustee is in the process of gathering information, including identification of creditors and amounts of their claims, both pre- and post-petition, ownership of assets, current valuation of assets and potential avoidance actions.[447]

More to the point, as Price and McGinnis were vigorously involved in every aspect of the case, they cannot complain about lacking information about Trustee's activities or his intentions regarding a plan or conversion.

Price also contends that Trustee should have recognized that reorganization was not feasible, and converted the case to a Chapter 7 case early on since all assets were ultimately

---

[445]As Professor Williams stated: "[I]t would be imprudent for a trustee . . . to bust up a plan that he otherwise thought had . . . great promise."  Tr. 1/21/15 at 326.

[446]TRX-37.

[447]Id.

liquidated and the case was ultimately converted.  Professor Williams accurately pointed out that Price could have asked for conversion early in the case, but she did not, and in any event, transferring a huge operating enterprise to a Chapter 7 trustee would not have been in the best interests of the estate.[448]  Price does not articulate any benefit to early conversion to Chapter 7 other than the elimination of United States Trustee fees.  The downside of conversion would have been the high likelihood that the SPEs could not have been sold as operating entities, and MACCO's guarantees of the SPEs' mortgage debts would not have been eliminated. Converting to Chapter 7 was not feasible until all operating assets had been sold.[449] Immediately after the last SPE sale, the UST, with the backing of Trustee, did move to convert the remaining two Chapter 11 cases, MACCO and Brooks, to cases under Chapter 7.

Price argues that Trustee violated his duties under Section 1106 to file tax returns. Section 1106(a)(6) instructs that a Chapter 11 trustee shall–

> for any year for which the debtor has not filed a tax return required by law, furnish, without personal liability, such information as may be required by the governmental unit with which such tax return was to be filed, in light of the condition of the debtor's books and records and the availability of such information.[450]

Section 704(a)(8), made applicable to Chapter 11 trustees by Section 1106(a)(1), also provides that a trustee shall–

---

[448]Williams, Tr. 1/21/15 at 327-28.

[449]Trustee articulated multiple reasons why it did not make sense to convert the case to Chapter 7 until the operating assets were out of the estate, and testified to the many discussions he had with the UST regarding the feasibility of conversion at various points in time.  Tr. 1/20/15 at 195-96.

[450]11 U.S.C. § 1106(a)(6).

if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires.[451]

MACCO is a sub-chapter S corporation, a pass-through entity, so its tax attributes flow to Price as equity holder. The Internal Revenue Code imposes an obligation on Chapter 11 trustees to file an accurate income tax return for a sub-chapter S corporation, even though the estate is not a taxpayer and the filing of the return has no effect on the bankruptcy estate.[452] Trustee testified that because he lacked confidence in the accuracy of the books and records he inherited,[453] he could not produce an accurate return, and he so advised the Internal Revenue Service. Trustee was in regular contact with the Internal Revenue Service regarding pre and post-petition tax returns, provided information to it as requested, and provided updates

---

[451]11 U.S.C. § 704(a)(8).

[452]See 26 U.S.C. 1399 ("no separate taxable entity shall result from the commencement of a case under Title 11 of the United States Code"). Professor Williams testified that "the fact that there's no benefit, no pecuniary benefit to the estate to [file a return] isn't a justification for not doing it, because the law requires the trustee to do that." Tr. 1/21/15 at 329. "But it's a duty to prepare an accurate return. And if you do not have the information where you can prepare an accurate return, then you notify the IRS. . . . So long as the trustee is in discussions with the [IRS], and the state of the records are such that the trustee cannot prepare the returns, it's customary not to prepare the returns and to do so only when you can do so consistent with the jurat, . . . this signature under oath, that this is a true and accurate return of income and expense." Id.

[453]Trustee stated that the prepetition tax returns filed by Price and McGinnis in 2009 did not match the information in MACCO's books and records. Information in ledgers did not match the tax returns or the schedules. Trustee could not determine accurate bases on properties or accurate intercompany activity. Tr. 1/20/15 at 200.

as to the status of the returns.[454]  Professor Williams testified that Price could file her returns notwithstanding that MACCO has not filed its returns– "that's not unusual when you have an S corporation bankruptcy."[455]

Price also claims that Trustee breached fiduciary duties by abandoning properties in which there was equity available to the estate.  In determining whether abandonment was appropriate, Trustee reviewed the lenders' appraisals of their collateral and obtained his own broker opinions as to the values of the properties at the time of the proposed abandonment. Trustee was satisfied, based on the condition of the properties, the lack of cash flow, and the extent of the liens, that there was no value to be had for the estate.  In one case, Trustee abandoned a property that posed a danger to tenants for which he could not obtain the lender's authority to use cash collateral to repair.  Price did not object to motions for abandonment, and in all cases, the Court entered orders approving abandonment as in the best interests of the estate, which orders are final and were not appealed.[456]

Price also argues that Trustee undervalued the properties he sold, thus realizing only approximately $2.5 million of the equity instead of approximately $34 million in equity that

---

[454]Id. at 199-201.

[455]Tr. 1/21/15 at 348-49.  Trustee also testified that Price "could have filed a return based on her information on her personal [return] using IRS Form 8082, inconsistent treatment.  We do that all the time. I do a lot of bankruptcy tax work, and I advise people to do that all the time."  Tr. 1/20/15 at 200.

[456]McGinnis testified that he believed Trustee engaged in wrongful conduct when he acquiesced in stay relief and abandonment in connection with several properties, and allowed them to be foreclosed and sold at a sheriff's sale, subjecting Price and McGinnis to judgment for deficiencies on their guarantees.  Trustee, however, acted in the best interests of the estate in abandoning properties that posed a liability to the  estate, and Trustee had no duty to Price or McGinnis to reduce their exposure to guarantee liabilities.

Price claims existed based upon appraisals obtained by McGinnis. The Court finds that some of the appraisals commissioned by McGinnis are suspect because they were based on unreliable operational information McGinnis provided to the appraisers, such as inflated rent rolls, or based upon *pro forma* financial data provided by McGinnis rather than on data from actual operations. The Court further finds that Trustee was justified in relying on indicators of value other than the appraisals because he was acutely aware, from fraud claims filed against MACCO, that the same types of financial information McGinnis provided to appraisers was also provided to prepetition purchasers of apartment complexes. These fraud plaintiffs alleged detrimental reliance upon inaccurate rent rolls and inflated revenue projections.[457] Moreover, many of the McGinnis's appraisals were several years old and therefore not particularly indicative of the values at the time McGinnis drafted his schedules. Accordingly, many of the appraisals that underlie Price's lost equity claims are not persuasive evidence of the value of the properties at the time Trustee sold them.[458]

Price presented the testimony of Victor Thomas, of Multifamily Appraisal Specialists, who performed four appraisals in February 2011 at the request of McGinnis. Mr. Thomas appraised the apartment complexes owned by the four SPEs in Chapter 11 proceedings: JU Villa Del Mar Apartments, LLC; MA Cedar Lakes Apartments, LLC; SEP Riverpark Plaza Apartments, LLC; and NV Brooks Apartments, LLC.[459] Cause exists to doubt the reliability

---

[457]Deeba, Tr. 1/20/15 at 75-77; Payne, Tr. 1/20/15 at 230-32.

[458]In addition, many of the appraisal reports were not admitted into evidence because Price did not present the appraisers to sponsor their reports or to be cross-examined.

[459]Thomas, Tr. 1/22/15 at 549-600.

of these appraisals because (1) Mr. Thomas relied upon McGinnis's rent rolls, which Trustee and the management professionals found inaccurate at the time Trustee took over; (2) McGinnis did not provide Mr. Thomas with a physical needs assessment report, so Mr. Thomas's appraisal assumed no latent deferred maintenance; and (3) Mr. Thomas considered only deferred maintenance observed in his visual inspection of the property, which included interiors of units selected by McGinnis's management team.  In addition, Mr. Thomas inspected Riverpark Plaza, a forty-acre complex with over 500 units, on the same day he toured four other complexes, and therefore would not have had time to discover hidden deferred maintenance not disclosed by McGinnis.[460]  In connection with the Brooks property, McGinnis advised Mr. Thomas that one building had sustained "minor" fire damage and grossly underestimated the remaining repairs at $40,000.00, and did not disclose the extent of remediation required to purge the 82 criminal code violations.  Mr. Thomas placed a value on each property consistent with the information provided.  Nevertheless, Trustee sold three of the SPEs holding the properties for prices *in excess* of Mr. Thomas's appraised value.  The Court approved the sale of the Riverpark Plaza entity to Price, without objection, for

---

[460]When the RSC firm was retained to manage Riverpark Plaza, Mr. Martens assessed the scope of deferred maintenance and estimated that it would cost $2 million to repair the exterior and $1.5 million to rehabilitate the interiors in order to render it in a "stabilized occupancy" condition.  Tr. 1/26/15 at 791-92.  At that time, the property had numerous "down units" and pre-existing mold and wood rot issues.  Id. at 840-47.  Units identified as "down units" were not rehabilitated due to lack of funds, so they would have been turned over to Price in a condition similar to when Trustee assumed control.

approximately eight and one-half percent below Mr. Thomas's appraised value.[461]   Mr.

Thomas's testimony and appraisals do not support any breach of duty on the part of Trustee.

Price also faults Trustee for not immediately appraising the remaining properties in

order to determine market value.  Expert witness Payne opined that fiduciaries, seeking to

avoid unnecessary administrative expenses, do not ordinarily retain an appraiser but will

instead look for "indications of value" by researching comparable sales, obtaining brokers'

opinions, reviewing lenders' appraisals, and obtaining prior appraisals from the debtor, if

available.[462] Trustee obtained broker opinions of value for the purpose of selling the

properties, and also reviewed appraisals commissioned by the lenders whose loans were

secured by the property.

To the extent that Price is arguing that Trustee's failure to have the properties formally

appraised resulted in the loss of equity upon selling the properties at less than their market

values, the Court finds that (1) Price and McGinnis participated in the transactions in which

all but one of the properties or entities were sold; (2) neither Price nor McGinnis objected to

the sales or appealed the sale orders;[463] and (3) no one offered Trustee more for the assets than

----

[461]Mr. Thomas's appraisal of River Park Apartments was based on "a prospective stabilized market" which assumed a certain level of stabilized occupancy in the future. Further, the appraisal was based on the flawed assumption that no costs for deferred maintenance or capital improvements were required, which was contradicted by Mr. Martens' testimony that $3.5 million in repairs was needed before the property could be brought to stabilized occupancy.

[462]Payne, Tr. 1/20/15 at 228-30.

[463]The motions to sell generally recited that Trustee determined that the sale "will enable Trustee to obtain the highest and best value, . . . thereby maximizing the value of the assets to the Estate."  See, e.g., TRX-101 at 4, ¶ 9.

Price and McGinnis or their affiliates.[464]  No third party offers came close to paying the debt secured by the properties, except in the cases of Brooks Apartments and Charter Apartments,[465] and in the case of Brooks, the third party purchaser paid more than Mr. Thomas's appraised value.  Price did not present any evidence indicating that she, her investor, or any other potential buyer, were willing to pay more for the properties or entities.

The Court further finds, as explained more fully above, and as previously found after a full hearing on Trustee's first application for compensation in July 2012,[466] that Trustee did not breach any duties in connection with the Global Agreement transaction.

### b.    Mismanagement and/or gross negligence

Price contends that when Trustee was appointed, her net equity in MACCO was approximately $34 million, but Trustee's liquidation of MACCO's assets produced only about $3 million, which, after payment of administrative expenses and unsecured claims will leave nothing to equity.  Price claims that alleged mismanagement, failure to supervise the professional management companies, and failure to maintain and repair the properties resulted in her loss of in excess of $30 million in equity.

The allegation that Trustee mismanaged and neglected the SPEs and the non-income producing properties by refusing to move cash around as needed for maintenance and repair

---

[464]Although Price has argued that Trustee should have demanded a higher price from the investor she was representing, she also stated that Price herself "didn't beg them to pay a lot more . . . I didn't try to say, well, you should pay this because you'll have this benefit or it will be of benefit to the estate, because there was no point in at that stage giving more funds to the estate because of what happened."  Price, Tr. 11/6/14 at 689.

[465]Deeba, Tr. 1/20/15 at 78-79; 81-84.

[466]Order, TRX 171.

has been litigated at least twice already – in July 2011 in connection with Price's attempt to remove Trustee, and in July 2012 in connection with Price's objections to Trustee's first fee application.  Both times, the Court determined that Trustee was absolutely prohibited from adopting prior management's cash management practices – that is, using funds generated by income-producing properties owned by one SPE (funds that constituted a lender's cash collateral), to pay operating expenses, capital costs, maintenance, and debt-service related to non-income producing properties, or another SPE's underperforming properties.

Price also contends that the property management professionals failed to properly train, manage, and supervise employees; maintain or repair the properties; or seek and maintain tenants, resulting in loss of income and decline in the condition of the properties, and that Trustee should be held responsible for failing to supervise their management.  Both Price Edwards and RSC have extensive qualifications to manage multi-family properties, and Trustee's decision to retain these firms was approved by the Court.  Upon retention, both firms encountered (1) seriously run down properties; (2) code violations and mold; (3) inaccurate rent rolls; (4) untrained employees; (5) disorganized books and records; and (6) absence of required equipment and insufficient funds available to maintain or repair units or grounds. These conditions were apparent immediately, and testimony of the same was presented in detail at the hearing in July 2011, and the Court so found.  To the extent that bad things happened during the time the property management professionals operated the apartment complexes (*e.g.*, employee theft, down units, decline in revenues), the Court concludes that Price failed to establish that these events resulted from any breach of duty on the part of Price Edwards, RSC, or Trustee.  The Court finds specifically that Trustee maintained close and

constant contact with the management professionals, kept himself informed regarding management and operational issues, and reacted to the same in a reasonable and responsible manner consistent with his fiduciary duties.

Price alleges that Trustee "pursued an intentional course of action of not maintaining the properties" and that he "starved the properties."[467]  The evidence establishes that Trustee negotiated with each secured lender for permission to use its cash collateral to address code violations, safety issues, maintenance, and repairs.  Trustee's ability to keep the properties from further deteriorating was constrained by the ability of the particular property to generate income and the lenders' willingness to fund any particular repair.[468]  Trustee also obtained Court authority to use portions of the disputed $1.375 million in unencumbered funds to address the most urgent matters at each property.

In the final analysis, Price's testimony concerning the relative conditions of the properties before Trustee was appointed, when McGinnis was managing them, and after she purchased them back from Trustee was simply not credible.  Price's testimony that Trustee and his management professionals allowed units to become contaminated with mold, for example, was undercut by testimony of the management firms' representatives, whose written

---

[467]Respondents' Post-Trial Brief at 41, ¶¶ 160-61.

[468]Price's complaint about Trustee's failure to repair broken windows caused by persistent vandalism at the Battin apartments falls flat in light of the fact that the property had been vacant for a long period of time before Trustee was appointed, and did not generate one cent of income.  Trustee sought and received the Court's permission to allocate some of the frozen disputed unencumbered funds to fix code and safety violations at Battin.  Although Trustee desired to abandon Battin, the lender, FEB, agreed to fund repairs and Price and McGinnis agreed to perform the repairs, freeing the estate from the responsibility of maintaining Battin pending its proposed sale to Price under the Global Agreement.  Deeba, Tr. 1/26/15 at 1053-60.

-166-

inventories taken upon commencement of their assignments in July 2011 disclosed numerous units with pre-existing water leaks, water damage, and mold.  Price's introduction of photos she took early in the bankruptcy, but represented were taken *after* she had repurchased the properties, further destroyed her credibility on the issue.  Price did not establish that any decline in the condition of the properties, occupancy rates, or income was proximately caused by mismanagement, neglect, or any intentional or reckless course of action on the part of Trustee.

As Price failed to establish her claims by a preponderance of the evidence, judgment will be entered in favor of Trustee and MED PLLC on all claims.

> 2.    Claims against Counsel

With respect to Price's claims of mismanagement and gross mismanagement, she failed to present any credible evidence that Counsel *managed* the businesses of MACCO or the SPEs, much less mismanaged them.  Judgment shall be entered in favor of Counsel on these claims.

With respect to Price's breach of fiduciary duty claim, Counsel was retained and authorized to act as attorney for Trustee, and as such, Counsel had duties only to its client (Trustee) and the Court.  Counsel does not owe fiduciary duties to the creditors, equity holders or any other constituent or beneficiary of the estate.[469]  Accordingly, Counsel could not breach

_____

[469]See, e.g., Susan M. Freeman, Are DIP and Committee Counsel Fiduciaries for their Clients' Constituents or the Bankruptcy Estate?  What is a Fiduciary, Anyway?, 17 Am. Bankr. Inst. L. Rev. 291 (Winter 2009).  Ms. Freeman's excellent article includes a well-researched, well-reasoned survey of case law on the topic of to whom fiduciary duties of counsel for a DIP or Chapter 11 trustee run.  The Court concludes that the most persuasive articulation of counsel's duties is found in the case of Hansen, Jones & Leta, PC v. Segal, 220 B.R. 434 (D. Utah 1998), which held that DIP's counsel owes fiduciary duties of loyalty and

fiduciary duties to Price or McGinnis.  Judgment shall be entered in favor of Counsel on this claim.

The Court further concludes that Price and McGinnis failed to prove a claim of gross negligence.  Gross negligence is characterized as a "lack of slight care and diligence" in performing duties owed to the plaintiff.[470]  The behavior complained of must be "so flagrant, so deliberate, or so reckless that it is removed from the realm of mere negligence."[471]

> The intentional failure to perform a manifest duty in reckless disregard of the consequences or in callous indifference to the life, liberty or property of another, may result in such a gross want of care for the rights of others and of the public that the finding of a wilful, wanton, deliberate act is justified.[472]

In this case, evidence is lacking to show that Counsel failed to exercise care and diligence.  Overwhelming evidence indicates that Counsel's collective bankruptcy experience guided them in advising Trustee of his fiduciary duties and in assisting him in carrying out his duties.  Counsel was heavily involved in all aspects of the case.

---

care to his/her client, the debtor-in-possession, not to the estate, which is not an entity in and of itself but simply a collection of property rights (id. at 450-54), and not to beneficiaries of the estate (i.e., creditors and equity interest owners), because they were not clients.  See also Summit Metals, Inc., 477 B.R. at 502 (creditor could not sue trustee's counsel, because only trustee has authority to do so); In re Continental Coin Corp., 380 B.R. 1, 16 (Bankr. C.D. Cal. 2007), aff'd 2009 WL 2589635 (C.D. Cal.) ("The trustee's attorney in this case does not owe a statutory or fiduciary duty to the creditors of the estate.  The attorney's duties are to the trustee.  The claims for breach of statutory and fiduciary duties against the attorney cannot proceed."); ICM Notes, Ltd. v. Andrews & Kurth, 278 B.R. 117, 123-26 (S.D. Tex. 2002) (counsel for the debtor-in-possession owes no fiduciary duties directly to any particular creditor).

[470]25 O.S. § 6.  See also Fox v. Oklahoma Memorial Hospital, 1989 OK 38, 774 P.2d 459, 461.

[471]Fox, 774 P.2d at 461.

[472]Id.

The Court finds no credible evidence to support Price and McGinnis's allegation that Ms. Loyd exercised extraordinary control over Trustee, that she was essentially acting as trustee,[473] or that she made decisions that were intentionally detrimental to Price and McGinnis.  Counsel's role was to advise Trustee as to legal matters, which Counsel did ethically and competently.[474]

Judgment shall be entered in favor of Counsel on Price's gross negligence claim.

### F.      Relief is Precluded by the Equitable Doctrine of "Unclean Hands"

Finally, the Court concludes that Price and McGinnis are barred from obtaining the relief they seek due to the "unclean hands" doctrine.  A plaintiff requesting equitable relief "must come with clean hands."[475]  This doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."[476]  Section 105 permits courts to *sua sponte* exercise equitable powers not contrary to the Bankruptcy Code in order to carry out provisions of Code.[477]  And when facts warranting the

---

[473]The only evidence presented was McGinnis's subjective belief that "Mrs. Loyd was, as I viewed it, the trustee and Mr. Deeba was the bookkeeper.  She called the shots."  Tr. 11/6/14 at 718.  In response to his counsel's question: "[D]id you come to have some understanding who was directing the Macco Chapter 11 case on behalf of the trustee," McGinnis stated: "Yes . . . Mrs. Loyd."  Id. at 724.  McGinnis also stated that his belief that Mrs. Loyd was "directing this bankruptcy" was based on Trustee telling him "I can't do one thing, even blow my nose, without the direction of Mrs. Loyd."  Id. at 827.

[474]Trustee testified that the reason that he consulted Counsel when interacting with McGinnis or Price was because they constantly threatened to sue him, and did sue him.  Deeba, Tr. 1/20/15 at 124.

[475]Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814 (1945).

[476]Id.

[477]See, e.g., Mitan v. Duval (In re Mitan), 573 F.3d 237, 244 (6th Cir. 2009)

application of the unclean hands doctrine come to a court's attention, the court should "close[]

the doors,"[478] and refuse to award any remedy to the party with unclean hands, in order to

protect the integrity of the court.

> This maxim necessarily gives wide range to the equity court's use of discretion
> in refusing to aid the unclean litigant.  It is 'not bound by formula or restrained
> by any limitation that tends to trammel the free and just exercise of discretion.'
> [citation omitted].  Accordingly one's misconduct need not necessarily have
> been of such a nature as to be punishable as a crime or as to justify legal
> proceedings of any character.  Any willful act concerning the cause of action
> which rightfully can be said to transgress equitable standards of conduct is
> sufficient cause for the invocation of the maxim[.]
>
> Moreover, where a suit in equity concerns the public interest as well as the
> private interests of the litigants this doctrine assumes even wider and more
> significant proportions.  For if an equity court properly uses the maxim to
> withhold its assistance in such a case it not only prevents a wrongdoer from
> enjoying the fruits of his transgression but averts an injury to the public.[479]

Examples of the use of the unclean hands doctrine abound.  In Goldstein v. Delgratia

Mining Corp.,[480] the District Court denied a class action plaintiff's motion to dismiss because

plaintiff made multiple misrepresentations of fact in an attempt to mislead the court into

believing that plaintiff's dismissal was not a tactical maneuver and would have no adverse

effect on class members.

---

("bankruptcy courts, as courts of equity, may always consider the presence of bad faith on
the part of one of the parties when fashioning relief," id. at 245).  See also Hopper v. Everett
(In re Everett), 364 B.R. 711, 723 (Bankr. D. Ariz. 2007) ("A court may raise the unclean
hands doctrine *sua sponte*."); Casa Nova, Inc. v. Casa Nova of Lansing, Inc. (In re Casa Nova
of Lansing, Inc.), 146 B.R. 370, 380 (Bankr. W.D. Mich. 1992).

[478]Precision Instrument Mfg. Co., 324 U.S. at 814.

[479]Id. at 815.

[480]176 F.R.D. 454 (S.D.N.Y. 1997).

As Plaintiff's hands are so sully with untruths, misrepresentations and brazen failure to deal with the facts, he represents a striking example of a plaintiff caught with unclean hands. The doctrine of unclean hands allows a court to deny relief in an action in which a party has been guilty of unconscionable conduct in relation to the matter that he seeks. [citations omitted] . . . This Court has the authority to use this doctrine to protect the integrity of this Court, and chooses to do so.[481]

In the case of <u>Hopper v. Everitt</u>,[482] a bankruptcy court declined to except plaintiffs' debt from discharge where plaintiffs' conduct during the transactions complained of included misrepresenting facts related to these transactions on public documents and to third party financial institutions.[483]

Recently, in <u>Northbay Wellness Group, Inc. v. Beyries</u>,[484] the Ninth Circuit reversed a judgment declaring a debt owed by a debtor attorney to his client dischargeable. The debtor attorney stole $25,000 in cash that his client, a medical marijuana dispensary, deposited with the attorney in trust for future defense work. The bankruptcy court found that although the client established that the debt should be excepted from discharge under Section 523(a)(4), it refused plaintiff's prayer for relief under the unclean hands doctrine because the stolen funds were originally the proceeds of illegal marijuana sales. The Ninth Circuit determined, however, that "the unclean hands doctrine should not be strictly enforced when to do so would frustrate a substantial public interest."[485] After balancing the two offenses, the Ninth Circuit

---

[481]<u>Id</u>. at 458.

[482]364 B.R. 771 (Bankr. D. Ariz. 2007).

[483]<u>Id</u>. at 723-24.

[484]789 F.3d 956 (9th Cir. 2015).

[485]<u>Id</u>. at 960.

held that the public interest weighed heavily against allowing an attorney to discharge a debt arising from conversion of client funds, regardless of the creditor's quasi-illegal occupation.

In In re Baetz,[486] the bankruptcy court refused to award damages to debtors who claimed their landlord violated the automatic stay. Instead, the court found that these were "dishonest debtors who misled the landlord and its agents, and who were attempting to play games with the bankruptcy process"[487] and that the "debtors' own conduct bears a significant portion of the responsibility for creating the stay violation."[488]

In Mitan v. Duval,[489] the Sixth Circuit affirmed a bankruptcy court's decision to grant *nunc pro tunc* effect to its conversion of a Chapter 11 case to a Chapter 7 case, concluding it a proper use of the court's Section 105 power to prevent an abuse of the bankruptcy process by the debtor and his father, who invoked his status as creditor to have standing to appeal the conversion. "Any holding that the bankruptcy court erred in retroactively converting the case would . . . [e]ffectively . . . give [debtor] the benefit of his continual refusal to cooperate and justify his abuse of the judicial process."[490] The case was "full of extraordinary circumstances warranting equitable relief," citing with approval a case in which the court refused "to allow

---

[486]493 B.R. 228 (Bankr. D. Colo. 2013).

[487]Id. at 238.

[488]Id. at 239.

[489]573 F.3d 237 (6th Cir. 2009).

[490]Id. at 246.

a party's 'self-serving interpretation of bankruptcy procedure' to disrupt the normal administration of the bankruptcy estate."[491]

A party with unclean hands may be barred from asserting setoff,[492] the equitable remedy sought by Price.  In this case, the Court refuses to allow Price and McGinnis, through objections or by bringing claims, to block payment to Trustee and his professionals for work necessarily caused by Price and McGinnis's own prepetition misconduct, their post-petition disregard for the Bankruptcy Code, and their obstruction and interference in Trustee's fulfillment of his duties.  Rewarding Price and McGinnis's conduct would be contrary to the public interest.  It is hard enough to attract qualified persons willing to assume the difficult duties of a Chapter 11 trustee, counsel to trustee, and accountant to trustee.[493]  Permitting professional fees to become a target for displaced management's disgruntlement will drive away the most effective and accomplished practitioners – to the disservice of the entire bankruptcy system.[494]

------------

[491]Id. (citation omitted).

[492]MacNeal v. Equinamics Corp. (In re MacNeal), 393 B.R. 805, 810 (Bankr. S.D. Fla. 2008) ("Setoff not proper where the party seeking equitable relief has unclean hands[.]").

[493]See, e.g., Williams, Tr. 1/21/15 at 319-20 (fee caps and the propensity for Chapter 11 trustees to be forced to engage in ancillary litigation not related to administration of the estate  "poses a very serious institutional issue. . . . [T]here has been more and more reluctance on the part of fiduciaries to take Chapter 11 appointments.  In many jurisdictions . . . somebody of Mr. Deeba's caliber would not have taken this case as a Chapter 11 trustee.").

[494]The Bankruptcy Code and Rules already impose onerous procedural requirements and barriers to prompt payment for services rendered by such professionals.  These include applying for authority to provide services to a debtor or trustee, filing statements of disinterestedness after performing an extensive conflicts assessment and disclosures of relationships with any creditor or party in interest, keeping meticulous time records, filing

A balancing of the equities in this case results in an overwhelmingly lopsided case against Price and McGinnis. Any injury they believe they have suffered by virtue of the size of the estate professionals' administrative claims was self-inflicted. The amount of time and effort necessary to administer the case, and consequently the amount of fees and expenses incurred by the estate, was induced by and is directly related to their wrongful, bad faith, or inequitable conduct, which included, without limitation:

- Filing inaccurate schedules and statements of financial affairs
- Making unauthorized payments to unauthorized professionals
- Check kiting between MACCO and the SPEs
- Misappropriating tenant security deposits
- Failing to account for, and commingling, SPE lenders' cash collateral and diverting such cash to other uses
- Failing to pay workers compensation premiums
- Failing to remedy safety code violations
- Failing to pay ad valorem taxes
- Failing to pay insurance premiums
- Not paying tenant utilities until cut-off notices were received
- Misrepresenting rent rolls
- Misappropriating $192,000.00 in insurance proceeds
- Settling claims filed against the MACCO estate without notice or Court approval
- Transferring estate money to Mr. Ledbetter to purchase a claim against the estate in order to interfere with the work of the Committee
- Failing to turn over MACCO and SPE records requested by Trustee
- Refusing to cooperate with Trustee
- Misappropriating $88,000.00 in rents from Riverpark Apartments
- Moving to dismiss the case or to remove Trustee, combined with an adversary proceeding seeking to enjoin Trustee from performing his statutory and fiduciary duties

---

fee applications compliant with the Guidelines, giving notice to all creditors, attending hearings on fee applications, and defending against objections. Moreover, a professional may apply for fees "not more than once every 120 days," and therefore must extend credit to the estate. 11 U.S.C. § 331. Professionals may be required to forfeit claims for any unpaid prepetition work performed in order to become disinterested. In addition, a Chapter 11 trustee's compensation is capped, regardless of how much time and effort a case requires. See generally, 11 U.S.C. §§ 101(14), 326-31; Fed. R. Bankr. P. 2014, 2016.

- Interfering with the operation of the SPEs by Trustee and the management professionals
- Objecting to routine applications, motions and orders without just cause
- Withdrawing objections immediately before or at a hearing
- Commencing vexatious litigation against trustee and other estate professionals
- Violating orders and settlements
- Repeatedly asserting claims and arguments that had been fully litigated and rejected or denied
- Misrepresenting to the Court the dates when photos of the properties were taken

Accordingly, the Court finds and concludes that the doctrine of unclean hands precludes Price and McGinnis from prevailing on their objections to, and their setoff claims against, the fees of Trustee, MED PLLC, and Counsel.

## IV. SUMMARY AND CONCLUSION

Price and McGinnis chose to put MACCO and its subsidiaries in Chapter 11. Chapter 11 cases are complicated, and professionals with specialized knowledge and skills must be employed to insure compliance with  Chapter 11's complex laws and rules.  To ensure a debtor in possession does not run afoul, Chapter 11 provides for the appointment of a creditors committee to act as watchdog.  The United States Trustee has enhanced responsibilities in Chapter 11 cases as well.  When the United States Trustee and the committee suspect or discover fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor on the part of the debtor in possession's management, they have the duty to speak up in order to protect the creditor body and the integrity of the Chapter 11 mission, and to request the appointment of a Chapter 11 trustee. When evidence of malfeasance justifies the appointment of a trustee, another layer of complexity is superimposed on the case.  The trustee, a third party with no agenda other than to bring the case into legal compliance consistent with strict fiduciary duties, and to exercise the business judgment of a competent executive, is saddled

with a crisis, a financial mess that must be untangled and cleaned up. Once a trustee is appointed, the immediate task is to secure and protect all estate property and perform an investigation, report the findings, and assess a course of action that is in the best interests of creditors and the estate. The trustee is entitled to retain professionals– legal, financial, management– to assist him in these tasks, and they are all entitled to be paid.

Chapter 11 is an expensive option for a business seeking to reorganize, and becomes more expensive when it is necessary to appoint a trustee. In this case, Trustee and all his professionals did the jobs required of them under the Bankruptcy Code. The Committee performed its role exactly as the Bankruptcy Code envisioned, as did the UST. There was no conspiracy to "loot" the estate, no "cabal" intent on harming the interests of Price and McGinnis. Although the administrative expense claims in this case are higher than they should have been, the fault for the inflated administrative expenses rests exclusively upon Price and McGinnis.

Accordingly, the Chapter 11 administrative expenses sought by Trustee, Counsel, and MED PLLC are allowed as set forth above, and all claims asserted Price and McGinnis are denied. Separate orders and judgments will be entered in connection with each application contemporaneously herewith.

**SO ORDERED** this 10th day of September, 2015.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE

-176-